## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Richard Blank, Esq., as personal
representative of the Estate of Marielis
Gonzalez; Andy Napoleonis,
Individually and as next friend of AN;
and Melissa Coury, as next friend of JB,

      Plaintiffs,

   v.

United States of America,

      Defendant.

Civil Action No. 19-11855-JCB

## Government's Amended Proposed Findings of Fact
## and Conclusions of Law

The United States respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and the Court's Pre-Trial Order (ECF No. 78).

## Preliminary Statement

This medical malpractice lawsuit concerns treatment received by the late Marielis Gonzalez from Dr. Caroline Pahk and Dr. Nsa Henshaw at Dot House Health (Dot House) in Dorchester, Massachusetts. Dr. Pahk and Dr. Henshaw saw Ms. Gonzalez in the Family Medicine (Primary Care) and Urgent Care departments at Dot House between 2011 and 2017. Because Dot House is a federally supported community health center, and Dr. Pahk and Dr. Henshaw are deemed employees of that center, the United States of America is the defendant in this case.

On March 2, 2017, Ms. Gonzalez was diagnosed with an aggressive right sided breast cancer, metastatic to bone and lung. She passed away on August 15, 2020. Plaintiffs are Richard Blank (the personal representative of Ms. Gonzalez's estate), Andy Napoleonis, JB (the minor daughter of Ms. Gonzalez), and AN (the minor daughter of Ms. Gonzalez and Mr. Napoleonis). They claim that: 1) Dr. Pahk and Dr. Henshaw failed to exercise reasonable skill and attention in their care and treatment of Ms. Gonzalez, which proximately caused or significantly contributed to her injuries; 2) Dr. Pahk and Dr. Henshaw provided care and treatment to Ms. Gonzalez that deviated from accepted standards of medical care in 2015-2017; and 3) the United States is liable for $7 million of dollars of damages for medical expenses, pain and suffering, loss of consortium, and loss of earning capacity. *See* ECF No. 112.

Judgment should enter for the United States. Dr. Pahk and Dr. Henshaw met the standard of care in their management of Ms. Gonzalez's symptoms. Each time Ms. Gonzalez raised a breast-related symptom, the doctor referred her to specialists, who did not report any concerns or recommend additional imaging or a biopsy. Second, even if the Court were to find that Dr. Pahk or Dr. Henshaw did not meet the standard of care, Plaintiffs did not meet their burden on causation, because they did not show that Dr. Pahk or Dr. Henshaw's actions were the but-for cause of Ms. Gonzalez's death or that it was reasonably foreseeable that specialists at a comprehensive breast health center would not be able to diagnose her.  For these reasons, the government is not liable to Plaintiffs for the damages they seek. Moreover, the evidence does not support the entire damages amount sought.

## FINDINGS OF FACT

In light of the evidence presented, the Court finds:

**A. The parties and their household composition between 2010 and 2020.**

1.      Marielis Gonzalez was born in 1986. Stipulated Fact (SF) 1.

2.      In 2014, Ms. Gonzalez worked for Goodwill Industries. Her pay advice indicated that her tax status was single. Exhibit 51 (Records of the Massachusetts Department of Transitional Assistance (DTA Records)) at USA013416.

3.      Ms. Gonzalez's daughter, JB, was born in 2007. SF 2.

4.      In 2012, AN was born. SF 4.

5.      In Spring 2015, Ms. Gonzalez and Plaintiff Andy Napoleonis were separated, and her migraines prevented her from working. Exhibit 1 (Dot House Medical Records) at USA-007745, USA-007761, USA-007790.

6.      On June 17, 2015, Ms. Gonzalez signed an absent parent affidavit in support of her application for benefits under the Transitional Aid to Families with Dependent Children program in which she certified under the penalties of perjury that Mr. Napoleonis had been continuously absent since October 1, 2010. Ms. Gonzalez also certified to DTA that she had never been married, that Mr. Napoleonis was an absent parent, and that her household consisted of her, JB, and AN. She signed her application under the penalties of perjury. Exhibit 51 (DTA Records) at USA013459, USA013464 – USA013465, USA013467, USA013473.

7.      On September 22, 2015, Ms. Gonzalez filled out a DTA form for a Disability Supplement. In that form, she wrote that she last worked on July 2, 2014

and that her migraines made it hard for her to remember, do regular housework, or spend time with friends and family. She also wrote that, because of her migraines, she "couldn't cook or take care of basic things in [her] house and kids." Exhibit 51 (DTA Records) at USA013429 – USA013438.

8.     In 2015 and 2016, Ms. Gonzalez certified to the DTA that she lived with JB and AN and no one else other than her brother and that she was disabled; at times, she also certified that she had never been married and that Mr. Napoleonis had been continuously absent from her household since October 1, 2010. Exhibit 51 (DTA Records) at USA013529, USA0134620 – USA013630; *see generally* Exhibit 51.

9.     In June 2016, Ms. Gonzalez certified to the Boston Housing Authority (BHA) that her household was composed of herself, AN, and JB. Exhibit 66 (BHA Records) at USA 013863—USA 013867.

10.     In June 2016, Mr. Napoleonis informed the BHA that he gave $150 monthly to Ms. Gonzalez for AN and that he did not live at Ms. Gonzalez's address. Exhibit 66 (BHA Records) at USA 013873.

11.     On March 25, 2017, Ms. Gonzalez certified to DTA that she had never been married, that she lived with JB and AN and someone named Juan G. Gonzalez, that she had been diagnosed with breast cancer in February 2017, that Mr. Napoleonis was a noncustodial parent, that Mr. Napoleonis had been continuously absent from her household since October 1, 2010, and that she had good reason for not cooperating with the Child Support Enforcement Division of the Massachusetts Department of Revenue because cooperation would place her or her child at risk of

4

physical or emotional harm or domestic violence. Exhibit 51 (DTA Records) at USA013699 – USA013702.

12.     Mr. Napoleonis filed a tax return with the Internal Revenue Service for the year 2016 that stated that he was single that year. Exhibit 53 (Tax Records) at USA 013751.

13.     Mr. Napoleonis filed a tax return with the Internal Revenue Service for the year 2017 that stated that he was a head of household; Ms. Gonzalez was not listed as his spouse on that tax return. Exhibit 53 (Tax Records) at USA 013757.

14.     On August 7, 2017, and July 11, 2018, Ms. Gonzalez certified to the BHA that her household was composed of herself, AN, and JB. Exhibit 66 (BHA Records) at USA 013824—USA 013826 and USA 013814—USA 013815.

15.     On July 11, 2018, Mr. Napoleonis informed the BHA via letter that he gave Ms. Gonzalez $120 for AN each month and that he lived in Randolph, Massachusetts. Exhibit 66 (BHA Records) at USA 013813.

16.     At different times between 2017 and 2019, Yaritza Vargas, Licy Vega Colon, and Rosana Arias each served as Ms. Gonzalez's primary health care agent (proxy). Exhibit 4 (Brigham and Women's Hospital Medical Records) at Gonzalez005883, Gonzalez005884, Gonzalez018658, Gonzalez018665, Gonzalez018672—Gonzalez018677, Gonzalez019989, Gonzalez020518, Gonzalez021728 Gonzalez021736, Gonzalez022396, Gonzalez022445.

17.     In February 2019, while hospitalized at Brigham and Women's Hospital, Ms. Gonzalez reported concerns about the care provided by Mr. Napoleonis to AN;

5

there was a filing with the Department of Children and Families (DCF). Around that time, Ms. Gonzalez reported being worried about Mr. Napoleonis's behavior, her desire to have him leave her home, and that she could not get discharged home because Mr. Napoleonis had her keys. Exhibit 4 (Brigham and Women's Hospital Medical Records) at Gonzalez022493, Gonzalez0022502.

18.    On February 27, 2019, Ms. Gonzalez obtained a restraining order against Mr. Napoleonis that was set to expire in one year. Exhibit 49 (District Court Records) at USA013777 – USA013780.

19.    In 2019, Ms. Gonzalez asked Ms. Arias to serve as the guardian of JB and AN; JB and AN stayed with Ms. Arias for some time while Ms. Arias pursued custody. Exhibit 4 (Brigham and Women's Hospital Medical Records) at Gonzalez018658 and Gonzalez022356; Testimony of Mr. Napoleonis (Trial Day 1).

20.    In her will, dated January 24, 2020, Ms. Gonzalez referred to Mr. Napoleonis as her spouse and stated that her omission of him was intentional. She also asked her personal representative to consider allocating all loss of consortium damages arising from her injury and her death to JB and AN. Exhibit 52 (Last Will and Testament) at Gonzalez023018, Gonzalez023030 – Gonzalez023031.

21.    JB is in the custody of the Department of Children and Families and AN's paternal grandmother, Gloria Ribot, was awarded custody of AN for some time; Mr. Napoleonis now has custody of AN. Testimony of Mr. Napoleonis.

22.    On August 15, 2021, Ms. Gonzalez passed away. SF 5.

**B. At Dot House, Primary Care is patient-led, meaning that patients can choose who they see, and at different times, Dr. Pahk and Dr. Henshaw saw Ms. Gonzalez in Primary Care and in Urgent Care.**

23.    A Primary Care Physician (PCP) is someone trained generally in internal or family medicine or pediatrics who provides comprehensive longitudinal care to a panel of patients. This may include visits for annual physicals as well as urgent care visits and chronic disease management. Testimony of Dr. Leigh H. Simmons, Trial Day 7, Transcript at 13 (lines 1-6).

24.    Longitudinal care is care provided over span of time. A PCP is a patient's point person for initial evaluation of complaints, referrals to specialists when needed, and management of general preventative health, like immunizations. Testimony of Dr. Simmons, Trial Day 7, Transcript at 13 (lines 8-14).

25.    Patients at Dot House generally decide who they want to be their PCP. If a provider leaves, their patient panel will be re-assigned. A patient can also decide to change the PCP. Testimony of Dr. Pahk, Trial Day 2, Transcript at 61 (lines 18-22, 25) abd 62 (lines 1-6).

26.    In Urgent Care at Dot House, patients can be seen without having to call ahead and make an appointment, as a walk-in. Urgent Care is staffed by a few doctors who specialize in that department, but it is primarily staffed by PCPs. Testimony of Dr. Pahk, Trial Day 2, Transcript at 62 (lines 9-12, 15-17).

27.    Dr. Pahk was Ms. Gonzalez's PCP from 2012 to March 18, 2016, and from August 18, 2016, to December 29, 2016. Dr. Henshaw saw Ms. Gonzalez in a primary care capacity several times between 2011 and 2016, and served as her PCP

from March 18, 2016, to August 17, 2016. Ms. Gonzalez was also seen in Primary Care by Dr. Shenbagam Dewar, Dr. Vuong Nguyen, and Dr. Kathryn Harris. Exhibit 1 (Dot House Medical Records) at USA07289, USA07294, USA07369, USA07372, USA07282, USA-008200; Testimony of Dr. Pahk, Trial Day 1, Transcript at 6 (lines 3-4), Trial Day 2, Transcript at 64 (lines 4-6).

28.     Between 2009 and 2017, Ms. Gonzalez's treatment at Dot House included, but was not limited to, referrals to two endocrinologists for thyroid disease; two neurologists for migraine care; social workers and a psychiatric nurse clinical specialist for anxiety and attention deficit hyperactivity disorder (ADHD); a nurse midwife for pregnancy care; acupuncture for migraine care; physical therapy for back pain; the Belkin Breast Health Center (Belkin) for evaluation of a breast lump; and sports medicine for evaluation of back pain. Testimony of Dr. Simmons, Trial Day 7, Transcript at 42 (lines 13-21) and 43 (lines 5-7).; *see generally* Exhibit 1 (Dot House Medical Records).

### C. Ms. Gonzalez did not report having a lump in her right breast to any of the primary care physicians or other medical providers who she saw at Dot House between 2009 and March 18, 2016.

29.     In 2009, Ms. Gonzalez began receiving health care at Dot House. SF 3.

30.     On October 16, 2009, and January 5, 2010, Ms. Gonzalez mentioned having left breast pain to Dr. Shenbagam Dewar, who examined her breasts on both dates and found no masses. Dr. Dewar documented that Ms. Gonzalez was told that cancers are painless and to avoid coffee. Exhibit 1 (Dot House Medical Records) at USA-007289—USA-007291, USA-007294—USA-007296.

31.     On April 15, 2011, Ms. Gonzalez had a complete physical examination with Dr. Henshaw, who documented a normal breast examination. Ms. Gonzalez did not raise any breast concerns on that day. Exhibit 1 (Dot House Medical Records) at USA-007373—USA-007376.

32.     On December 19, 2012, Ms. Gonzalez saw Dr. Pahk to have her birth control device removed. Ms. Gonzalez did not raise any breast concerns at this visit. Exhibit 1 (Dot House Medical Records) at USA-007606—USA-007610.

33.     On April 16, 2014, Ms. Gonzalez had a physical examination with Dr. Pahk.  On that day, Dr. Pahk ordered a *Helicobacter pylori* test for Ms. Gonzalez given the family history of apparent stomach cancers in her mother and maternal grandmother. Ms. Gonzalez did not raise any breast-related concerns to Dr. Pahk on that day. Exhibit 1 (Dot House Medical Records) at USA-007663—USA-007667; Testimony of Dr. Pahk, Trial Day 2, Transcript at 71 (Lines 2-7).

34.     On February 28, 2015, Ms. Gonzalez was seen in Urgent Care by Dr. Ivy Brackup for vaginitis, a dark mark on her toenail, and a lump on the back of her head. No breast complaints were mentioned, and she had an examination of her toe, her neck, and a pelvic examination. She was treated for yeast vaginitis. Exhibit 1 (Dot House Medical Records) at USA-007748—USA-007752.

35.     On March 30, 2015, Dr. Henshaw saw Ms. Gonzalez in Urgent Care for gastroenteritis. Ms. Gonzalez did not raise any breast-related concerns to Dr. Henshaw on that day.  Exhibit 1 (Dot House Medical Records) at USA-007772—USA-007777.

36.     On April 9, 2015, Ms. Gonzalez was seen at Carney Hospital Emergency Room for presumed viral gastroenteritis. No breast complaints were recorded on that day. Exhibit 3 (Carney Medical Records) at USA-010411—USA-010429.

37.     On April 15, 2015, Ms. Gonzalez had a call with office nurse Nikkia Simpson, LPN to discuss right chest pain she had been experiencing for 6 days. Ms. Gonzalez was advised to go to the emergency room for evaluation. Exhibit 1 (Dot House Medical Records) at USA-007788.

38.     On April 29, 2015, Ms. Gonzalez called Dot House to request evaluation for itchiness all over her body. The nurse advised Ms. Gonzalez to go to Urgent Care. Exhibit 1 (Dot House Medical Records) at USA-007798.

39.     On May 7, 2015, Ms. Gonzalez re-established behavioral health care with Lilliam Pabon, RNCS, at Dot House for depression, anxiety, fragmented sleep, and memory problems. At the visit, Ms. Gonzalez reported that she forgot so easily that she felt frustrated and that her husband "left home and wanted [a] divorce" and she found out he was testing or texting his ex-girlfriend. Exhibit 1 (Dot House Medical Records) at USA-007802.

40.     On June 10, 2015, Ms. Gonzalez saw Nurse Pabon for follow-up of her new medications. She described ongoing depression and anxiety, fragmented sleep, and stress in her marriage. When asked about her desire to work, Ms. Gonzalez stated that her migraines got in the way. Exhibit 1 (Dot House Medical Records) at USA-007815, USA-007819.

41.     On July 9, 2015, Ms. Gonzalez saw Nurse Pabon at Dot House and continued to describe difficulty with focus. Exhibit 1 (Dot House Medical Records) at USA07827.

42.     On July 20, 2015, Ms. Gonzalez saw Dr. Pahk in Primary Care for migraines. On that day, Dr. Pahk:

a.  started verapamil as a migraine preventive medicine;

b.  reviewed Ms. Gonzalez's treatment for PTSD and anxiety, hypothyroidism, and appropriate STD screening (she reported having a new partner); and

c.  recommended a follow up visit in 4-6 weeks to assess effectiveness of verapamil in preventing migraines.

Ms. Gonzalez did not make any breast complaints to Dr. Pahk during this visit. Testimony of Dr. Pahk; Exhibit 1 (Dot House Medical Records) at USA-007834—USA-007839; *see generally* Testimony of Dr. Pahk, Trial Day 2, Transcript at 74-75.

43.     Ms. Gonzalez did not cry in front of Dr. Pahk on that day. Testimony of Dr. Pahk, Trial Day 2, Transcript at 13 (line 5).

44.     Dr. Pahk sent a follow up results letter to Ms. Gonzalez on July 21, 2015, addressing the thyroid test results and STD test results, and encouraging Ms. Gonzalez to follow up with any questions by calling the nurse at the health center. Exhibit 1 (Dot House Medical Records) at USA-007845.

45.     On August 10, 2015, Ms. Gonzalez saw Nurse Pabon for follow up of depression and anxiety. She was still having difficulty with focusing and concentrating. Exhibit 1 (Dot House Medical Records) at USA-007852.

46.     On August 17, 2015, Ms. Gonzalez saw Amanda Luong, a nurse practitioner at Dot House, for a rash on her fingers and inner thighs. A skin examination was done, and she was prescribed an emollient and steroid cream. No breast complaints were mentioned. Exhibit 1 (Dot House Medical Records) at USA-007857—USA-007862.

47.     On October 2, 2015, Ms. Gonzalez saw Dr. Lindsay Ryan at Dot House for vaginitis. No breast complaints were mentioned. She was tested for gonorrhea, chlamydia, bacterial vaginosis, and yeast vaginitis, and was treated for yeast vaginitis. Exhibit 1 (Dot House Medical Records) at USA-007872—USA-007876.

48.     On October 13, 2015, Ms. Gonzalez saw Nurse Pabon at Dot House and stated that she was not sleeping, was distracted and forgetful, and had been asked to leave her GED classes until she could focus better. She continued to take bupropion for depression. She had stopped amitriptyline prescribed by neurology for migraines as she thought it caused her forgetfulness, but despite stopping the medicine a month before, her memory had not improved. She was prescribed doxepin at night for sleep. Exhibit 1 (Dot House Medical Records) at USA-007883.

49.     On October 18, 2015, Ms. Gonzalez was seen at Carney Hospital for a migraine, she received a follow-up call from Dot House, and a follow-up visit was scheduled. At the time of her visit, Ms. Gonzalez reported to Carney Hospital that

her marital status was single. Exhibit 1 (Dot House Medical Records) at USA-007893; Ex. 3 (Carney Hospital Medical Records) at USA-010370—USA-010398.

50.     On November 12, 2015, Ms. Gonzalez saw Nurse Pabon at Dot House. She described problems with concentration, attention, and completing chores at home and stated that she was easily distracted and overwhelmed. Exhibit 1 (Dot House Medical Records) at USA-007895.

51.     On January 15, 2016, Ms. Gonzalez was seen in the Carney Hospital Emergency Room for migraines. She noted she ran out of her sumatriptan (Imitrex) medication. No breast complaints were mentioned. She received a follow up call from Dot House on January 15, 2016, and was instructed to return to Urgent Care if the sumatriptan did not help. Exhibit 3 (Carney Medical Records) at USA-010360—USA-010369; Exhibit 1 (Dot House Medical Records) at USA-007906—USA-007911.

52.     On January 22, 2016, Ms. Gonzalez had an intake at Dot House for acupuncture for migraines and upper back pain with Dr. Judith Loh. At that time, she did not mention any breast complaint to Dr. Loh. Ms. Gonzalez then had six additional acupuncture visits (ending March 25, 2016) with Dr. Loh for migraine and back pain, and did not mention any breast complaints at any of those appointments. Exhibit 1 (Dot House Medical Records) at USA-007912—USA-007916, USA-007918—USA-007929, USA-007947—USA-007950, USA-007953—USA-007956, USA-008112—USA-008115.

53.     On February 1, 2016, Ms. Gonzalez saw Dr. Pahk in Primary Care for a migraine follow-up. On that day:

a. Ms. Gonzalez reported having daily headaches, that tricyclics caused constipation, that topiramate caused forgetfulness, and that she could not recall taking the verapamil previously prescribed by Dr. Pahk.

b. Ms. Gonzalez also discussed dry skin on her hands, pain in her left arm when doing pushups, and a bad smell on her scalp.

c. Ms. Gonzalez had a physical examination of her heart, lungs, and gait.

d. Dr. Pahk noted that she would continue acupuncture for migraines and back pain, as patient indicated this was helping, would remain in follow up with behavioral health for her PTSD and anxiety, and remained on levothyroxine for hypothyroidism.

Ms. Gonzalez did not raise any breast-related concerns to Dr. Pahk at this visit. Exhibit 1 (Dot House Medical Records) at USA-007930—USA-007935; *see generally* Testimony of Dr. Pahk, Trial Day 2, Transcript at 75.

54. On February 22, 2016, during a visit in Behavioral Health, Ms. Gonzalez reported having "[p]roblems with concentration and attention" and "[d]ifficulty completing chores at home." Exhibit 1 (Dot House Medical Records) at USA-007936.

55. On March 7, 2016, Ms. Gonzalez was seen by Dr. Tu Mai Tran in Urgent Care at Dot House for chest pain related to stress and a rash under both of her arms. She had an underarm examination of her rash. Dr. Tran agreed that the rash was contact dermatitis and likely a symptom of anxiety; she recommended follow up with her behavioral health specialist team for anxiety and prescribed steroid cream. Exhibit 1 (Dot House Medical Records) at USA-007940—USA-007945.

14

**D. On March 18, 2016, Ms. Gonzalez tells Dr. Pahk for the first time that she has a lump in her breast.**

56.     On March 18, 2016, Ms. Gonzalez presented in Urgent Care at Dot House for a right breast mass. Ex. 1 (Dot House Medical Records) at USA-007963—USA-007967.

57.     During triage, Ms. Gonzalez reported that the lump in her right breast was causing pain, burning, and getting bigger, and that she had a lump check the year before and the PCP said it would go away. Ex. 1 (Dot House Medical Records) at USA-007963

58.     Dr. Pahk did not perform a lump check for Ms. Gonzalez in 2015. Testimony of Dr. Pahk, Trial Day 2, Transcript at 77 (line 8).

59.     None of the many providers Ms. Gonzalez saw in 2015 recorded performing a lump check or that Ms. Gonzalez reported a breast concern; the only previous breast concerns raised by Ms. Gonzalez that was noted in the medical records were reports of left breast pain to Dr. Dewar in 2009 and 2010. *See generally* Exhibit 1 (Dot House Medical Records).

60.     At that visit on March 18, 2016, Dr. Pahk examined Ms. Gonzalez and documented a one-centimeter, hard, rubbery mass at 11 o'clock, two or three centimeters from the nipple with surrounding thicker tissues that felt like fibrocystic changes and that Ms. Gonzalez's left breast was mildly more full-appearing. Dr. Pahk

did not note any discharge, overlying cellulitis or dimpling, or axillary lymphadenopathy.[1] Ex. 1 (Dot House Medical Records) at USA-007964.

61.     Ms. Gonzalez would not have been able to get a mammogram at Dot House. Because she had a lump, she would have needed a diagnostic, rather than a screening, mammogram. Dot House did not have the capacity to perform diagnostic mammograms or breast ultrasounds in-house. Testimony of Dr. Pahk, Trial Day 2, Transcript at 19 (lines 13-15), 79 (lines 2-4).

62.     Dr. Pahk did a differential diagnosis, and cancer was on it. Testimony of Dr. Pahk, Trial Day 2, Transcript at 89 (lines 9-13).

63.      Dr. Pahk explained to Ms. Gonzalez that she was sending her to the breast clinic. Testimony of Dr. Pahk, Trial Day 2, Transcript at 78 (lines 8-12).

64.     After examining Ms. Gonzalez on March 18, 2016, Dr. Pahk referred her to the Belkin Breast Health Center (Belkin) at Boston Medical Center (BMC) for further evaluation. The "ORDERS: tests, services, and referrals" category of the medical record generated for that visit contains the entry "Breast Health – General [OUTSIDE REFERRAL]." Exhibit 1 (Dot House Medical Records) at USA-007966; Testimony of Dr. Pahk, Trial Day 2, Transcript at 26 (lines 2-4).

65.     The March 18, 2016, referral to Belkin cannot be produced because when Dot House's computer system changed, referrals were not computerized. Only the notation that an order was made is available in the record. Testimony of Dr. Pahk,

---

[1] Axillary lymphadenopathy, a symptom, describes changes in the size and consistency of lymph nodes in the armpit.

Trial Day 2, Transcript at 29 (lines 20-23), 30 (lines 4-7).

66.    Dr. Pahk was trained that the best way to treat a breast lump is to send the patient to a specialist at a comprehensive breast clinic where their imaging and their exam and the possibility of a biopsy and seeing a surgeon are all co-located. According to Dr. Pahk: "it is a sophisticated and difficult diagnosis that can require various follow-up, [and] it's best done in a comprehensive clinic where everything is close to each other and [it's] easy to communicate." Testimony of Dr. Pahk, Trial Day 1, Transcript at 28 (lines 11-15) and Trial Day 2, Transcript at 24 (lines 20-21), 87 (lines 22-25), 88 (lines 1-4)

67.    Dr. Pahk knew Belkin was a comprehensive breast center where there are surgeons, oncologists, and medical doctors to triage patients. She had sent patients to Belkin before March 2016.   In her experience, Belkin would review referrals and ask for imaging before a patient was seen in the clinic. Testimony of Dr. Pahk, Trial Day 2, Transcript at 79 (lines 7-10, 15-19, 23), 80 (lines 3-10).

68.    There was no way for Dr. Pahk to refer Ms. Gonzalez to a specific doctor at Belkin using Dot House's referral system. She trusted the breast clinic to ensure the credentialing of their providers and doctors. Testimony of Dr. Pahk, Trial Day 2, Transcript at 25 (lines 2, 5-6).

69.    Dr. Pahk "ha[s] never directly ordered a biopsy for a patient." According to her, "[b]ecause there are many different kinds of biopsies, stereotactic, punch, [fine needle aspiration], the type of biopsy affects what types of surgery can be done afterwards, and so the type of biopsy and doing it is best done by a breast surgeon in

the context of a comprehensive clinic." Testimony of Dr. Pahk, Trial Day 2, Transcript at 88 (line 9-14).

70. Dr. Pahk sent Ms. Gonzalez to Belkin to rule out cancer. Testimony of Dr. Pahk, Trial Day 2, Transcript at 35 (lines 3-4).

71. Dr. Pahk never laughed at Ms. Gonzalez. Ms. Gonzalez did not cry in front of Dr. Pahk on March 18, 2016. Dr. Pahk did not believe that Ms. Gonzalez was exaggerating her symptoms. Dr. Pahk believed that Ms. Gonzalez was worried and that the best way to resolve that worry was to send her to the breast clinic. Testimony of Dr. Pahk, Trial Day 2, Transcript at 17 (lines 15-16), 91 (lines 2-15).

72. Generally, when Dr. Pahk referred someone to Belkin, Belkin would often tell Dot House that they wanted imaging. Dr. Pahk generally did not order imaging; she let the breast center decide. In her experience, the breast center asked for ultrasound or mammogram or both. Testimony of Dr. Pahk, Trial Day 2, Transcript at 81 (lines 22-25), 82 (lines 1-4).

73. When Dr. Pahk refers a patient to a specialist, she cedes responsibility for that problem, and the specialist determines the appropriate management. When she next sees the patient, she will review the specialist's note with the patient. Testimony of Dr. Pahk, Trial Day 1, Transcript at 15 (lines 4-6, lines 11-16).

74. In Dr. Pahk's experience, specialists take their own history, do their own examination, and ask about the patient's medical history. Testimony of Dr. Pahk, Trial Day 1, Transcript at 20 (lines 13-16).

**E. Belkin evaluates referrals and schedules patient appointments.**

75.     Belkin is a comprehensive breast center that includes internal medicine doctors who specialized in breast health, patient navigators, breast surgeons, and medical oncologists and that was co-located with breast imaging so patients could do all those things in one setting. Testimony of Dr. Tracy Battaglia (Trial Day 5).

76.     Referrals to Belkin can come by fax. Testimony of Alexis Higgins, Trial Day 3.

77.     When a referral is received by Belkin, staff looks at it to see if imaging has been done. If imaging has not been done, the staff reaches out to the referring provider. Testimony of Alexis Higgins, Trial Day 3.

78.     The doctors at Belkin decide what type of imaging is necessary and provide staff with a chart they can use to evaluate referrals. If staff have questions, they can ask the doctors. Testimony of Alexis Higgins, Trial Day 3.

79.     When BMC receives a referral for an ultrasound, the referral goes to Breast Imaging, whose staff calls the patient and schedules the appointment. Testimony of Alexis Higgins, Trial Day 3.

**F. Dr. Pahk orders an ultrasound for Ms. Gonzalez, which occurs six days later and comes back negative.**

80.     On March 23, 2016, five days after her visit with Dr. Pahk in Urgent Care, Ms. Gonzalez appeared at Dot House Health's Behavioral Health department. Ms. Gonzalez told the provider that her memory was very bad, focusing was a struggle, and that she was forgetful. Exhibit 1 (Dot House Medical Records) at USA0-008105.

81.     That same day, Ms. Gonzalez informed Dot House that she needed a referral for a breast ultrasound. On that day, Dr. Henshaw noted that there was a "[r]eferral to BMC pending." Exhibit 35 (Medical Inbox Messages) at USAO012982.

82.     On March 24, 2016, Dot House staff noted that, "[Ms. Gonzalez] came in very upset, no order in portal second time coming in. Wants an order [for a breast ultrasound]. BMC will not schedule a breast clinic appt unless there is a breast ultrasound order." Exhibit 35 (Medical Inbox Messages) at USAO012982.

83.     Dr. Pahk understood that Ms. Gonzalez was trying to schedule her appointment at Belkin and that Belkin needed two orders – one for the for clinic and one for the ultrasound.  Dr. Pahk then ordered the ultrasound and contacted the head of managed care and the breast navigator to make sure Ms. Gonzalez got her appointment. Testimony of Dr. Pahk, Trial Day 2, Transcript at 41 (lines 4-8); Exhibit 35 (Medical Inbox Messages) at USAO012982; Exhibit 37 (Referral for Ultrasound) at USA-008443—USA-008445.

84.     The referral stated that the "Clinical Indication" was "r upper breast lump 1 cm in diameter at 11 o'clock" and contained the following information:

> Please see OCHIN Care Everywhere for:
>
> 1.  Recent office visit and recent labs
> 2.  Snap shot include current meds/allergies/problem list with overview comments/histories/ immunization.
>
> Thank you for seeing Marielis Gonzalez in consultation.
>
> If you have questions and need to contact the provider please call 617-288-3230.

Exhibit 37 at USA-008444.

85.     On March 30, 2016, a targeted breast ultrasound of Ms. Gonzalez's breast was completed at Boston Medical Center (BMC) and reviewed by Dr. Neely Hines. Exhibit 2 (BMC Medical Records) at USA013081; Testimony of Dr. Neely Hines, Trial Day 6.

86.     Dr. Hines was a radiologist who, in 2016, was board certified in diagnostic radiology and specialized in breast imaging. Testimony of Dr. Hines (Trial Day 6).

87.     In 2016, ultrasounds at BMC were generally performed by a technician and interpreted by a physician. Testimony of Dr. Hines (Trial Day 6).

88.     In 2016, Dr. Hines's general practice for patients coming in for an ultrasound with a palpable lump was as follows. First, a technician would do the scan and present the case to Dr. Hines. Then, if the patient had a palpable lump, Dr. Hines would go into the room with the patient, scan the patient herself, and discuss the results with the patient. Testimony of Dr. Hines (Trial Day 6).

89.     Dr. Hines made the following findings regarding Ms. Gonzalez:

> Targeted right breast ultrasound was performed in the area of concern as indicated by the patient's physician. At the 11 o'clock position, 1-10 cm from the nipple, there is no suspicious mass or suspicious sonographic finding. Otherwise, no solid or cystic masses or other sonographic abnormalities are seen in the targeted area.

Exhibit 2 (BMC Medical Records) at USA013081; Testimony of Dr. Hines (Trial Day 6).

90.     Dr. Hines found "[n]o evidence of malignancy." By malignancy, she meant cancer. Exhibit 2 (BMC Medical Records) at USA013082; Testimony of Dr. Hines (Trial Day 6).

91.     Dr. Hines scored the ultrasound as "BIRADS 1 – negative."[2] Exhibit 2 (BMC Medical Records and imaging) at USA013082; Testimony of Dr. Hines (Trial Day 6).

92.     As a result, Dr. Hines recommended clinical follow up. Exhibit 2 (BMC Medical Records and imaging) at USA013082; Testimony of Dr. Hines (Trial Day 6).

93.     On April 5, 2016, Dr. Pahk reviewed Ms. Gonzalez's breast ultrasound and noted that the radiologist resulted the ultrasound as negative and scored it BIRADS-1. Testimony of Dr. Pahk, Trial Day 2, Transcript at 85 (lines 4, 6, 14-20); Exhibit 1 (Dot House Medical Records) at USA-008380.

94.     Dr. Pahk assumed Belkin saw the patient after the ultrasound and reviewed results with her.  Testimony of Dr. Pahk, Trial Day 2, Transcript at 85 (lines 17-20).

95.     Dr. Pahk never heard from Ms. Gonzalez that she was not seen at BMC. Testimony of Dr. Pahk, Trial Day 2, Transcript at 86 (line 8).

96.     At this point, Dr. Pahk considered that the proverbial loop closed on her referral because she made the referral, took additional steps to make sure that Ms. Gonzalez got her appointment, and got a report so she knew Ms. Gonzalez was seen. Testimony of Dr. Pahk, Trial Day 2, Transcript at 87 (lines 6-12).

---

[2]BI-RADS stands for "Breast Imaging Reporting and Database System."

**F. Ms. Gonzalez next raises a concern about her breast lump to a Dot House provider on July 18, 2016.**

97.    Ms. Gonzalez never saw Dr. Pahk again, but she did receive follow up care from Dot House regarding the ultrasound. Testimony of Dr. Pahk, Trial Day 2, Transcript at 33 (lines 17-18).

98.    On May 26, 2016, Ms. Gonzalez saw Dr. Harris in Urgent Care at Dot House for a migraine. Ms. Gonzalez did not raise any breast concerns to Dr. Harris but did mention back pain. Exhibit 1 (Dot House Medical Records) at USA-008137.

99.    On July 18, 2016, Ms. Gonzalez saw Dr. Henshaw in Primary Care for a complete physical examination. On that day:

> a.  Ms. Gonzalez told Dr. Henshaw that she wanted to address a persistent right breast lump, that she had been referred for an ultrasound at Boston Medical Center, and that the ultrasound was normal.
>
> b.  Ms. Gonzalez described the lump as "a little bigger" and distorting her nipple and with no rash or nipple discharge.
>
> c.  Dr. Henshaw examined Ms. Gonzalez's breasts and found a 3 x 4 cm ill-defined mass and an inverted nipple on the right breast but no nipple discharge, tenderness, induration, or peau d'orange skin on that breast.
>
> d.  Ms. Gonzalez did not have back pain that day.

Exhibit 1 (Dot House Medical Records) at USA-008151—USA-008156.

100.    On that day, Dr. Henshaw reviewed the ultrasound report with Ms. Gonzalez. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 22 at 15.

101.    When patients have breast complaints, Dr. Henshaw refers them to the breast clinic. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 31 (lines 2-4).

102.    Dr. Henshaw understood that when patient went to the breast clinic, the specialists took their own history and did their own independent examinations. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 35 (lines 9-11).

103.    Because Ms. Gonzalez was a young patient with a breast complaint who had an ultrasound a few months before and the area of the complaint was ill-defined, Dr. Henshaw "was transparent enough to question what [she] was feeling" and "felt like [Ms. Gonzalez] needed a higher level of evaluation." Dr. Henshaw relies on specialists when she is not sure what she is feeling. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 37 (lines 2-8).

104.    Dr. Henshaw did what she felt in her judgment was the best option and course for Ms. Gonzalez—which was to send Ms. Gonzalez to a breast health specialist. Because Dr. Henshaw was unsure about whether what she felt was a disparate lump or an ill-defined area of breast tissue, she decided to consult a specialist to advise the patient, and she "knew [Ms. Gonzalez] would be in a place where there were multiple options of evaluation . . .." Testimony of Dr. Henshaw, Trial Day 2, Transcript at 38 (lines 3-5).

105.    To make sure cancer was ruled out, Dr. Henshaw initiated a referral to the breast health center. She felt an area of concern, and Ms. Gonzalez was concerned. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 15 (lines 2-4, 6-7), 37 (lines 24-25), 38 (lines 1-5), 44 (lines 21-25), and 65 (lines 5-6),

24

106.   Dr. Henshaw felt Ms. Gonzalez] would benefit from "the highest level of evaluation" at the breast center, which could evaluate Ms. Gonzalez and assess her. Dr. Henshaw felt that if Ms. Gonzalez needed any further testing, they would take it from there.  Testimony of Dr. Henshaw, Trial Day 2, Transcript at 64 (lines 2-6); *see also* Testimony of Dr. Henshaw, Trial Day 2, Transcript at 38 (lines 11-13).

107.   Dr. Henshaw did not order a mammogram at that time because of Ms. Gonzalez's age, because she was not quite sure of her findings, and because she believed if Ms. Gonzalez was evaluated at the breast center, they would follow up with a mammogram or further testing. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 65 (lines 8-16).

## G. The day after Dr. Henshaw sees Ms. Gonzalez, she refers Ms. Gonzalez to the specialists at Belkin for a second time.

108.   On July 19, 2016, Dr. Henshaw referred Ms. Gonzalez to Belkin. The referral included the following information:

a.   Ms. Gonzalez complained of a right breast lump for 6 months, an ultrasound in April 2016 was negative, Ms. Gonzalez still noted the lump, and it seemed bigger and was distorting her nipple.

b.   Dr. Henshaw herself noted an ill-defined 3x4cm lumpiness right breast between 9 and 11 o'clock and questioned whether the mass was breast tissue. She asked Belkin to evaluate Ms. Gonzalez.

c.   Phone numbers where Ms. Gonzalez could be reached.

d.   The medical records and the patient's problem list were available through Care Everywhere.

e.  Dr. Nsa Henshaw at DotHouse Health was the referring provider.

f.  "If you have any questions and need to contact the provider please call 617-288-3230."

Exhibit 1 (Dot House Medical Records) at USA-008427—USA-008429.

109.  Dr. Henshaw understood that urgent referrals were for matters like inflammatory breast cancer that can lead to blood clots. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 66 (lines 10-18).

110.  On August 1, 2016, a referral appointment was entered by Janeesa Pearson at BMC. Exhibit 1 (Dot House Medical Records) at USA-008428.

111.  On August 17, 2016, Ms. Gonzalez expressed interest in participating in Integrative Medicine Group visits and was scheduled for a phone interview. On August 30, 2016, a provider at Dot House contacted Ms. Gonzalez about participating in a group mindfulness class. Ms. Gonzalez responded that she could not participate because her daughter had not been accepted in to K0 (preschool) so she had to stay home with her. Exhibit 1 (Dot House Medical Records) at USA-008165; USA-008169.

**G. On September 9, 2016, Ms. Gonzalez is seen at Belkin by Dr. Ramachandran, who evaluates her and does not report any concerns or order additional testing.**

112.  On September 9, 2016, Ms. Gonzalez went to Belkin and saw Dr. Ambili Ramachandran. Testimony of Dr. Ramachandran, Trial Day 7.

113.  Dr. Ramachandran was a 2009 graduate of Baylor Medical School who had participated in the Care of the Underserved track in medical school. She had done a fellowship in women's health, was board certified in internal medicine in 2012,

had practiced in the Women's Health Group at BMC from 2012 to 2016, and had
published articles on barriers faced by low-income women who had abnormal cancer
screening results. *See generally* Exhibit 40 (Dr. Ramachandran's CV).

114.   On that day:

   a.   The first page of the medical record of the visit stated that the diagnosis
        was "Mass of breast – Primary."[3]

   b.   Ms. Gonzalez's medical history was taken.

   c.   Ms. Gonzalez stated that about a year earlier, she noticed a mass in her
        right breast.

   d.   Ms. Gonzalez stated that about six months earlier, she started to have
        pain.

   e.   Ms. Gonzalez stated that on April 1, 2016, she had an ultrasound that
        was normal.

   f.   Ms. Gonzalez stated that she had seen her doctor twice about the issue
        and was concerned.

   g.   Ms. Gonzalez stated that she felt a sharp and burning sensation in right
        breast, that it hurt every day, at various times per day, lasting 5 minutes
        or so, that there were no triggers, that the pain was not related to

---

[3] The record of this visit that Plaintiffs included in their binder, which was
generated on March 22, 2017, may not have been the complete record; the first page
of that record states at the top "Telephone Encounter (continued)." The certified copy
of the BMC record that appears in Exhibit 2 differs from what Plaintiffs had in their
binder because it starts with "Visit Summary" and specifies that the Diagnoses
included "Mass of breast – Primary." Exhibit 2 (BMC Records at USA013095).

periods, and that she had had no changes in medication, lifestyle, or health about six or twelve months earlier.

h. Ms. Gonzalez stated that she felt pain in multiple places in right breast, at the nipple, near 12 o'clock, and beneath right breast, that she had no nipple discharge, that she felt like the right nipple was being pulled inside, that the pains and masses coincided, and that all the lumps were getting bigger.

i. Dr. Ramachandran documented that Ms. Gonzalez's family history was notable for gastric cancer and uterine cancer and described the breast exam as having no axillary adenopathy, no discrete masses, and very dense areas of breast tissue at 12 o'clock and 5 cm from the nipple, and at 6 o'clock and 2 cm from the nipple.

j. Dr. Ramachandran performed a physical examination of Ms. Gonzalez's breasts while the patient was upright and when she was supine.

k. Dr. Ramachandran noted mild pain over nipple, no skin changes, no nipple changes or retraction, no nipple discharge, and very dense nodular breasts.

l. Dr. Ramachandran did not make any further diagnoses or refer Ms. Gonzalez to a breast surgeon or for a biopsy or other testing.

m. Dr. Ramachandran educated Ms. Gonzalez about breast pain, reassured her, and discussed management of breast pain including heat and ice, taking aspirin with food, and wearing supportive bras.

n.  Regarding follow up, Dr. Ramachandran advised Ms. Gonzalez to return to Belkin if her symptoms worsened or failed to improve.

Testimony of Dr. Ramachandran, Trial Day 6; Exhibit 2 (BMC Medical Records) at USA013095—USA013108.

115.  Dense tissue that comes and goes is much more reassuring than a hard lump that is growing. Testimony of Dr. Russo, Trial Day 3.

116.  The guidance Dr. Ramachandran gave to Ms. Gonzalez is consistent with that generally given for the management of fibrocystic breast disease. Testimony of Dr. Simmons, Trial Day 7, Transcript at 30 (lines 19-25) and 31 (line 1).

117.  Fibrocystic breast disease is a condition that causes pain and fluctuating masses. Testimony of Dr. Simmons, Trial Day 7, Transcript at 31 (lines 3-7).

118.  Dr. Ramachandran considered Ms. Gonzalez's ultrasound to be recent, as it had occurred five months earlier. Testimony of Dr. Ramachandran, Trial Day 6.

119.  While Dr. Ramachandran did not have access to Dr. Henshaw's referral, the scheduler at Belkin would have had access to it.  Testimony of Dr. Ramachandran, Trial Day 6.

120.  Dr. Henshaw reviewed Dr. Ramachandran's report in September 2016. From reading the report, Dr. Henshaw knew that the breast health clinic had evaluated Ms. Gonzalez and reported back that there was no discrete mass and that the area of concern was dense breast tissue. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 45 (lines 1-4).

### H. Ms. Gonzalez sees Dr. Henshaw about back pain and other matters in October and November 2016 but does not raise breast concerns.

121.    On October 28, 2016, Ms. Gonzalez saw Dr. Henshaw in Urgent Care on for a pregnancy test, vaginal discharge, STD exam, and back pain. On that day:

    a.  Her history was reviewed and there were no changes.

    b.  Cervical cancer screening was performed.

    c.  Ms. Gonzalez did not report concerns about her breast to Dr. Henshaw.

Exhibit 1 (Dot House Medical Records) at USA-008174—USA-008177.

122.    Dr. Henshaw did not ask about the breast concerns on that day because she had read the consult report, and Ms. Gonzalez did not mention any concerns. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 68 (lines 20-23)

123.    On November 28, 2016, Ms. Gonzalez saw Dr. Henshaw in Urgent Care for sinus pain and back pain.  On that day:

    a.  Ms. Gonzalez reported having back pain in the mid-back, worse with movement, for about three weeks; she had no paresthesia or incontinence.

    b.  An examination of Ms. Gonzalez showed lumbar paraspinal muscle tenderness bilaterally, and Dr. Henshaw referred her to physical therapy.

    c.  Ms. Gonzalez did not raise any breast complaints to Dr. Henshaw.

Exhibit 1 (Dot House Medical Records) at USA-008178—USA-008185.

**I. On December 28, 2016, Ms. Gonzalez raises a breast concern to a provider at Carney Hospital, who diagnoses her as having cysts and tells her to follow up with her primary care physician.**

124.   On December 28, 2016, Ms. Gonzalez visited the emergency department at Carney Hospital. On that day:

a. Ms. Gonzalez complained of neck, mid, and lower back pain over one year that had worsened over the last month.

b. Ms. Gonzalez complained of feeling lumps in her right breast, worsening over the past month or two, and stated that she had not followed up with her PCP.

c. Dr. Swati Dhanireddy examined Ms. Gonzalez's breast and noted that firm but mobile cystic like masses to the right breast area that were nontender, that there was no bruising or swelling, and that the areola was unremarkable.

d. Dr. Dhanireddy diagnosed Ms. Gonzalez with having a cyst of right breast that was diffuse and fibrocystic. Dr. Dhanireddy noted: "In regard to the breast, most consistent with cysts. However, patient referred to PCP or OB/GYN if she may need outpatient ultrasound or mammogram."

Exhibit 3 (Carney Medical Records) at USA-010335—USA-010338.

**J. Ms. Gonzalez returns to Dot House, is seen by three different doctors, and is referred to Belkin for breast lump and elsewhere for her back.**

125.   On January 20, 2017, Ms. Gonzalez saw Dr. Henshaw in Urgent Care. On that day:

a.  She was seen for lumbar back pain and described that the pain was worse with walking on stairs, coughing, sneezing, and movement, with interrupted sleep.

b.  Dr. Henshaw noted that Ms. Gonzalez had tenderness to palpation over the rhomboid and paraspinal muscles, and a negative straight leg raise test.

c.  Dr. Henshaw ordered a plain film of the lumbar spine, which showed no fractures but did show mild disc narrowing and degenerative change.

Exhibit 1 (Dot House Medical Records) at USA-008192—USA-008197.

126.   A plain film x-ray can highlight the vertebrae and the structures around it. Testimony of Dr. Henshaw, Trial Day 2, Transcript at 58 (lines 4-5).

127.   On January 23, 2017, Ms. Gonzalez saw her PCP, Dr. Harris at Dot House, for back pain and diagnostic imaging. On that day:

a.  Ms. Gonzalez mentioned having a lump in her right breast and that she had visited the breast center twice.

b.  Dr. Harris examined the breast but did not feel a discrete mass or see any skin changes.

c.  Dr. Harris referred Ms. Gonzalez back to Belkin and to Sports Medicine for the back pain.

Exhibit 1 (Dot House Medical Records) at USA-008200—USA-008207.

128.   On January 27, 2017, Ms. Gonzalez was seen by a nurse practitioner Kathryn M. Schoch, a nurse practitioner, at BMC for a rash and was diagnosed with

32

dermatitis of face and breast. She was noted to have ill-defined erythema and scale on her right breast. Exhibit 2 (BMC Medical Records) at USA013122.

129.   On February 1, 2017, Ms. Gonzalez was seen by Dr. Kalpana Narayan in the Emergency Department of BMC for back pain. No breast complaints were noted, and she was assessed as having chronic back pain that appeared to be muscular. It was noted that the back pain

> is a chronic problem. The current episode started more than 1 year ago. The problem occurs constantly. The problem has been waxing and waning. Associated symptoms include arthralgias. Pertinent negatives include no abdominal pain, chest pain, chills, fever, headaches, joint swelling, neck pain, rash, vomiting, or weakness. The symptoms are aggravated by bending.

She was discharged with instructions to follow up with her PCP. Exhibit 2 (BMC Medical Records) at USA013128—USA013134.

130.   On February 3, 2017, Ms. Gonzalez was seen by Dr. Vasileia Varvarigou in Urgent Care at Dot House for a rash under her breast and legs. On that day:

a.   Dr. Varvarigou noted that Ms. Gonzalez stated that she had lump on her right breast, the she complained of increased pain, and that there as some redness on her right side, below the armpit.

b.   Dr. Varvarigou further noted that Ms. Gonzalez was seen by dermatology for the rash and was given hydrocortisone, which did not help, and that her PCP had previously referred her to a breast center.

c.   Dr. Varvarigou performed a breast exam and noted that Ms. Gonzalez had an inverted nipple and erythema of the right breast and no

tenderness. Dr. Varvagirou also noted that there was an area above the nipple that felt slightly harder than the rest of the breast tissue. Exhibit 1 (Dot House Medical Records) at USA-008216—USA-008220.

131.    On February 8, 2017, Ms. Gonzalez was seen by physician's assistant Corinne Stratton at BMC for pack pain. She stated that pain had been present for three months. X-rays taken that day did not show evidence of cancer. Exhibit 2 (BMC Medical Records) at USA013151—USA013178.

## K. Ms. Gonzalez goes to Carney Hospital in February of 2017 for her back pain and cancer is discovered.

132.    On February 22, 2017, Ms. Gonzalez was seen in the emergency department at Carney Hospital by Dr. Serena Jiddou. On this day:

a.    Ms. Gonzalez reported that she noted lumps in her breasts several years earlier, was evaluated by her physician, and did not have a mammogram but did have an ultrasound that was within normal limits.

b.    Ms. Gonzalez noted pain in her left hip and left shoulder and lower back, that she described as throbbing and deep pain, without relief. She said her pain was aggravated with movement and activity.

c.    An X-ray of Ms. Gonzalez's hip demonstrated lucencies[4] throughout her pelvis. Most were rounded and some were irregularly shaped. The largest was just above the left hip joint.

---

[4]    "Lucency" is "a region in an image caused by an absorber of lower x-ray attenuation than its surrounding tissues; in general, the opposite of opacity." Lucency | definition of lucency by Medical dictionary (thefreedictionary.com)

d. A computed tomography (CT) was performed and revealed, among other things, diffuse lytic bone lesions suspicious for metastasis.

e. The CT showed, among other things, a 2.5 cm irregular soft tissue density subareolar region of the right breast compatible with neoplasm.

f. "There [was] almost complete destruction of the L5 vertebral body . . . ."

Exhibit 3 (Carney Medical Records) at USA-010309—USA-010317.

**L. Ms. Gonzalez goes to BMC, where doctors diagnose her cancer.**

133.   On February 26, 2017, Ms. Gonzalez went to BMC, where she and Mr. Napoleonis stated that they were "frustrated with the delayed diagnosis here at BMC." At the time, Ms. Gonzalez was scheduled to be seen at the breast clinic on March 10, 2017. Exhibit 2 (BMC Records) at USA013182.

134.   On February 28, 2017, Ms. Gonzalez was seen at BMC. On that day:

a. Ms. Gonzalez stated that she first noticed the lump in March or April 2015 and that she was seen by a primary care physician and referred to the breast center and that no lump was felt by the provider and the ultrasound was negative.

a. Ms. Gonzalez also stated that she consistently felt a lump in her right breast that was increasing in size, her skin was drier, her nipple seemed different, and she had tingling in her body.

b. Ms. Gonzalez reported she had "not felt any lumps in her armpit or anywhere else."

---

(accessed January 27, 2021).

c.  On examination, Ms. Gonzalez's right nipple was retracted. There was no obvious skin rash, but the skin close to the right areola was somewhat thickened, and there was a palpable firm subareolar irregular mass on the right that was hard to define but appeared to extend to both upper inner and outer quadrants at least 3-4 cm. There was no nipple discharge.

d.  On that day, the doctor noted:

> She has been having gradually worsening back pain for several months and has seen providers, including orthopedics. However, there were no red flags sings [*sic*] on exam and plain films failed to show any concerning findings last month. She has seen [physical therapy,] but it did not help. She has been managed conservatively.

e.  The doctor noted that Ms. Gonzalez had "right breast mass x 1 year."

f.  Her breast exam revealed that "both breast[s] appear symmetrical in size, right nipple appears retracted, no obvious skin rash but skin close to rt areola is somewhat thickened. Palpable firm subareolar irregular mass on the right, hard to define the extent, appears to be extending to the both upper and inner outer quadrant at least 3x4 cm, no nipple discharge. Palpable [lymph node] in right axilla, firm about 1 cm."

Exhibit 2 (BMC Medical Records) at USA013207—USA013242.

135.   On March 1, 2017, a mammogram revealed a large irregular mass in Ms. Gonzalez's right breast with associated architectural distortion and calcifications, as well as overlying skin thickening. The mass measured 6.4 x 5.1 x 4.5 cm. In addition, there was a 1.1 cm irregular mass in the upper inner breast posteriorly, about 2-3 cm posterior to the dominant mass. Calcifications extended across the upper breast and into the lower breast. Overall, the extent of the mammographic abnormality was about 10 x 8.9 x 8.9 cm. The impression was of multicentric, advanced breast cancer with Axillary metastases. An ultrasound also showed a mass. Exhibit 2 (BMC Medical Records) at USA013275—USA013280.

136.   On March 2, 2017, Ms. Gonzalez had a right breast core biopsy that revealed an infiltrating ductal carcinoma, grade 2, with lymphovascular invasion. Exhibit 2 (BMC Medical Records) at USA013285—USA01392.

137.   On March 2, 2017, Ms. Gonzalez's tumor was diagnosed as strongly estrogen receptor positive (98%), progesterone receptor positive (69%), and the HER2 was amplified (6.1) by fluorescence in situ hybridization. Exhibit 2 (BMC Medical Records) at USA013293—USA013301.

**M. Dr. Simmons opined to a reasonable degree of medical certainty that Dr. Pahk and Dr. Henshaw met the standard of care for PCPs in their management of Ms. Gonzalez's breast symptoms and back pain.**

138.   Dr. Leigh Simmons is board certified in internal medicine. After graduating medical school and having four years of post-graduate training, she started working as a physician at Massachusetts General Hospital in Boston, Massachusetts in 2008. Her clinical experience is in the care of adult patients for

comprehensive primary care, longitudinal care, and the care of hospitalized patients for acute internal medicine conditions. She is also an assistant professor of medicine at Harvard Medical School; in that capacity, she works with students doing their primary care clerkships and has overseen the objective structured clinical examinations for medical students learning to do breast examinations. She has published and edited articles and chapters in textbooks and handbooks on primary care, breast cancer screening, and breast disease. *See generally* Testimony of Simmons, Trial Day 7, Transcript at 5-11; Exhibit 54 (CV of Dr. Leigh Simmons).

139.   The standard approach that a PCP takes when a patient presents with a breast lump is as follows. The first step is that the PCP takes a history and asks when the patient first noticed the lump, whether the patient had it in the past, whether it is painful, whether it is changing, and whether it is related to the menstrual cycle. Next, an examination will occur. After the examination, the standard approach requires a determination regarding the need for further imaging, specialist referral, or continued observation. Testimony of Dr. Simmons, Trial Day 7, Transcript at 15 (lines 8-20) and 45 (lines 12-15).

140.   Dr. Pahk met the standard of care in her primary care management of Ms. Gonzalez's breast symptoms. Testimony of Dr. Simmons, Trial Day 7, Transcript at 44 (lines 10-11).

141.   In a patient who was Ms. Gonzalez's age, the most common type of hard, rubbery mass is a fibroadenoma. Breast cancer is also a consideration, as is fibrocystic tissue. Testimony of Dr. Simmons, Trial Day 7, Transcript at 130 (lines 13-24).

142.   Young women do not commonly have breast cancer. Testimony of Dr. Russo (Trial Day 3).

143.   A "clinically suspicious mass" means that there is a concern that the mass could represent a serious or malignant condition. It is not a diagnostic examination. It means that in a doctor's differential diagnosis, the doctor is considering the possibility of breast cancer. There are different levels of clinical suspicion. Testimony of Dr. Simmons, Trial Day 7, Transcript at 131 (lines 14-19) and 132 (7-12).

144.   Among the symptoms that would be worrisome for cancer early on are: peau d'orange skin changes, nipple inversion, induration or hardening of the skin, or the presence rash overlying the area. Testimony of Dr. Simmons, Trial Day 7, Transcript at 132 (lines 13-21).

145.   Referring clinicians, such as PCPs, have different options. One option is sending a patient to a specialist to make the determination of whether a biopsy or needle aspiration would be appropriate. A PCP also has the option of initiating the steps himself or herself and directly referring a patient for a specific diagnostic study. Testimony of Dr. Simmons, Trial Day 7, Transcript at 133 (lines 2-11).

146.   Following the first documented instance of her right breast symptoms in March 2016, Ms. Gonzalez was referred for a targeted breast ultrasound, which would be the standard initial imaging for of a woman under age 30 presenting with breast symptoms or a breast lump. Testimony of Dr. Simmons, Trial Day 7, Transcript at 45 (lines 1-5).

147.    "The diagnostic approach to the evaluation of palpable masses in younger women differs among experts. The approach that is advocated by the National Comprehensive Cancer Network (NCCN) is an initial breast ultrasound (US) [.] If the examination is indeterminate or suspicious, mammography is often performed, although its utility in young women with breast masses or nodularity is limited, and a biopsy is probably warranted even if the mammogram is negative. If the mass cannot be visualized by US, mammography may be considered, or alternatively, a tissue biopsy or period of observation may be appropriate depending on the level of clinical suspicion." Exhibit 72 (Diagnostic Evaluation of women with suspected breast cancer - Up to Date) at 14.

148.    Where a patient has a palpable finding, there are a few options. An ultrasound is one of those options, and at least one guideline, which is a summary table that had been adapted by the NCCN Breast Cancer Evidence Block, notes that ultrasound is the preferred method. Needle sampling or observation for one or two menstrual cycles is also an option if there is low suspicion of malignancy. Testimony of Dr. Simmons, Trial Day 7, Transcript at 47 (lines 7-11); *see also* Exhibit 58.

149.    When Ms. Gonzalez's ultrasound did not show a malignancy, the next step on the algorithm would be a phase of a lesion that was not visualized. At that point, there is consideration of a mammogram or, moving further down the algorithm, tissue biopsy or observation every three to six months, plus/minus, which means imaging for one to two years. And if there is a change in size, the guidelines indicate "refer for a tissue biopsy." Dr. Pahk did order initial imaging and knew that the

imaging did not show a malignancy. Testimony of Dr. Simmons, Trial Day 7, Transcript at 45 (lines 1-5) 49 (lines 12-22); *see also* Exhibit 58.

150. Where a PCP is not sure whether a mass is worrisome or not, the PCP is at a branch point about whether to refer to specialist, maybe order imaging, or continue to observe the patient. Testimony of Dr. Simmons, Trial Day 7, Transcript at 78 (lines 14-16).

151. If a dominant mass persists in a woman through menstrual cycles, such masses are often evaluated by breast radiologists and breast specialists, who make the determination as to whether aspiration or a surgical referral is warranted. In general, biopsies in most cases are performed by breast radiologists and occasionally by a surgical oncologist. Local referral practices in the Boston area would be that a breast radiologist using needle localization would do the biopsy under some circumstances. If an excisional biopsy was recommended, a breast surgeon would handle that. Testimony of Dr. Simmons, Trial Day 7, Transcript at 50 (lines 21-25) and 51 (lines 1-4) and 89 (lines 5-8); *see also* Exhibit 58.

152. As a result of Dr. Pahk's referral, Ms. Gonzalez received an evaluation by a breast radiologist. Breast radiologists are an important part of a care team for the evaluation of breast masses. In primary care referrals for breast radiology to work up an abnormality for a patient presenting with symptoms or a detected abnormality, a breast radiologist is an important part of the referral process and will give guidance on further follow-up. Testimony of Dr. Simmons, Trial Day 7, Transcript at 99 (lines 15-22).

153.    There are different types of biopsies available. There are those initiated by breast radiologists. Breast pathologists can do a fine needle aspiration biopsy. There are also biopsies that are done by surgeons. Testimony of Dr. Simmons, Trial Day 7, Transcript at 133 (lines 15-25).

154.    Breast radiologists are consultants who formulate plans. If they do not see anything that warrants a biopsy, they say so. They will recommend follow-up with them for an abnormality or recommend a biopsy. Testimony of Dr. Simmons, Trial Day 7, Transcript at 100 (lines 5-13).

155.    Ms. Gonzalez had clinical follow-up in primary care four months after her first documented complaint of a breast mass. Testimony of Dr. Simmons, Trial Day 7, Transcript at 50 (lines 13-15).

156.    Dr. Henshaw met the standard of care regarding her management of Gonzalez's breast concerns. When Dr. Henshaw saw Ms. Gonzalez in July 2016, she reviewed the breast ultrasound and heard what Ms. Gonzalez said about her symptoms worsening. She also noted that Ms. Gonzalez had not yet had a clinical evaluation by the breast center and referred her to breast center for further evaluation. Testimony of Dr. Simmons, Trial Day 7, Transcript at 51 (lines 12-19); Transcript at 61 (lines 10-13).

157.    Often doctors dismiss a problem or do not make a referral early enough. That did not happen here. Dr. Henshaw referred the patient to a specialist for evaluation of not only an unresolved problem but a worsening symptom. Testimony of Dr. Simmons, Trial Day 7, Transcript at 61 (lines 14-18).

158.    Furthermore, Dr. Henshaw made an appropriate referral to a breast center for evaluation. She knew Ms. Gonzalez had a negative ultrasound but still felt discomfort and felt a mass. At that point, a PCP would want to put the patient in the hands of a breast specialist, and Dr. Henshaw referred the patient to a comprehensive breast health center. It is within a PCP's scope of practice to decide that the patient needed something beyond what was available at the PCP's health center. Testimony of Dr. Simmons, Trial Day 7, Transcript at 52 (lines 13-20) and 56 (lines 12-24).

159.    Where a PCP has a patient with a breast lump, and the PCP has some questions about what the best next step is, and the PCP wants to get the patient on the right path, if the PCP makes a referral to a comprehensive center where they have specialists who see this problem not only daily but multiple times a day, their use of imaging in conjunction with their evaluation is something that the PCP will expect the center to decide. That is the standard expectation of a referral to a comprehensive breast center. Testimony of Dr. Simmons, Trial Day 7, Transcript at 58 (lines 1-8, 22-25).

160.    The standard expectation is that staff members at a comprehensive referral center will review the referrals and a decision will be made there as to what type of clinician the patient will see. A coordinator may make the initial decision but the first clinician who sees the patient may decide that another doctor in the center, or a team of clinicians, needs to see the patient. Testimony of Dr. Simmons, Trial Day 7, Transcript at 59 (lines 18-25) and 60 (lines 1-6).

161.    Once Dr. Henshaw referred Ms. Gonzalez to Belkin, the expectation of a PCP would be that the breast center would make further recommendations for surgical consultation, biopsy, or further imaging. Testimony of Dr. Simmons, Trial Day 7, Transcript at 61 (lines 22-25), 62 (lines 1-4, 10-13), and 130 (lines 1-6).

162.    An urgent referral means that the patient needs to jump a queue. Symptoms that appear to be a breast infection or inflammatory breast cancer, with rash, heat, or fevers require urgent referrals. Testimony of Dr. Simmons, Trial Day 7 at 116 (lines 14-25) and 118 (lines 1-7).

163.    Dr. Henshaw met the standard of care in primary care regarding her evaluation of Ms. Gonzalez's symptoms of back pain Fall 2016 and Winter 2017. Testimony of Dr. Simmons, Trial Day 7, Transcript at 62 (lines 20-22).

164.    During Dr. Henshaw's evaluation of Ms. Gonzalez's back pain, Ms. Gonzalez did not have symptoms or signs of metastatic cancer, such as weight loss, fevers, night sweats, or tenderness along palpation of the spine, all of which would have prompted further evaluation for metastatic disease. Testimony of Dr. Simmons, Trial Day 7, Transcript at 62 (lines 23-25) and 63 (lines 1-4).

165.    Dr. Henshaw performed appropriate initial imaging with a lumbar spine x-ray for the persistent back pain in January 2017, as a plain film can show evidence of bony metastasis. Testimony of Dr. Simmons. Trial Day 7, Transcript at 63 (lines 5-14) and 64 (lines 9-14).

166.    When Dr. Henshaw evaluated Ms. Gonzalez for back pain, she knew about the Belkin consultation. And Ms. Gonzalez did not make any breast complaints

to Dr. Henshaw during the visits, which were for rhinitis, vaginosis, pregnancy tests, and back pain. Testimony of Dr. Simmons. Trial Day 7, Transcript at 63 (lines 18-25).

167.   Dr. Henshaw was not operating with the knowledge that Ms. Gonzalez had continued breast symptoms. She knew that there had been an evaluation at Belkin and a negative ultrasound. The back pain was not accompanied by fever, weight loss, or night sweats, and there was no point tenderness when she pressed along the spine. Thus, the initial recommendation of physical therapy, anti-inflammatory medicine, and an x-ray was appropriate primary care management of her back pain. Testimony of Dr. Simmons. Trial Day 7, Transcript at 64 (lines 4-14).

168.   Ms. Gonzalez was evaluated not only by Dr. Henshaw for the back pain, but by at least two other doctors (Dr. Harris and Dr. Varvarigou) and sports medicine at Boston Medical Center, all of whom did not suspect metastatic cancer as the cause of her back pain. When Dr. Harris examined Ms. Gonzalez's breast on January 23, 2017, no abnormalities were noted on exam. These multiple evaluations by several different clinicians of Ms. Gonzalez's same complaints of breast symptoms and back pain are notable in "that everyone seemed to be having trouble putting these things together." Testimony of Dr. Simmons. Trial Day 7, Transcript at 65 (lines 11-25) and 66 (lines 1-7).

**N. Because of the biology of her tumor and the way it spread, a diagnosis at the time Ms. Gonzalez first noticed a lump, in 2015, or in 2016, when she first brought it to the attention of her doctors at Dot House, would not have changed her prognosis or outcome.**

169.   Dr. Stephanie Bernstein received her medical degree from Albert Einstein College of Medicine in 1978; after that she trained in hematology and

oncology at Tufts New England Medical Center. She is board certified in internal medicine, medical hematology, and medical oncology. Between 1984 and 1987, she worked as New Hampshire Hematology Oncology in Manchester, New Hampshire. Between 1992 and 2016, she practiced as a medical oncologist and a medical hematologist for the Faulkner Breast Center in Boston, Massachusetts, and for Winchester Hospital (including the Winchester Hematology/Oncology Center and the Winchester Breast Center), in Winchester, Massachusetts. She has testified as an expert witness in medical malpractice suits. Exhibit 55 (Bernstein CV); *see generally* Testimony of Dr. Bernstein (Trial Day 5), Transcript at 5-8.

170.    It is more likely than not that Ms. Gonzalez harbored node-positive breast cancer with metastatic disease to bone when she was seen by Drs. Pahk and Henshaw in 2016 and in 2015 as well. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 60 (lines 14-17) and 61 (lines 23-25).

171.    A diagnosis in 2016 would have led to the same outcome in terms of the development of clinical metastatic disease and ultimate death. Testimony of Dr. Bernstein, Trial Day 5, Transcript at page 98 (lines 20-25).

172.    Ms. Gonzalez had a breast cancer that had not been detected, metastasis to the lymph nodes that had not been detected, and, in fact, metastasis to the spine that had not been detected before she first found a lump. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 87 (line 19).

173.    When Ms. Gonzalez was diagnosed with breast cancer, she had very extensive involvement of her bones. The notations in the record about bone pain

indicated she may have been experiencing discomfort from metastatic disease at that time. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 31 (lines 3-8).

174.   Dr. Bernstein noted that on December 28, 2016, Ms. Gonzalez "presented with pain in the neck, the mid and lower back, for what she describes as 'over one year,' worsening of the pain over the past month.  Without benefit of physical therapy, the pain was getting worse." That record "further strengthen[ed] the idea that the back pain that she was experiencing [was] related to her disease." Testimony of Dr. Bernstein, Trial Day 5, Transcript at 32 (lines 1-4, 23-25).

175.   Ms. Gonzalez's breast exams were mercurial in nature. The exams seemed "to change from visit to visit, admittedly among different examiners." Findings of nipple retraction and nipple pulling, which would generally be persistent, seemed to change.  Testimony of Dr. Bernstein, Trial Day 5, Transcript at 33 (lines 7-13).

176.   Pain from breast cancer in the bones can wax and wane initially, and Ms. Gonzalez described her pain that way. On February 1, 2017, while at BMC, Ms. Gonzalez "complained of worsening back pain, worse over the past three months" and stated that "'[t]he current episode started more than one year ago, waxing and waning, associated with arthralgias, aggravated by bending.'" Testimony of Dr. Bernstein, Trial Day 5, Transcript at 36 (lines 18-25), 37 (line 1), and 89 (lines 5-6).

177.   When x-rays were taken in February 2017, Ms. Gonzalez was seen to have lucencies in her pelvis. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 41 (lines 1-2).

178.   "[L]ucencies, in terms of the bone, means a punched-out lesion.  . . . [T]hey're referring to a punched-out looking lesion, almost like Swiss cheese.  Swiss cheese kind of lesions in the bone, they're called lytic lesions.  'Lytic' is the word 'lysis,' [and means] breaking down.  The bone has been broken down in little holes by tumor cells and can cause significant discomfort when they enlarge ultimately." Testimony of Dr. Bernstein, Trial Day Transcript at 41 (lines 6-11).

179.   In February 2017, Ms. Gonzalez had a lesion within her breast that was suspicious for a primary breast cancer, with spread to multiple bones throughout her body. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 42 (lines 13-16).

180.   At that point, the bone disease was extensive and throughout the body. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 42 (lines 20-21).

181.   At the time she was diagnosed, Ms. Gonzalez had stage 4 cancer, which can be treated. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 45 (lines 1, 4).

182.   Treatment for Stage 4 cancer depends on other features of the cancer performed by the department of pathology, including the HER2/neu testing results and the results of the estrogen and progesterone receptors. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 45 (lines 6-9).

183.   HER2 is a protein that exists on the surface of the body's cells.  But in some kinds of cancer, and particularly in breast cancer, it can be overexpressed. If it is triggered, it sends a signal into the cell to multiply. This can be very dangerous in that these tumors can start multiplying and growing and spreading. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 45 (lines 12-20).

184.    Ms. Gonzalez's tumor was HER2 positive. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 46 (line 9)

185.    A HER2 positive tumor has an aggressive course, and it is a more rapidly growing type of tumor.  There are drugs that very often hold it in check, but these drugs are still being studied. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 45 (lines 21-25), 46 (lines 1-5), and 52 (lines 16-20).

186.    Estrogen receptor is also a protein that exists on the surface of the majority of breast cancers.  Fat cells and liver and other organs can produce estrogen and stimulate these estrogen receptors to then go into the center of the cell and cause cell growth and dissemination of cancers. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 46 (lines 11-18).

187.    Ms. Gonzalez had both estrogen and progesterone receptors in fairly high numbers. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 48 (lines 4-6).

188.    While estrogen and progesterone positivity can be a positive prognosticator, it is more an indicator of the treatments to which a patient will respond. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 94 (lines 19-21).

189.    The role of the progesterone receptor and how it relates to the estrogen receptor is debated, but it appears to be better to have positive progesterone receptor along with the estrogen receptor, as patients that have the estrogen receptor without the progesterone receptor generally do not do as well. These markers—HER2, estrogen receptor, and progesterone receptor, are primarily predictors of what drugs can be used to treat the cancer. For example, hormonal therapy would not be given

to a patient who lacked the estrogen and progesterone receptors, because they would not respond to them. And anti-HER2 drugs would not be given to a patient who is HER2 negative. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 47 (lines 13-23), 48 (lines 15-25), 49 (lines 1-10).

190.   The majority of deaths among patients with breast cancer are estrogen and progesterone receptor positive, because they relapse.  And since they are the majority of patients with breast cancer, they comprise the largest number of relapsed patients. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 95 (lines 12-18).

191.   An aggressive tumor grows quickly, spreads quickly, and might be more resistant to treatment. Ms. Gonzalez had an aggressive tumor. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 52 (lines 16-17, 22-24) and 53 (lines 10-12).

192.   While Ms. Gonzalez had some favorable prognosticators in that she was estrogen and progesterone receptor positive, and HER2 positive being a more aggressive tumor, the combination of estrogen and progesterone receptor positivity and HER2 positivity may have conflicted with one another and the HER2 positivity may have silenced the estrogen receptor in that it blunted its response to hormonal agents. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 54 (lines 1-6).

193.   For a triple-positive tumor, patients can be treated with estrogen and progesterone or the hormonal drugs and the HER2-positive drugs.  Testimony of Dr. Bernstein, Trial Day 5, Transcript at 49 (lines 5-10).

194.   There are drugs that block the HER2 receptor and lock it in place. These drugs that are very effective and that have started levelling the field for some patients

who have HER2-positive tumors, which are generally faster growing and more aggressive. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 45 (lines 21-25).

195.  For stage 4 patients, treatment aims to reduce the amount of tumor cells, to allow the patient to be as free of symptoms as possible and to, as a result, lead to a better quality of life and prolonged survival in many cases. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 49 (lines 18-22).

196.  But Ms. Gonzalez did not have any durable response to treatments. Instead, her tumor continued to progress. Ms. Gonzalez's tumor continued to grow, even after treatment. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 50 (lines 1-3) and 79 (lines 18-21).

197.  Generally, when patients receive a treatment, they periodically undergo retesting, through blood work and x-rays, and CT scans, for example, so doctors can look for improvement or whether the patient showed an excellent response to this treatment to determine whether the treatment should continue. In the case of Ms. Gonzalez, however, the records indicated only poor tolerance of the treatments, progressive disease, ongoing pain and discomfort, and further debilitation, which seemed to the extent that ultimately treatment was abandoned in her case. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 50 (lines 6-16).

198.  Age was a negative prognosticator. Young patients with breast cancer, that are under age 35, have more aggressive disease and are less responsive to treatments. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 50 (line 19) and 51 (lines 2-13).

199.    At the time of Ms. Gonzalez's diagnosis, the disease was present in the pelvis, the spine, the hips and the sacrum. It is impossible to imagine that this evolved over just a couple of months.  This was an extensive amount of tumor, and given what is known about the biology of tumor growth, the tumor it is more likely than not that it had been growing for a very long while, initially microscopically, and then macroscopically, seeable on x-rays and visible on x-rays. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 55 (lines 2-12).

200.    Ms. Gonzalez's tumor grade was 2. Tumor grade describes how tumors look under a microscope. A grade 2 might indicate it was growing for a fairly long period of time. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 57 (lines 12-25) and 58 (line 1),

201.    When scientists know the subsequent course of a tumor and see the pattern of spread and the response to therapy, they can assess the biology of the tumor and how it likely spread. Tumors can disseminate from the breast to the lymph nodes or directly into the body when they are the size of a pinhead.  And some tumors do not spread until they are very, very large; and they will not spread at all, in spite of becoming very large; and others spread almost from inception, from being the size of a pinhead. Based on Ms. Gonzalez's clinical course, it is possible to make a very intelligent estimate and a very informed estimate of when the tumor formed and what its biology was. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 109 (lines 20-25) and 110 (lines 1-10).

202.   Because Ms. Gonzalez had very resistant or refractory disease, poor outcome to any treatment, poor tolerance of any treatment, and subsequent growth of her tumor, her outcome would have been the same but her clinical course may have been different. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 93 (lines 12-18).

203.   It is more likely than not that Ms. Gonzalez would have developed a disease recurrence at some point, based on what is known about her response to treatment and tolerance of treatment.  She would not have received different doses or different drugs had she been treated earlier. Testimony of Dr. Bernstein, Trial Day 5, Transcript at 111 (lines 1-6).

204.   Dr. James Leo Connolly is a physician and pathologist who specializes in breast pathology. Surgical pathologists make diagnoses after looking at biopsy results. He is board certified in anatomic pathology and currently affiliated with the Beth Israel Deaconess Medical Center (BIDMC) in Massachusetts. For about 20 years, he served as the Director of Anatomic Pathology at BIDMC. He was also once a consultant in breast pathology for the Dana Farber Cancer Institute. He is also a professor of pathology at Harvard Medical School. He has done extensive research and is well published in the area of breast disease (including cancer). He has testified as an expert previously. Testimony of Dr. Connolly, Trial Day 6, Transcript at 3-9; Exhibit 56 (CV of Dr. Connolly)

205.   A core biopsy in 2017 revealed that Ms. Gonzalez had an infiltrating ductal carcinoma. The biological markers, which are the estrogen and progesterone

receptors, were positive, and the HER2 assay was positive itself. Testimony of Dr. Connolly, Trial Day 6, Transcript at 11 (lines 8-13).

206.   Invasive cancers and in situ ductal cancers are always tested for the presence of estrogen receptor because it indicates the tumor will be potentially responsive to hormone-blocking agents. Testimony of Dr. Connolly, Trial Day 6, Transcript at 14 (lines 24-25) and 15 (lines 1-2).

207.   The progesterone receptor is another hormone that is in normal breast tissue. Certain tumors that are estrogen receptor negative but progesterone receptor positive will also respond to hormone blocking agents. Testimony of Dr. Connolly, Trial Day 6, Transcript at 15 (8-12).

208.   Estrogen and progesterone receptor positivity can be favorable factors, because those characteristics indicate a better differentiated tumor and that the patient will be eligible for hormone-blocking agents as a potential treatment. Normal breast tissue has those factors, while a high-grade carcinoma would not. Testimony of Dr. Connolly, Trial Day 6, Transcript at 17 (lines 24-25) and 18 (lines 1-4).

209.   HER2 is associated, in non-treated patients, with a faster growth rate and a more aggressive tumor, but currently is regarded as a favorable prognostic indicator because a patient who has HER2 positivity is likely to respond to HER2 blocking agents. Testimony of Dr. Connolly, Trial Day 6, Transcript at 16 (4-7); *see also id.*, Transcript at 13 (lines 23-24)

210.   Highly aggressive tumors would be grade 3. They would not have estrogen or progesterone receptor positivity. Testimony of Dr. Connolly, Trial Day 6,

Transcript at 13 (lines 21-22).

211.   Compared to some other cancers, breast cancer is relatively slow-growing tumor. The average breast cancer takes eight to nine years to reach one cm in diameter; however it would have been quicker in a younger patient like Ms. Gonzalez. Testimony of Dr. Connolly, Trial Day 6, Transcript at 16 (lines 10-13, 16-17).

212.   Breast cancers that retain some of the normal characteristics of breast tissue such as estrogen and progesterone positivity tend to be more slowly growing than more rapidly growing tumors. Testimony of Dr. Connolly, Trial Day 6, Transcript at 17 (lines 7-8).

213.   Ms. Gonzalez's tumor was an intermediate grade, Grade 2 of 3, except for the HER2, which is usually seen in more aggressive cancers. Highly aggressive tumors are Grade 3 and do not have estrogen or progesterone positivity. Testimony of Dr. Connolly, Trial Day 6, Transcript at 13 (line 19-24) and 17 (lines 10-11, 14).

214.   An MRI from Carney Hospital taken on February 23, 2017, showed widespread metastatic disease, involving primarily bones, and pathological fractures of some of the vertebral bodies. Testimony of Dr. Connolly, Trial Day 6, Transcript at 17 (line 20-24).

215.   It would take a number of years for breast cancer to metastasize to the point that it causes pathological fractures. By the time a tumor causes such fractures, it would have to be larger than a centimeter, and generally it takes many years to get to that size. How long it will take depends on the biology of the tumor, the age of the

patient, and other factors. Testimony of Dr. Connolly, Trial Day 6, Transcript at 20 (line 5-8, 11-13).

216.   Tumors in women who are under the age of 40 and 45 are more aggressive than those in older women in that they have the ability to spread and grow faster than an average breast cancer would. Testimony of Dr. Connolly, Trial Day 6, Transcript at 19 (lines 20-22, 24-25).

217.   The most rapidly growing breast cancers have been shown to occur in patients with hereditary breast cancer syndromes in very young patients. Their tumors are generally estrogen and progesterone receptor negative and are high grade. But even in Grade 3 tumors, it would take years for the metastases to get large enough to destroy a vertebral body. Testimony of Dr. Connolly, Trial Day 6, Transcript at 20 (lines l4-20).

218.   Ms. Gonzalez did not have hereditary breast cancer symptoms. Testimony of Dr. Connolly, Trial Day 6, Transcript at 36 (line 24).

219.   Breast cancers can spread at any size. Testimony of Dr. Connolly, Trial Day 6, Transcript at 34 (line 7-8).

220.   Because Ms. Gonzalez's tumor did not respond well to available chemotherapy, it would not have responded to the available chemotherapy at an earlier time. Testimony of Dr. Connolly, Trial Day 6, Transcript at 69 (line 23-25).

221.   The destruction of the spine was marked at the time of the diagnosis indicates that the metastasis was an ongoing process that occurred at a much earlier time. Given the extent of tumor involvement with her spine, and that she had lung

lesions and pathological fractures, the cancer had to have spread as single cells. Therefore, it would have taken a long time to grow to the size that it did in the metastatic site for it to cause clinical symptoms. Testimony of Dr. Connolly, Trial Day 6, Transcript at 73 (lines 1-8).

222.   To have a tumor that is big enough to destroy a vertebral body, which would be close to two centimeters at a minimum, it would take a very long time to get to that tumor volume, based on what is known about how such cancers grow. Testimony of Dr. Connolly, Trial Day 6, Transcript at 73 (lines 14-19).

223.   Ms. Gonzalez's tumor characteristics were such that she would not have been in the group with the fastest growth rate. Testimony of Dr. Connolly, Trial Day 6, Transcript at 72 (line 11-18).

224.   Given the extent of the disease that Ms. Gonzalez had when her cancer was discovered, it probably took about five or six years for the metastases to get large enough to cause the problems that they did. The cancer metastasized before she called attention to her breast lump. Testimony of Dr. Connolly, Trial Day 6, Transcript at 21 (lines 3-7) and 22 (lines 22-23) and 62 (lines 18-22).

225.   The alleged delay in diagnosis therefore did not affect Ms. Gonzalez's ultimate prognosis. Testimony of Dr. Connolly, Trial Day 6, Transcript at 73 (line 25).

## CONCLUSIONS OF LAW

In light of the evidence presented to the Court, the Court makes the following conclusions of law:

1.    Plaintiffs' claims against the United States are governed by the requirements of the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671-80, and, accordingly, by the substantive law of Massachusetts. *See, e.g.*, *Bolduc v. United States*, 402 F.3d 50, 56 (1st Cir. 2005); *see also* 28 U.S.C. § 1346(b)(1).

2.    In Massachusetts, "to prevail on a claim of medical malpractice, a plaintiff must establish the applicable standard of care and demonstrate both that a defendant [health care provider] breached that standard, and that this breach caused the patient's harm." *Zaleskas v. Brigham and Women's Hospital*, 141 N.E.3d 927, 942 (Mass. App. Ct. 2020) (cleaned up) (brackets original).

3.    A defendant may be found "liable *either* for causing the patient's wrongful death or for causing the patient's loss of chance to survive, but not for both." *Renzi v. Paredes*, 890 N.E.2d 806, 813 (Mass. 2008) (emphasis original). Plaintiffs are not proceeding under a loss-of-chance theory.

### *Dr. Pahk and Dr. Henshaw met the standard of care.*

4.    "A physician owes a legal duty to a patient to provide medical treatment that meets the standard of care of the average qualified physician in his or her area of specialty." *Medina v. Hochberg*, 987 N.E.2d 1206, 1209-1210 (Mass. 2013) (citation omitted).

5.      "[B]ecause the standard of care is determined by the care customarily provided by other physicians, it need not be scientifically tested or proven effective: what the average qualified physician would do in a particular situation *is* the standard of care." *Palandjian v. Foster*, 842 N.E.2d 916, 921 (Mass. 2006) (citation omitted).

6.      "The proper standard is whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession." *Palandjian*, 842 N.E.2d at 920 (cleaned up).

7.      Dr. Pahk met the standard of care regarding the treatment of Ms. Gonzalez's breast lump.

>   a. When Dr. Pahk first learned that Ms. Gonzalez had a breast lump on March 18, 2016, she examined Ms. Gonzalez's breast, documented her findings, and immediately referred Ms. Gonzalez to Belkin.

>   b. It was within the standard of care for Dr. Pahk to expect that Belkin would determine the type of testing that was required; and, in fact, the evidence shows that Belkin asked Dot House on or about March 23, 2016, to order an ultrasound. Dr. Pahk placed the order right away.

>   c. When the ultrasound results became available, Dr. Pahk reviewed them on April 5, 2016, and learned that a radiologist had concluded that there was no malignancy and recommended clinical follow up.

    d. Ms. Gonzalez never returned to see Dr. Pahk after March 18, 2016, but she continued to see other doctors at Dot House.

8.     Dr. Henshaw also met the standard of care regarding Ms. Gonzalez's breast lump.

    a. On July 18, 2016, when Ms. Gonzalez saw Dr. Henshaw in Urgent Care regarding her breast lump, Dr. Henshaw examined her, documented her findings, and immediately referred her to Belkin.

    b. In the referral, Dr. Henshaw wrote that Ms. Gonzalez had complained of a breast lump for six months, and an ultrasound in April 2016 was negative, but Ms. Gonzalez still noted the lump and reported that it seemed bigger and was distorting her nipple. Dr. Henshaw also informed Belkin that she herself noted an ill-defined 3 x 4 cm lumpiness in her right breast between 9 and 11 o'clock. She asked Belkin to evaluate Ms. Gonzalez, and Dr. Henshaw's referral included phone numbers where Ms. Gonzalez could be reached.

    c. Dr. Henshaw reviewed BMC's report in September 2016, which stated that the specialists did not have any concerns.

    d. Ms. Gonzalez saw Dr. Henshaw three more times in Urgent Care—on October 28, 2016, November 28, 2016, and January 20, 2017—but she did not raise any breast concerns to Dr. Henshaw on those dates. By that time, Dr. Henshaw no longer worked in Primary Care, and Dr. Harris was Ms. Gonzalez's PCP.

9.     The evidence does no show that Dr. Pahk and Dr. Henshaw ignored multiple complaints made by Ms. Gonzalez about her breast lump in 2015 or that the doctors should have ordered testing sooner:

   a. Ms. Gonzalez saw Dr. Henshaw and Dr. Pahk once each in 2015 and she never complained of a lump in her breast.

   b. The evidence shows that Ms. Gonzalez saw many different providers at Dot House and elsewhere in 2015 and she did not make a breast complaint to any of those providers in 2015.

   c. In September 2016, Ms. Gonzalez told Dr. Ramachandran that she had seen her doctors twice about her breast lump. Ms. Gonzalez's own, pre-diagnosis statement thus matches the medical records, which show that she raised complaints on two occasions: once to Dr. Pahk on March 18, 2016, and once to Dr. Henshaw on July 18, 2016.

   d. Ms. Gonzalez was inconsistent in reporting when she first told Dr. Pahk or Dr. Henshaw about her lump. She attributed statements recorded by Dr. Dewar in 2009 and 2010 to Dr. Pahk in 2015. Before her diagnosis, Ms. Gonzalez reported telling her doctors twice about her lump. This matches the medical record, which indicates she told Dr. Pahk in March 2016, and Dr. Henshaw in July 2016. The answers she gave her doctors varied after her diagnosis. At a deposition in 2018, Ms. Gonzalez testified that she first told her doctors about her lump in 2016; she signed an errata sheet that changed her answer.

10.    An ultrasound was an appropriate first step for a breast concern found in Ms. Gonzalez, a woman under 30, in 2016.

11.    Dr. Russo testified that Ms. Gonzalez's mass was clinically suspicious in March 2016, when Dr. Pahk examined her, and that a biopsy should have been performed then. Aside from the fact that he did not examine Ms. Gonzalez in 2016, his opinion that her breast lump was suspicious enough to warrant a biopsy in March 2016 is unsupported by the evidence.

   a.  There are different levels of clinical suspicion, and the next step in the work-up of a breast lump depends on the *level* of clinical suspicion. "If the mass cannot be visualized by [ultrasound], mammography *may* be considered, or alternatively, a tissue biopsy *or* period of observation may be appropriate depending on the level of clinical suspicion." Exhibit 72 (Diagnostic Evaluation of women with suspected breast cancer - Up to Date) at 14 (emphasis added).

   b.  When Ms. Gonzalez saw Dr. Pahk on March 18, 2016, she did not have skin changes, nipple discharge, or other indicia that there was a strong presumption that she had cancer.

   c.  The referral to Belkin was to determine the appropriate course of action. And Ms. Gonzalez received follow up; she was seen by her PCP at Dot House regarding her breast lump four months after the ultrasound.

12.    Dr. Russo's opinion that Dr. Henshaw failed to meet the standard of care because she did not order a biopsy in July 2016 ignores that, as Dr. Simmons testified,

a PCP has two options in this scenario. A PCP can either order the test him/herself or send the patient to a comprehensive breast center where specialists makes those decisions. A referral to a comprehensive breast center with internists, imaging, and oncologist with specific observations in the referral, as was the case here, also meets the standard of care.

13.     Ms. Gonzalez's symptoms were not dismissed by Dot House; each time she made a breast-related complaint, a diagnostic plan was formulated and carried out. Similarly, when Ms. Gonzalez presented with back pain, she was evaluated with a physical examination and referred to specialists and for imaging studies.

14.     The decision on whether to perform a tissue biopsy became Belkin's responsibility at the time of Dr. Ramachandran's evaluation, who as a breast health specialist was tasked with making appropriate internal referrals for further evaluation of a persistent breast lump.

15.     Five doctors other than Dr. Pahk and Dr. Henshaw, at three different medical centers, saw Ms. Gonzalez for breast symptoms in 2016 and 2017. Each felt something different, indicating that Ms. Gonzalez's presentation was mercurial.

16.     Drs. Pahk and Henshaw set the process for imaging and breast center evaluation in motion during the visits in which they evaluated her for the breast mass, thus meeting the standard of care in their primary care responsibilities. They did not push her off. They pushed her forward.

### *Neither Dr. Pahk nor Dr. Henshaw caused the claimed injuries.*

17.     "[A] defendant cannot and should not be held liable for a harm unless the defendant caused the harm." *Doull v. Foster*, 163 N.E.3d 976, 982 (Mass. 2021).

18.     "Causation has traditionally involved two separate components: the defendant had to be both a factual cause (or 'cause in fact') and a legal cause of the harm." *Doull*, 163 N.E.3d at 982-983.

19.     "Generally, a defendant is a factual cause of a harm if the harm would not have occurred 'but for' the defendant's negligent conduct." *Doull*, 163 N.E.3d at 983 (citing W.L. Prosser & W.P. Keeton, Torts § 41, at 265 (5th ed. 1984) ("An act or an omission is not regarded as a cause of an event if the particular event would have occurred without it")).

20.     "This long-standing principle ensures that defendants will only be liable for harms that are actually caused by their negligence and not somehow indirectly related to it." *Doull,* 163 N.E.3d at 983 (citation omitted).

21.     "Another way to think about the but-for standard is as one of necessity; the question is whether the defendant's conduct was necessary to bringing about the harm." *Doull,* 163 N.E.3d at 983 (citing Restatement (Third) § 26 comment b ("a factual cause can also be described as a necessary condition for the outcome")).

22.     The Court, in order to conclude that Dr. Pahk and Dr. Henshaw's actions were the factual cause of Plaintiffs' injuries, must find that the actions of Dr. Pahk or Dr. Henshaw were the "but for" cause of Ms. Gonzalez's death. The Court cannot make such a finding.

a. Ms. Gonzalez did not tell either Dr. Pahk or Dr. Henshaw that she felt a lump before March 18, 2016.

b. Referring a patient to a specialist for diagnosis—which is what Dr. Pahk and Dr. Henshaw did each time they heard about or felt a lump—does not delay a diagnosis. It makes diagnosis more likely.

c. Even if this Court were to find that Dr. Pahk or Dr. Henshaw actions somehow delayed the diagnosis by not ordering a biopsy for her, the biology of Ms. Gonzalez's tumor and the manner in which it spread was such that a diagnosis in either 2015 or 2016 would not have prevented Ms. Gonzalez's death.

    i. Although tumors that are "triple positive," like Ms. Gonzalez's was, can have a good prognosis in *some* patients, that is not the case for *all* patients, and it was not the case for Ms. Gonzalez. She did not have a durable response to her treatments.

    ii. The amount of metastasis that Ms. Gonzalez had in March 2017 would have taken more than two years to develop.

    iii. Ms. Gonzalez's tumor was Grade 2, an intermediate cancer which is not the fastest-growing or the slowest-growing type of cancer.

    iv. Ms. Gonzalez did not have hereditary factors for breast cancer, which would have been another indicator that the tumor, while aggressive, was not so rapidly-growing that discovery in 2015 or 2016 would have made a difference.

v.  To have a tumor that is big enough to destroy a vertebral body, which would be close to two centimeters at a minimum, it would take a very long time to get to that tumor volume, based on what is known about how such cancers grow.

23.    Similar evidence led the jury in *Doull* to determine that a PCP's failure to diagnose a patient was not the but-for cause of that patient's death. *Doull*, 163 N.E.3d at 981 (noting defense expert testified that outcome would have remained the same had her PCP diagnosed her earlier).  And under analogous circumstances, the Supreme Judicial Court in 1995 directed that summary judgment should enter for the defendant doctors in a case where the plaintiff did not show, through evidence, that an earlier biopsy would have changed the outcome for the patient *Rudenauer v. Zafiropoulos*, 837 N.E.2d 278, 283 (2005) (observing that "[t]he only proffered testimony on causation is that "had a biopsy been performed [earlier], it likely would have resulted in a curative [procedure]"). Finally, the government has been found not liable in this district where, as here, the evidence showed that metastasis was present at the time of the allegedly negligent actions. *Santos v. United States*, 603 F. Supp. 417, 420 (D. Mass. 1985) (crediting testimony of defense expert that "the prognosis for plaintiff would be no different had the cancer been treated" nine months earlier).

24.    "Whether negligent conduct is the proximate cause of an injury depends not on factual causation, but rather on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct." *Kent v. Commonwealth,* 771 N.E.2d 770, 777 (2002); *see Doull*, 163 N.E.3d at 983.

25.    "'[N]egligent conduct is the proximate cause of an injury . . . [if] the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct.'" *Delaney v. Reynolds*, 825 N.E.2d 554, 556 (Mass. App. Ct. 2005) (quoting *Kent,* 771 N.E.2d at 777). "A result is foreseeable if it was not highly extraordinary." *Id.* (citations omitted).

26.    "This formulation is not altered when the original negligent act is followed by an independent act or event that actively operates in bringing about a plaintiff's injury, that is, a so-called intervening cause. Where the intervening occurrence was foreseeable by a defendant, the causal chain of events remains intact and the original negligence remains a proximate cause of a plaintiff's injury. Where, however, the intervening event was of a type so extraordinary that it could not reasonably have been foreseen, that new event is deemed to be the proximate cause of the injury and relieves a defendant of liability." *Delaney*, 825 N.E.2d at 557 (citations omitted).

27.    "If a series of events occur between the negligent conduct and the ultimate harm, the court must determine whether those intervening events have broken the chain of factual causation or, if not, have otherwise extinguished the element of proximate cause and become a superseding cause of the harm." *Kent*, 771 N.E.2d at 777 (citation omitted). *Cf. Reid v. City of Boston*, 129 N.E.3d 867, 877 (Mass. App. Ct. 2019) (reciting the standard and explaining that causation is generally a factual question for the factfinder).

28.    "Expert testimony is necessary where proof of medical causation lies outside the ken of lay jurors. In fact, the medical malpractice case law recognizes that the causal link between the defendant's negligence and the plaintiff's harm generally must be established by expert testimony. However, where a determination of causation lies within general human knowledge and experience, expert testimony is not required." *Pitts v. Wingate at Brighton, Inc.,* 972 N.E.2d 74, 78-79 (Mass. App. Ct. 2012) (reversing grant of directed verdict where the plaintiff did not have an expert regarding the issue of causation).

29.    Here, the Court finds that the United States did not cause Plaintiffs' harm, as Dr. Pahk and Dr. Henshaw met the standard of care by examining Ms. Gonzalez and referring her for consultation (which they expected would include appropriate imaging) each time she mentioned having breast lump to each doctor. But even if this Court were to find that their actions failed to meet the standard of care, the United States is not the proximate cause of the claimed injuries because the intervening actions of Belkin broke the chain of causation.  Assuming a diagnosis of Ms. Gonzalez's breast cancer could have been made both times she was referred to Belkin, Belkin's failure to diagnose her was not reasonably foreseeable. Dr. Henshaw and Dr. Pahk knew that Belkin had the means and expertise to adequately evaluate Ms. Gonzalez and order appropriate testing for her, as it was a comprehensive breast center with internists who specialized in breast health, patient navigators, breast surgeons, and medical oncologists, all of whom were co-located with ultrasound and mammography so patients could do all those things in one setting. Belkin providers

independently evaluated patient's needs, did not rely solely on information provided in a referral, and determined what follow up was needed. Although Dr. Pahk's initial referral to Belkin resulted in an imaging study and not a clinical evaluation as well, a clinical evaluation six months later at Belkin still did not result in a tissue biopsy. The Court cannot conclude that a clinical consultation at the Belkin Center earlier in the course of Ms. Gonzalez's illness would have resulted in a different result.

### *Plaintiffs have not sufficiently supported all of their damages claims.*

30.     Because Plaintiffs have failed to meet their burden of proof regarding the negligence and causation aspects of this lawsuit, Plaintiffs are not entitled to any damages, and the United States is entitled to judgment in its favor on all counts of the Amended Complaint.

31.     If the Court finds the United States liable for the injuries sustained by Plaintiffs, the damages award should be based on the evidence presented at trial.

> [D]amage awards must be based on the evidence presented. A corollary to this axiom is that a court charged with making a damage award should take into account the particular circumstances of each individual plaintiff. This corollary holds true with respect to damages for emotional distress and loss of consortium, both of which by their very nature are difficult to monetize.

*Limone v. United States*, 579 F.3d 79, 107-108 (1st Cir. 2009) (cleaned up).

32.     Punitive damages are not available to Plaintiffs under the FTCA. *See* 28 U.S.C. § 2674; *Poyser v. United States*, 602 F. Supp. 436, 440 (D. Mass. 1986).

33.     "If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for

actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof." 28 U.S.C. § 2674; *see Massachusetts Bonding & Ins. Co. v. United States*, 352 U.S. 128, 132-133 (1956).

34.     "[T]he SJC . . . has stressed the paramount importance of case-specific facts." *Limone*, 579 F.3d at 103, 107 (cleaned up) (characterizing award based on comparable cases as "at the outer edge of the universe of permissible awards" and "surviv[ing] scrutiny, though barely, only because of the deferential nature of the standard of review and the unique circumstances of the case").

35.     "A defendant may be held liable only for the damages that it actually causes." *Limone*, 579 U.S. at 108 (citing W. Page Keeton, *Prosser & Keeton on Torts* 292 (5th ed. 1984); *see id.* at 108 (affirming award where government's misconduct caused only a fraction of the woes claimed because the rest would have occurred because of the family environment).

36.     "The prior independent existence of marital discord or separation short of divorce are important considerations, since they qualify the nature of the society that has been lost." *Limone v. United States*, 497 F. Supp. 2d 143, 246 (D. Mass. 2007)*, aff'd* 579 F.3d 79 (1st Cir. 2009).

37.     Regarding loss of consortium damages for Mr. Napoleonis, his relationship with Ms. Gonzalez was complicated; Ms. Gonzalez certified under the penalties of perjury that they did not live together in 2015, 2016, 2017, 2019, and 2020; they were separated many times, including after she was diagnosed with

cancer; in 2019, Ms. Gonzalez took out a restraining order against Mr. Napoleonis; and in January 2020, Ms. Gonzalez asked in her will that her personal representative allocate all loss of consortium damages from this lawsuit to JB and AN and stated that her omission of Mr. Napoleonis was intentional. *See Litif v. United States*, 682 F. Supp. 2d 60, 85 (D. Mass. 2010), *aff'd* 670 F.3d 39 (1st Cir. 2012) (awarding $50,000, for spouse where couple had a complicated relationship in which they worked together regarding their children but otherwise had separate lives).

38.    "A child has a viable claim for loss of parental society if she establishes filial needs for closeness, guidance, and nurture.  A child's recovery for loss of parental society is based upon dependence on the injured parent for management of the child's needs and for emotional guidance and support[.]" *Barbosa v. Hopper Feeds, Inc.*, 537 N.E.2d 99, 104-105 (Mass. 1989) (cleaned up).

39.    While "no extensive display of facts is required to demonstrate, in light of ordinary human experience, an emotional or psychological dependence by the child upon her mother, . . .  [a] court cannot take judicial notice of these facts." *Barbosa*, 537 Mass. at 105 (cleaned up).

40.    Regarding loss of consortium damages for JB, Plaintiffs presented almost no evidence on that issue. JB lived with Ms. Arias in 2019; subsequently she was placed in DCF custody, and Mr. Napoleonis is not her guardian. Neither JB, nor Ms. Arias, nor JB's guardian, Melissa Coury testified or submitted any evidence on behalf of JB. Mr. Napoleonis did not describe any current contact with JB.

41.     Regarding the issue of reasonably expected net income, "'[i]t should be noted that the statute refers to net income and hence, the issue is future earnings and not future earning capacity.'" *Litif*, 682 F. Supp. 2d at 85 (quoting Joseph R. Nolan & Laurie J. Sartorio, 37A *Massachusetts Practice* § 28.3 (3d ed. 2009)).

42.     Plaintiffs are not entitled to any damages for earning capacity between 2017 and 2020, because there is no evidence that shows that Ms. Gonzalez earned an income outside the home after August 3, 2014. For similar reasons, Plaintiffs' claim for reasonable net income lacks support in the record. Before her diagnosis, Ms. Gonzalez's migraines made it impossible for her to work outside the home, and nothing in the medical records or her DTA records indicate that her migraine issues had resolved. *Cf. Litif*, 682 F. Supp. 2d at 85 (explaining that "the estate of a stay-at-home mother who intended to go back to work when her children were older was not entitled to recover expected net income") (citing *Santos v. Chrysler Corp.,* Civil Action No. 921039, 1996 WL 1186818, at *2 (Mass. Super. Ct. Sept. 18, 1996)).

43.     Regarding the claim for loss of household services, the claimed amount is inflated. Ms. Gonzalez certified to the DTA that her migraines affected her ability to do household chores and care for her children in 2015 and 2016. Dr. Lee did not take this information into account in his opinion.

44.     The Court should not include Plaintiff Richard Blank's $81,000, in legal fees for managing AN and JB's trust in any damages award; Plaintiffs failed to disclose them in discovery or their pre-trial filing. *See, e.g.*, *Kirouac v. Donahoe*, Civil Action No. 2:11-00423-NT, 2013 WL 5773818, at * 3 (D. Me. Oct. 23, 2013).

## CONCLUSION

After consideration of the evidence presented, this Court finds that judgment will enter in favor of the United States of America.

Respectfully submitted,

The United States of America

By its attorney,

Nathaniel R. Mendell
Acting United States Attorney


*/s/Annapurna Balakrishna*
Annapurna Balakrishna
Eve A. Piemonte
Assistant United States Attorneys
John J. Moakley United States Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
annapurna.balakrishna@usdoj.gov
eve.piemonte@usdoj.gov
(617) 748-3111

March 31, 2021