UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD BLANK, ESQ. AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARIELIS GONZALEZ; ANDY NAPOLEONIS, INDIVIDUALLY AND AS NEXT FRIEND OF AN; AND MELISSA COURY AS NEXT FRIEND OF JB,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 19-11855-JCB |

## PLAINTIFFS' POST-TRIAL AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs respectfully submit the following Post-Trial Amended Proposed Findings of Fact and Conclusions of Law.

## PROPOSED FINDINGS OF FACT

### I.   PARTIES AND JURISDICTION

1.     During her lifetime, Marielis Gonzalez was an individual residing in Boston, Massachusetts. She died on August 15, 2020 at the age of thirty-four.

2.     Richard Blank, Esq. as Personal Representative of the Estate of Marielis Gonzalez has standing to pursue this action on behalf of Marielis Gonzalez and on behalf of her husband Andy Napoleonis and her two minor daughters, JB and AN.

3.      Andy Napoleonis, Ms. Gonzalez's husband, is an individual residing at 80 Fenwood Road, Apartment 210, Boston, Massachusetts 02115.

4.      AN is the minor daughter of Andy Napoleonis and the decedent, Marielis Gonzalez.  AN is currently eight years old.

5.      Melissa Coury is the Guardian Ad Litem ("GAL") of JB, the minor daughter of the decedent Marielis Gonzalez.  JB is currently thirteen years old.

6.      DotHouse Health, Inc. ("DotHouse") is a federally funded community health center located in Dorchester, Massachusetts.

7.      At all times relevant, Dr. Pahk was employed by DotHouse and provided primary care services to patients, including Ms. Gonzalez, at DotHouse. Dr. Pahk is board certified and specializes in family medicine.

8.      At all times relevant, Dr. Henshaw was employed by DotHouse and provided primary care services to patients, including Ms. Gonzalez, at DotHouse. Dr. Henshaw is board certified and specializes in internal medicine.

9.      The United States of America is a party in this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671 et seq.

10.      The jurisdiction of this Court is founded upon the FTCA, 28 U.S.C. 2671, et seq. The damages incurred by Plaintiffs were caused by the negligent or wrongful acts or omissions of Dr. Pahk and Dr. Henshaw while acting within the scope of their employment at DotHouse, under circumstances where the United States, if a private person, would be liable to Plaintiffs under Massachusetts law.

## II.   FACTUAL BACKGROUND

### A.   MARIELIS BEGINS TREATING WITH DR. PAHK AND DR. HENSHAW AT DOTHOUSE.

11.     Marielis Gonzalez moved to Dorchester, Massachusetts from Puerto Rico in 2008 at the age of twenty-two with her one-year-old daughter, JB. See Testimony of Andy Napoleonis.

12.     That same year, Ms. Gonzalez began dating Andy Napoleonis, who was eighteen years old at the time. See Testimony of Andy Napoleonis.

13.     In 2012, Marielis Gonzalez and Andy Napoleonis had a daughter, AN, and were married the next year in December 2013. Ms. Gonzalez and Mr. Napoleonis were married until Ms. Gonzalez's death in August 2020. See Testimony of Andy Napoleonis; Exhibit 20 Marriage Certificate of Marielis Gonzalez and Andy Napoleonis (Gonzalez026475); Exhibit 31 Death Certificate of Marielis Gonzalez (Gonzalez023008-023009).

14.     In or about 2009, Marielis Gonzalez began receiving medical care, including primary care services, at DotHouse. DotHouse is a neighborhood health clinic located in Dorchester, Massachusetts. See Exhibit 1 Portions of the DotHouse Medical Record that was produced on March 4, 2020 with conversion chart (USA007269-USA008606) ("DotHouse Medical Record").

15.     Between 2012 and 2017, Marielis Gonzalez treated on numerous occasions at DotHouse with primary care physicians Caroline Pahk, M.D. and Nsa Henshaw, M.D. See id.; Testimony of Caroline Pahk, M.D. and Nsa Henshaw, M.D.

### B.   RESPONSIBILITIES OF DR. PAHK AND DR. HENSHAW AS PRIMARY CARE PHYSICIANS.

16.     Between 2015 and 2017, Dr. Pahk and Dr. Henshaw were responsible for direct patient care and managing the continuity of care of the patients they treated for whom they were responsible. Dr. Pahk and Dr. Henshaw were responsible for the care of patients on their panel for whom they provided primary care services. These responsibilities included follow up for chronic medical conditions, including scheduling patients to return within an appropriate period of time, such that they could continue to receive primary care treatment for such conditions. See Testimony of Dr. Caroline Pahk, Dr. Nsa Henshaw, John Russo, M.D., and Leigh Simmons, M.D.; Exhibit 32 Caroline Pahk, M.D. Employment Agreement (Exhibit 3, Deposition of Caroline Pahk, M.D.); Exhibit 39 Nsa Henshaw, M.D. Employment Agreement (Exhibit 6, Deposition of Nsa Henshaw, M.D.).

17.     Between 2015 and 2017, Dr. Pahk and Dr. Henshaw were responsible for following up on any laboratory results and imaging studies of patients for whom they were providing primary care. See Testimony of Dr. Caroline Pahk, Dr. Nsa Henshaw, Dr. John Russo, and Dr. Leigh Simmons; Exhibit 32 Caroline Pahk, M.D. Employment Agreement (Exhibit 3, Deposition of Caroline Pahk, M.D.); Exhibit 39 Nsa Henshaw, M.D. Employment Agreement (Exhibit 6, Deposition of Nsa Henshaw, M.D.).

18.     Between 2015 and 2017, Dr. Pahk and Dr. Henshaw were responsible for referring patients to specialists for consultation in certain situations. It was the responsibility of Dr. Pahk and Dr. Henshaw to provide the appropriate specialist with the information necessary for the specialist to have an understanding of why the patient was being referred, to ensure that the referral reached the specialist, and to close the loop on the referral to the specialist for

consultation. See Testimony of Dr. Caroline Pahk, Dr. Nsa Henshaw, Dr. John Russo, and Dr. Leigh Simmons.

19.    In order to close the loop on a patient referral, it was the responsibility of Dr. Pahk and Dr. Henshaw between 2015 and 2017, to ensure that the patient was able to go to the referral and that the note from the specialist was sent back to them as the primary care doctor. Upon receiving the specialist's consultation report, it was Dr. Pahk's and Dr. Henshaw's responsibility to review the report, incorporate the report into the patient's medical record and to follow up with the patient regarding ongoing care. In other words, Dr. Pahk and Dr. Henshaw had an obligation to follow up with the person to whom they referred a patient to see what had happened and to get feedback on what the resolution was for that problem for the purpose of ongoing and comprehensive care. See Testimony of Dr. Caroline Pahk, Dr. Nsa Henshaw, Dr. John Russo, and Dr. Leigh Simmons.

20.    Between 2015 and 2017, Dr. Pahk and Dr. Henshaw, as primary care physicians, had a continuing responsibility to provide comprehensive and longitudinal care to the patients for whom they were responsible for providing primary care. See Testimony of Dr. Caroline Pahk, Dr. Nsa Henshaw, Dr. John Russo, and Dr. Leigh Simmons.

21.    Between 2015 and 2017, Dr. Pahk and Dr. Henshaw, as primary care physicians, had a responsibility to coordinate the care of their primary care patients, including by integrating primary care activities between two or more physicians involved with a patient's care. Care coordination is aimed at reducing fragmentation in the healthcare system including issues surrounding confusion arising from lack of communication between multiple physicians caring

for one patient. See Testimony of Dr. Caroline Pahk, Dr. Nsa Henshaw, Dr. John Russo, and Dr. Leigh Simmons.

22.     Dr. Pahk was Marielis Gonzalez's primary care physician from September 21, 2013 to March 18, 2016 and from August 17, 2016 to December 29, 2016. See Testimony of Dr. Caroline Pahk; see generally Exhibit 1 DotHouse Medical Record.

23.     Dr. Henshaw was Marielis Gonzalez's primary care physician from March 18, 2016 to August 17, 2016. See Testimony of Dr. Nsa Henshaw; see generally Exhibit 1 DotHouse Medical Record.

### C. MARIELIS  GONZALEZ DISCOVERS HER BREAST LUMP AND REPORTS THE LUMP TO DR. PAHK.

24.     In 2015, Ms. Gonzalez discovered a hard lump near her nipple on her right breast while she was conducting a self-examination of her breasts in the shower. She often conducted such self-examinations because she had an extensive family history of cancer. See Exhibit 57 Redacted Affidavit of Marielis Gonzalez (Exhibit 1, Videotaped Deposition of Marielis Gonzalez) ("Redacted Affidavit of Marielis Gonzalez") at ¶3; Exhibit 61 Videotaped Deposition of Marielis Gonzalez dated August 13, 2018 Transcript and Video, pp. 1-30 ("Videotaped Deposition of Marielis Gonzalez") at 8:2 – 9:1; Testimony of Andy Napoleonis.

25.     Immediately after discovering the lump, Ms. Gonzalez asked her husband, Andy Napoleonis, to confirm the existence of the lump.  He felt the area where Ms. Gonzalez had felt the lump and confirmed its existence. See Exhibit 57 Redacted Affidavit of Marielis Gonzalez at ¶3; Testimony of Andy Napoleonis.

26.     Concerned that her breast lump might be cancerous, Ms. Gonzalez brought it to the attention of her primary care doctor, Dr. Pahk, when she next saw her at DotHouse on July 20, 2015 for follow up regarding various issues, including her chronic migraines and

gynecological testing. <u>See</u> Exhibit 57 Redacted Affidavit of Marielis Gonzalez at ¶4 -5;
Testimony of Andy Napoleonis.

27.     Prior to treating Ms. Gonzalez on July 20, 2015, Dr. Pahk viewed Ms. Gonzalez's
behavioral health records in her medical record. <u>See</u> Testimony of Dr. Caroline Pahk; Exhibit 33
CPS Audit Trails (USA012601-012956) at USA012803.

28.     At the July 20, 2015 appointment, Ms. Gonzalez told Dr. Pahk that she had
discovered a hard lump in her right breast that was causing her pain. Dr. Pahk dismissed Ms.
Gonzalez's concerns, telling her that she was too young to get cancer and that the lump would go
away. Ms. Gonzalez asked to see a specialist and told Dr. Pahk that she was very worried due to
her family history of cancer, but Dr. Pahk said it was not necessary for her to see a specialist and
laughed at her. Dr. Pahk told Ms. Gonzalez that she was anxious and should see a therapist. <u>See</u>
Exhibit 57 Redacted Affidavit of Marielis Gonzalez at ¶4 -5; Exhibit 61 Videotaped Deposition
of Marielis Gonzalez at 11:11 – 12:3; Testimony of Andy Napoleonis; Exhibit 1 DotHouse
Medical Record at USA-007963 ("reports had lump check last year PCP said it would go
away").

29.     When she returned home after this appointment, Ms. Gonzalez was very upset and
crying. She explained to her husband what had happened at the appointment and that she felt
very disrespected, patronized and ignored by Dr. Pahk. <u>See</u> Testimony of Andy Napoleonis;
Exhibit 61 Videotaped Deposition of Marielis Gonzalez at 11:11 – 12:3.

30.     Later medical records indicate that Ms. Gonzalez continued to report to her
physicians that she had first noted her breast lump and reported it to her PCP in 2015. There is no
dispute that Dr. Pahk was Ms. Gonzalez's PCP in 2015. <u>See</u> Exhibit 1 DotHouse Medical Record
at USA-007963 ("reports had lump check last year PCP said it would go away"), USA007997 (in

February 2017 reporting noting lump in breast several years ago and evaluated by physician) and USA008025 ("initially noted R breast mass in 2015…went to her PCP…"); Exhibit 4 Brigham & Women's Hospital Medical Records (Gonazlez000001-002134;Gonzalez005875-016488; Gonzalez018649-022685) ("Brigham & Women's Hospital Medical Record") at Gonzalez000013 ("Pt initially noted R breast mass in 2015, referred by PCP to breast clinic…") and Gonzalez000021 ("The patient states that she has had a breast mass since 2015, was repeatedly evaluated by her primary care physician…"); Exhibit 5 Dana Farber Cancer Institute Medical Records (USA010494-011851)("Dana Farber Medical Record") ("Ms. Gonzalez reports first noticing a breast mass in 2015. She reported to her primary care physician did not seem to feel this was concerning at the time…").

31.     Ms. Gonzalez's breast lump did not go away in 2015 as Dr. Pahk has assured her that it would. Instead, Ms. Gonzalez's breast lump continued to grow and to cause her pain.  See Exhibit 57 Redacted Affidavit of Marielis Gonzalez at ¶6; Testimony of Andy Napoleonis.

32.     Ms. Gonzalez reported her breast lump to Dr. Pahk again on February 1, 2016. Just as she had in July 2015, Dr. Pahk again ignored Ms. Gonzalez's concerns, did not ask any questions about the lump, and did not perform a physical examination of Ms. Gonzalez's breasts. See Exhibit 57 Redacted Affidavit of Marielis Gonzalez at ¶7; Testimony of Andy Napoleonis.

33.     Dr. Pahk has no independent memory of treating Ms. Gonzalez on July 20, 2015 or February 1, 2016. See Testimony of Dr. Caroline Pahk.

34.     Dr. Pahk completed her note in the medical record for Ms. Gonzalez's July 20, 2015 appointment six days after seeing Ms. Gonzalez. It was not unusual that Dr. Pahk did not complete and sign a note in the medical record the same day she treated a patient. See Testimony of Dr. Caroline Pahk.

### D. MARIELIS GONZALEZ PRESENTS TO DR. PAHK IN MARCH 2016 WITH A PERSISTENT, GROWING AND PAINFUL PALPABLE BREAST LUMP.

35.     Marielis Gonzalez treated with her primary care doctor Dr. Pahk at DotHouse on March 18, 2016 in connection with the lump in her right breast. See Testimony of Dr. Caroline Pahk; Exhibit 1 DotHouse Medical Record at USA-007963 – 007967.

36.     At her March 18, 2016 appointment with Dr. Pahk, Marielis Gonzalez reported that the lump on her right breast was "now causing pain, burning and getting bigger" and that the lump was causing "mis shape in [her] breast." See Testimony of Dr. Caroline Pahk; Exhibit 1 DotHouse Medical Record at USA-007963.

37.     A lump in a woman's breast that is causing pain, burning and getting bigger is very worrisome and should cause a primary care physician to be concerned about cancer as the "red flag" or "can't miss" diagnosis. See Testimony of Dr. Caroline Pahk, Dr. Nsa Henshaw, Dr. John Russo and Dr. Leigh Simmons.

38.     Ms. Gonzalez also told Dr. Pahk that she was particularly worried about cancer because of the prevalence of cancer among her close family members and that she wanted Dr. Pahk to do a breast exam. See Testimony of Dr. Caroline Pahk and Andy Napoleonis.

39.     Dr. Pahk knew that Ms. Gonzalez had been traumatized watching her mother die at a young age from cancer and that she was particularly terrified of dying at a young age from cancer because of this experience. See Testimony of Dr. Caroline Pahk and Andy Napoleonis.

40.     Ms. Gonzalez reported that she had told her primary care physician (Dr. Pahk) about the lump in July of 2015 and that Dr. Pahk had told her that it would go away. Specifically, the medical record states, "reports had lump check last year PCP said it would go away."  See Testimony of Dr. Caroline Pahk and Andy Napoleonis; Exhibit 1 DotHouse Medical Record at USA-007963.

41.     Dr. Pahk recorded a "History of Present Illness" for Ms. Gonzalez, stating "breast lump x 1 year…now feels like it is getting bigger…affecting shape of her breast mildly tender…worreid [sic] because her mom died young of cancer, unknown primary."  See Testimony of Dr. Caroline Pahk; Exhibit 1 DotHouse Medical Record at USA-007964.

42.     According to Dr. Pahk, Ms. Gonzalez was a good historian of what was going on with her body. See Testimony of Dr. Caroline Pahk.

43.     In response to Ms. Gonzalez's complaints, Dr. Pahk again told Ms. Gonzalez she was too young to have cancer. See Testimony of Andy Napoleonis; Exhibit 57 Redacted Affidavit of Marielis Gonzalez at ¶7; Exhibit 61 Videotaped Deposition of Marielis Gonzalez at 11:11 – 20.

44.     Dr. Pahk performed a physical examination on Ms. Gonzalez, during which she identified a 1 cm hard and rubbery palpable lump in Ms. Gonzalez's right breast. Dr. Pahk's note in the record states, "1 CM hard rubbery mass at 11 oclock 2-3 CM from nipple with surrounding thicker tissues..." See Testimony of Dr. Caroline Pahk; Exhibit 1 DotHouse Medical Record at USA-007964

45.     Dr. Pahk also noted that Ms. Gonzalez's left breast was more full appearing (larger) than her right breast during the physical examination, confirming Ms. Gonzalez's complaint of "mis shape in [her] breast." See Testimony of Dr. Caroline Pahk; Exhibit 1 DotHouse Medical Record at USA-007964.

46.     At this appointment, Ms. Gonzalez presented to Dr. Pahk with a clinically suspicious breast lump. See Testimony of Dr. Caroline Pahk and Dr. Leigh Simmons.

47.     A hard and immobile breast lump like Ms. Gonzalez's breast lump is more likely to be breast cancer. A growing breast lump is also more likely to be cancer. See Testimony of Dr. Caroline Pahk, Dr. John Russo and Dr. Leigh Simmons.

48.     During Dr. Pahk's medical training she learned how to work up a palpable breast lump, including how to perform a proper physical examination of a woman's breasts. See Testimony of Dr. Caroline Pahk.

49.     Ms. Gonzalez asked Dr. Pahk if she could have a mammogram but Dr. Pahk never referred her for a mammogram. See Testimony of Andy Napoleonis and Dr. Caroline Pahk; Exhibit 57 Redacted Affidavit of Marielis Gonzalez at ¶7; Exhibit 61 Videotaped Deposition of Marielis Gonzalez at 12:12-19.

50.     There is no differential diagnosis for Ms. Gonzalez's breast lump included in Dr. Pahk's March 18, 2016 note in the medical record. See Testimony of Dr. Simmons; Exhibit 1 DotHouse Medical Record at USA-007963 – 007967.

51.     Dr. Pahk as a primary care physician would have learned the differential diagnosis for palpable breast lumps during her medical training. See Testimony of Dr. Leigh Simmons.

52.     A growing painful palpable breast lump in a patient that has been present for one year and has continued to grow over time is breast cancer until determined otherwise. See Testimony of Dr. John Russo.

53.     At some point during the week of Ms. Gonzalez's March 18, 2016 appointment with Dr. Pahk, DotHouse underwent a change in its medical records system. When data was transferred from the original CPS medical records system to the new EPIC medical records system, Ms. Gonzalez's primary care provider was changed in the system from Dr. Pahk to Dr.

Henshaw. This change occurred precisely with and a result of the change in the medical records computer system. See Testimony of Dr. Caroline Pahk and Dr. Leigh Simmons.

54.     Dr. Pahk did not communicate with Dr. Henshaw regarding Ms. Gonzalez at any time after treating Ms. Gonzalez on March 18, 2016. See Testimony of Dr. Caroline Pahk and Dr. Nsa Henshaw.

### E.   DR. PAHK ORDERS AN ULTRASOUND FOR MARIELIS GONZALEZ BUT DOES NOT REFER HER TO A BREAST SPECIALIST; NEITHER DR. PAHK NOR DR. HENSHAW FOLLOW UP OR CLOSE THE LOOP ON MARIELIS' CARE.

55.     Dr. Pahk did not refer Ms. Gonzalez to a breast specialist. Dr. Pahk did not communicate with any breast specialist regarding Ms. Gonzalez's very worrisome condition. See Testimony of Dr. Caroline Pahk, Alexis Higgins, Tracy Battaglia, M.D., Neely Hines, M.D. and Ambili Ramachandran, M.D.

56.     In particular, Dr. Pahk did not refer Ms. Gonzalez to the Belkin Breast Health Center. No such referral was ever received by the Belkin Breast Health Center. See Testimony of Alexis Higgins and Dr. Tracy Battaglia.

57.     Even if Dr. Pahk had referred Ms. Gonzalez to the Belkin Breast Health Center, she did not refer her to a particular breast specialist whom she knew to have appropriate experience and training in breast health. Dr. Pahk did not have any knowledge regarding the experience or training of non-surgeons at the Belkin Breast Health Center to whom she referred patients. See Testimony of Dr. Caroline Pahk.

58.     Even if Dr. Pahk had referred Ms. Gonzalez to the Belkin Breast Health Center, she admits that she did not send Ms. Gonzalez's visit notes with any referral. She also admits that, as of March 18, 2016, the electronic portal which now allows outside specialists to view

DotHouse medical records (Care Everywhere) was not available. See Testimony of Dr. Caroline Pahk.

59.     On March 23, 2016, almost one week after her appointment with Dr. Pahk, Ms. Gonzalez went to DotHouse to report that her referral had not gone through. Ms. Gonzalez spoke with Yamileth Flores (Vazquez), the DotHouse breast health navigator, about the missing referral. In response, Ms. Flores sent an internal message through the DotHouse medical records system to Dr. Henshaw asking Dr. Henshaw to place a referral for breast imaging for Ms. Gonzalez.  See Testimony of Dr. Caroline Pahk; Exhibit 35 Medical Inbox Messages Between March 23, 2016 and February 23, 2017 (USA012982 – USA012987) ("DotHouse Inbox Messages") at USA012982.

60.     Ms. Gonzalez also saw Lilliam Pabon, M.D. in the Behavioral Health Department at DotHouse on March 23, 2016. At this appointment, Ms. Gonzalez told Dr. Pabon that her breast lump was bothering her, that she had seen Dr. Pahk, that her mom and grandmother had died of cancer and that she was wanted to know the status of her referral. Dr. Pabon sent an inbox message to Dr. Henshaw relaying this information. See Testimony of Dr. Caroline Pahk; Exhibit 35 DotHouse Inbox Messages at USA012982.

61.     On March 24, Ms. Flores spoke with Dr. Pahk over the phone requesting that she refer Ms. Gonzalez for a breast ultrasound at Boston Medical Center. Dr. Pahk subsequently placed a referral to the Radiology Department at Boston Medical Center for a breast ultrasound. This referral did not go to the Belkin Breast Health Center, which is separate from the Boston Medical Center Radiology Department. See Testimony of Dr. Caroline Pahk, Alexis Higgins, Dr. Tracy Battaglia and Dr. Neely Hines.; Exhibit 1 DotHouse Medical Record at USA-008443 - 008445.

62.     Dr. Pahk's referral of Ms. Gonzalez to Boston Medical Center for an ultrasound authorized one visit to the Boston Medical Center Radiology Department only. See Testimony of Dr. Caroline Pahk; Exhibit 1 DotHouse Medical Record at USA-008443 -008445.

63.     On March 29, 2016, Ms. Gonzalez returned to DotHouse to again report that her referral was missing. Ms. Flores sent a message to Dr. Pahk stating that Ms. Gonzalez came to DotHouse very upset that her referral was still missing. Ms. Flores told Dr. Pahk that Ms. Gonzalez would need imaging prior to being seen at the breast clinic. See Testimony of Dr. Caroline Pahk; Exhibit 35 DotHouse Inbox Messages at USA012982.

64.     Dr. Pahk assumed that Ms. Flores had heard from Boston Medical Center regarding the referral of Ms. Gonzalez. See Testimony of Dr. Caroline Pahk.

65.     There is no evidence that Ms. Flores or anyone at DotHouse spoke with anyone at the Belkin Breast Health Center regarding Ms. Gonzalez.[1] See generally Exhibit 1 DotHouse Medical Record and Exhibit 2 Boston Medical Center Medical Records (USA012988-013357) ("Boston Medical Center Medical Record").

66.     At no time after referring Ms. Gonzalez to the Boston Medical Center Radiology Department for a breast ultrasound did Dr. Pahk ever refer Ms. Gonzalez to a breast specialist for a consultation or to the Belkin Breast Health Center. See Testimony of Dr. Caroline Pahk.

67.     By March 29, 2016, Dr. Pahk knew that Ms. Gonzalez had come to DotHouse twice concerned that she was not getting the referral she wanted and which Dr. Pahk told her she

---

[1] Yamileth Flores (Vazquez), the breast health navigator at DotHouse, was initially listed as a witness by Defendant at trial, but she did not testify. There is no additional evidence that a call between Ms. Flores and Boston Medical Center or the Belkin Breast Health Center ever took place.

was going to get, and that Ms. Gonzalez's inability to get her referral was making her anxious. <u>See</u> Testimony of Dr. Caroline Pahk; Exhibit 35 Medical Inbox Messages at USA012982.

68.     On March 30, 2016, a targeted right breast ultrasound was performed on Ms. Gonzalez at Boston Medical Center. The report, which was signed by Neely Hines, M.D., indicated that "there [was] no suspicious mass or suspicious sonographic finding" at the "11 o'clock position, 1-10cm from the nipple" and that the ultrasound did not show evidence of malignancy. The ultrasound report indicated "clinical follow up recommended." Dr. Pahk, not the Belkin Breast Health Center (which did not receive the ultrasound results) was responsible for initiating clinical follow up for Ms. Gonzalez. <u>See</u> Testimony of Dr. Neely Hines; Exhibit 2 Boston Medical Center Medical Record at USA013081 -013082.

69.     Dr. Pahk received Ms. Gonzalez's ultrasound results and reviewed them.. <u>See</u> Testimony of Dr. Caroline Pahk.

70.     Ms. Gonzalez's breast ultrasound results were not sent to a breast specialist or the Belkin Breast Health Center. Instead, these results were sent back to Dr. Pahk who was the referring physician. <u>See</u> Testimony of Dr. Neely Hines.

71.     It was Dr. Pahk's duty to follow up on Ms. Gonzalez's imaging results by referring her for further imaging and/or by referring her to a breast specialist. <u>See</u> Testimony of Dr. John Russo and Dr. Leigh Simmons.

72.     Dr. Pahk did not have any system in place to ensure that she received consultation reports for patients she had referred, including Ms. Gonzalez. <u>See</u> Testimony of Dr. Caroline Pahk.

73.     At no time after reviewing Ms. Gonzalez's ultrasound results did Dr. Pahk refer Ms. Gonzalez for further imaging. See Testimony of Dr. Caroline Pahk, Dr. John Russo and Dr. Leigh Simmons.

74.     At no time after reviewing Ms. Gonzalez's ultrasound results did Dr. Pahk look for a consultation report for clinical care for Ms. Gonzalez. See Testimony of Dr. Caroline Pahk.

75.     At no time after reviewing Ms. Gonzalez's ultrasound results did Dr. Pahk refer Ms. Gonzalez to a breast specialist or to the Belkin Breast Health Center. See Testimony of Dr. Caroline Pahk, Dr. John Russo and Dr. Leigh Simmons.

76.     Dr. Pahk had an ongoing duty to rule out breast cancer in Ms. Gonzalez for whom she had served as primary care physician for many years. See Testimony of Dr. Caroline Pahk and Dr. John Russo.

77.     An ultrasound cannot rule out cancer in a palpable breast lump. See Testimony of Dr. Caroline Pahk, Dr. Nsa Henshaw, Dr. John Russo, Dr. Leigh Simmons.

78.     Ultrasound can be used to distinguish cysts from solid lesions. Not all solid masses are detected by ultrasound; thus, a palpable mass that is not visualized on ultrasound by be presumed to be solid. Exhibit 59 Kasper Dennis, Fauci Anthony et al. Harrison's Principles of Internal Medicine, 19th ed. McGraw-Hill Education, 2015, Chapter 108 Breast Cancer, pp. 524-525 ("Harrison's Principles of Internal Medicine") at 525.

79.     Harrison's Principles of Internal Medicine is an authoritative text on breast cancer. See Testimony of Dr. John Russo and Dr. Leigh Simmons.

80.     When women first present with a suspicious new mass, diagnostic mammogram should be part of the initial workup, despite young age. See Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 2.

81.     Diagnostic algorithms must be adapted to patient preferences, such as Ms. Gonzalez's preference for a mammogram, so long as the diagnostic option is reasonable. It would have been reasonable for Dr. Pahk to order a mammogram for Ms. Gonzalez. <u>See</u> Testimony of Dr. Leigh Simmons; Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 14.

82.     A biopsy is the only way to rule out cancer in a palpable breast lump. Ms. Gonzalez never had a biopsy. <u>See</u> Testimony of Dr. Caroline Pahk, Dr. Nsa Henshaw, Dr. John Russo and Dr. Leigh Simmons.

83.     A growing breast lump is a clinically suspicious breast lump. <u>See</u> Testimony of Dr. John Russo and Dr. Leigh Simmons.

84.     In a patient with a palpable breast mass, the obligatory diagnostic technique is biopsy. Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 15.

85.     A clinically suspicious mass should be biopsied regardless of imaging findings. Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 1.

86.     A growing breast lump must be biopsied. <u>See</u> Testimony of Dr. John Russo and Dr. Leigh Simmons; Exhibit 58 "Diagnostic algorithm for palpable breast abnormalities in women <30 years of age" UpToDate, May 2019 (Exhibit 1, Dr. Simmons Expert Report).

87.     In Dr. Pahk's experience, most clinically suspicious breast lumps do end up getting biopsied. <u>See</u> Testimony of Dr. Caroline Pahk.

88.     Dr. Pahk had the ability to refer Ms. Gonzalez directly for a biopsy and to track her biopsy results. Despite her ability to do so, she did not refer Ms. Gonzalez for a biopsy. <u>See</u> Testimony of Dr. Caroline Pahk and Dr. Leigh Simmons; Exhibit 36 DotHouse Policies and

Procedures (Exhibits 2-7, 30(b)(6) Deposition of DotHouse – Caroline Pahk, M.D.) ("DotHouse Policies and Procedures) at USA000404.

89.     Dr. Pahk also could have requested that Ms. Gonzalez be seen by a surgeon in a referral of Ms. Gonzalez to the Belkin Breast Health Center but did not do so. See Testimony of Dr. Caroline Pahk, Dr. Tracy Battaglia, Dr. Ambili Ramachandran and Dr. Leigh Simmons.

90.     According to Dr. Pahk, her further responsibility to follow up on a patient referral is triggered only if the patient is having trouble getting the referral. See Testimony of Dr. Caroline Pahk.

91.     Ms. Gonzalez went back to DotHouse twice because she was having trouble getting her referral from Dr. Pahk. See Testimony of Dr. Caroline Pahk; Exhibit 35 DotHouse Inbox Messages at USA012982.

92.     According to Dr. Pahk it was most important that she made sure Ms. Gonzalez was able to get an appointment at the Belkin Breast Health Center. Dr. Pahk did not make sure Ms. Gonzalez was able to get an appointment at the Belkin Breast Health Center. Ms. Gonzalez did not get an appointment at the Belkin Breast Health Center as a result of any referral made by Dr. Pahk. See Testimony of Dr. Caroline Pahk and Dr. John Russo.

93.     Dr. Pahk did not receive a consultation report from a breast specialist concerning Ms. Gonzalez at any time after treating Ms. Gonzalez on March 18, 2016. See Testimony of Dr. Caroline Pahk, Dr. John Russo and Dr. Leigh Simmons.

94.     Despite this, Dr. Pahk expected Ms. Gonzalez to be seen by a specialist and assumed she had been. Expecting a patient to be seen by a specialist does not satisfy the standard of care. See Testimony of Dr. Caroline Pahk and Dr. Leigh Simmons.

95.     It was Dr. Pahk's duty to provide a breast specialist with the information necessary for the specialist to have an understanding of why Ms. Gonzalez was being referred, to ensure that the referral reached the specialist, and to close the loop on the referral to the specialist for consultation. See Testimony of Dr. John Russo and Dr. Leigh Simmons.

96.     Dr. Pahk did not provide a breast specialist with the information necessary for that specialist to have an understanding of why Ms. Gonzalez was being referred for clinical evaluation. She never made the referral and the Belkin Breast Health Center never received the referral. See Testimony of Dr. John Russo, Alexis Higgins, Dr. Tracy Battaglia.

97.     Dr. Pahk did not ensure that her referral of Ms. Gonzalez reached the specialist and did not close the loop on the referral. When she did not receive a consultation report concerning Ms. Gonzalez, she assumed that Ms. Gonzalez had been seen with no basis on which to make such an assumption. See Testimony of Dr. Caroline Pahk, Dr. John Russo and Dr. Leigh Simmons.

98.     It was at least Dr. Pahk's shared responsibility with a specialist to ensure that a patient referral actually occurred and that she received the specialist's report. See Testimony of Dr. Caroline Pahk.

99.     After treating Ms. Gonzalez on March 18, 2016, Dr. Pahk never followed up with Ms. Gonzalez, the Belkin Breast Health Center or Boston Medical Center regarding Ms. Gonzalez's growing and painful palpable breast lump which she found very concerning. See Testimony of Dr. Caroline Pahk, Dr. John Russo, Dr. Leigh Simmons and Dr. Hines.

100.     Though Dr. Henshaw was Ms. Gonzalez's primary care physician beginning on March 18, 2016, Dr. Pahk did not communicate with Dr. Henshaw about Ms. Gonzalez's breast

lump at any time prior to Ms. Gonzalez's cancer diagnosis. <u>See</u> Testimony of Dr. Caroline Pahk and Dr. Nsa Henshaw.

101.     Though Dr. Henshaw was Ms. Gonzalez's primary care physician beginning on March 18, 2016 and was directly involved with Ms. Gonzalez's care at this time (as evidenced by internal DotHouse messaging), she also did not follow up with Ms. Gonzalez, the Belkin Breast Health Center or Boston Medical Center regarding Ms. Gonzalez's persistent, growing, and painful breast lump. <u>See</u> Testimony of Dr. Nsa Henshaw; Exhibit 35 DotHouse Inbox Messages at USA012982.

102.     Dr. Pahk became Ms. Gonzalez's primary care physician again in August 2016 and was in Ms. Gonzalez's medical records at this time. While in Ms. Gonzalez's medical records, Dr. Pahk had the ability to review Ms. Gonzalez's history and to follow up regarding Ms. Gonzalez's breast lump. Nevertheless, Dr. Pahk did not order any further diagnostic testing for Ms. Gonzalez, did not make a clinical referral for Ms. Gonzalez, and did not follow up on her condition. <u>See</u> Testimony of Dr. Caroline Pahk; Exhibit 34 EPIC Audit Trails (Exhibits 11-15, 30(b)(6) Deposition of DotHouse – Caroline Pahk) at USA010051-010052.

**F.   <u>MARIELIS GONZALEZ PRESENTS TO DR. HENSHAW IN JULY 2016 WITH ALARMING SYMPTOMS HIGHLY SUSPICIOUS OF CANCER INCLUDING A BREAST LUMP THAT HAS GROWN THREE TO FOUR TIMES LARGER, AN INVERTED NIPPLE AND SKIN CHANGES.</u>**

103.     On July 18, 2016, Ms. Gonzalez, then thirty years old, returned to DotHouse for a complete physical exam and to specifically address her still persistent, growing and painful breast lump with her primary care doctor, Dr. Henshaw. <u>See</u> Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA008151-008156.

104.     Dr. Henshaw reviewed Dr. Pahk's March 2016 note in the medical record prior to treating Ms. Gonzalez. <u>See</u> Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA-007963 – 007967.

105.     Prior to treating Ms. Gonzalez, Dr. Henshaw knew that, as of March 18, 2016, Ms. Gonzalez reported a lump in her right breast that was causing pain, burning, and getting bigger. <u>See</u> Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA-007963 – 007967.

106.     Prior to treating Ms. Gonzalez, Dr. Henshaw knew that Ms. Gonzalez had her breast lump checked in 2015 and that her primary care physician had told her that it would go away. <u>See</u> Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA-007963 – 007967.

107.     Prior to treating Ms. Gonzalez, Dr. Henshaw knew that Ms. Gonzalez was concerned on March 18, 2016 because her breast lump was growing and because she had a family history of cancer. <u>See</u> Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA-007963 – 007967.

108.     Prior to treating Ms. Gonzalez, Dr. Henshaw knew that Ms. Gonzalez's breast lump had been present for one year as of March 18, 2016. <u>See</u> Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA-007963 – 007967.

109.     Prior to treating Ms. Gonzalez, Dr. Henshaw knew that, in March 2016, Ms. Gonzalez's breast lump was getting bigger and was affecting the shape of her breast, and that Dr. Pahk had identified a 1cm palpable breast lump in Ms. Gonzalez's right breast and noted asymmetry of Ms. Gonzalez's breasts on physical exam. <u>See</u> Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA-007963 – 007967.

21

110.    Dr. Henshaw did not speak with Dr. Pahk regarding Ms. Gonzalez before or after treating Ms. Gonzalez on July 18, 2016. According to Dr. Henshaw, there was no need for her to consult with anybody at DotHouse about Ms. Gonzalez's care. See Testimony of Dr. Nsa Henshaw and Dr. Caroline Pahk.

111.    At the appointment on July 18, 2016, Ms. Gonzalez reported to Dr. Henshaw that her breast lump had not gone away, that it felt bigger than before and that it felt like it was distorting her nipple. See Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA008151-008156.

112.    Dr. Henshaw conducted a physical exam during which she noted that Ms. Gonzalez had an inverted right nipple and "skin peau d'orange change" on her right breast. Dr. Henshaw identified a now 3 x 4 cm breast mass at 9-11 o'clock (grown three to four times larger from 1cm in March 2016) in Ms. Gonzalez's right breast. Her notes specifically stated, "inverted nipple, ill-defined 3x4 cm R breast mass 9-11o'clock breast tissue...No induration, skin peau d'orange change." See Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA008151-008156; Exhibit 27 Photograph of inverted nipple (Gonzalez005778).

113.    Dr. Henshaw has no independent memory of whether Ms. Gonzalez has skin peau d'orange change at this appointment and can only go by what she wrote in her note in the medical record. In her note, she wrote "skin peau d'orange change" not "no skin peau d'orange change." See Testimony of Dr. Nsa Henshaw and Dr. John Russo; Exhibit 1 DotHouse Medical Record at USA008151-008156.

114.    Dr. Henshaw used a template for her note in the medical record during this visit. The portion of the physical examination that she wrote herself is in bold font. In this portion of

the note, Dr. Henshaw indicated that she observed "skin peau d'orange change" on Ms.
Gonzalez's right breast. <u>See</u> Testimony of Dr. Nsa Henshaw.

115.    It would not be typical for a physician who did not see peau d'orange change on a
patient's breast to mention the condition. It is not common to see this skin condition and is a
clear sign of breast cancer. <u>See</u> Testimony of Dr. John Russo.

116.    Skin peau d'orange and an inverted nipple are well-known symptoms of breast
cancer. <u>See</u> Testimony of Dr. Nsa Henshaw, Dr. John Russo and Dr. Leigh Simmons.

117.    Dr. Henshaw received medical training regarding how to work up a palpable
breast lump including how to perform a thorough breast examination. The physical examination
of a patient with a palpable breast lump should include palpation of the axillary lymph nodes.
<u>See</u> Testimony of Dr. Nsa Henshaw.

118.    Dr. Henshaw's note in the medical record for the July 18, 2016 appointment did
not include a differential diagnosis for Ms. Gonzalez's breast lump. <u>See</u> Testimony of Nsa
Henshaw; Exhibit 1 DotHouse Medical Record at USA008151-008156.

119.    At this appointment, Dr. Henshaw found Ms. Gonzalez's presentation - including
a palpable breast lump which had been present for one year in March 2016 and which had grown
three to four times larger in four months in the setting of an inverted nipple - very alarming, very
concerning and highly suspicious of cancer. Dr. Henshaw was very worried for Ms. Gonzalez at
this appointment. <u>See</u> Testimony of Dr. Nsa Henshaw.

120.    When a mass is highly suspicious of cancer, the only way to rule out cancer is by
taking a piece of the tissue and examining it pathologically through biopsy. <u>See</u> Testimony of Dr.
Nsa Henshaw, Dr. Caroline Pahk, Dr. John Russo, Dr. Leigh Simmons.

121.    Ms. Gonzalez asked Dr. Henshaw if she could have a mammogram, but Dr. Henshaw did not order a mammogram, or any diagnostic testing, for Ms. Gonzalez. See Testimony of Nsa Henshaw; Exhibit 61 Videotaped Deposition of Marielis Gonzalez at 11:1-10.

122.    A young woman with a breast lump who receives a negative diagnostic test should receive further diagnostic testing (in addition to an ultrasound and mammogram) such as an MRI, fine needle aspiration or biopsy. See Testimony of Dr. Nsa Henshaw.

123.    Dr. Henshaw viewed Ms. Gonzalez as a compliant patient because when she was referred to do something she always followed through. See id.

### G. DR. HENSHAW DOES NOT REFER MARIELIS GONZALEZ FOR FURTHER IMAGING OR FOR BIOPSY, BUT INSTEAD REFERS MARIELIS GONZALEZ ON A NON-URGENT BASIS TO BOSTON MEDICAL CENTER.

124.    It was Dr. Henshaw's job as Ms. Gonzalez's primary care physician to make sure that someone presenting with such alarming changes to her breast like Ms. Gonzalez was worked up immediately for breast cancer. See Testimony of Dr. John Russo.

125.    A growing breast lump is a clinically suspicious breast lump. See Testimony of Dr. John Russo and Dr. Leigh Simmons.

126.    In a patient with a palpable breast mass, the obligatory diagnostic technique is biopsy. Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 15.

127.    A clinically suspicious mass should be biopsied regardless of imaging findings. Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 1.

128.    A growing breast lump must be biopsied. See Testimony of Dr. John Russo and Dr. Leigh Simmons; Exhibit 58 "Diagnostic algorithm for palpable breast abnormalities in women <30 years of age" UpToDate, May 2019 (Exhibit 1, Dr. Simmons Expert Report).

129.     As a result of her training and education, Dr. Henshaw knew that Ms. Gonzalez needed a biopsy in order to rule out cancer in her palpable breast lump. See Testimony of Dr. Nsa Henshaw.

130.     Dr. Henshaw did not refer Ms. Gonzalez for a biopsy or any further imaging. See id.

131.     Dr. Henshaw had the ability to refer Ms. Gonzalez directly for a biopsy and to track her biopsy results. Despite her ability to do so, she did not refer Ms. Gonzalez for a biopsy. See Testimony of Dr. Nsa. Henshaw and Dr. Leigh Simmons; Exhibit 36 DotHouse Policies and Procedures at USA000404.

132.     It was within Dr. Henshaw's power to refer Ms. Gonzalez to a breast surgeon. See Testimony of Dr. Nsa Henshaw.

133.     Dr. Henshaw did not refer Ms. Gonzalez to a breast surgeon. See id.

134.     Dr. Henshaw did not even refer Ms. Gonzalez for a mammogram. See id.

135.     When women first present with a suspicious new mass, diagnostic mammogram should be part of the initial workup, despite young age. See Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 2.

136.     Instead, Dr. Henshaw referred Ms. Gonzalez to the Belkin Breast Health Center at Boston Medical Center. Dr. Henshaw did not know the specialties of any of the doctors at the Belkin Breast Health Center. See Testimony of Dr. Nsa Henshaw.

137.     Dr. Henshaw referred Ms. Gonzalez for one visit to the Belkin Breast Health Center. See id.; Exhibit 1 DotHouse Medical Record at USA008427-008429.

138.     Dr. Henshaw had the ability to refer Ms. Gonzalez to the Belkin Breast Health Center on an urgent basis. She would have expected a patient presenting like Ms. Gonzalez to be

seen within 2-3 weeks by a breast specialist. Nevertheless, Dr. Henshaw chose to refer Ms. Gonzalez to the Belkin Breast Health Center on a "routine" basis. <u>See</u> Testimony of Dr. Henshaw; Exhibit 1 DotHouse Medical Record at USA-008427-008429.

139.    Dr. Henshaw had the ability to call the Belkin Breast Health Center and ask that Ms. Gonzalez be seen by a surgeon but did not do so. She also had the ability to make a directed referral for a mammogram or biopsy for Ms. Gonzalez but did not do so. <u>See</u> Testimony of Dr. Nsa Henshaw, Dr. Tracy Battaglia, Dr. Ambili Ramachandra, Dr. Leigh Simmons.

140.    At the time that she referred Ms. Gonzalez to the Belkin Breast Health Center, Dr. Henshaw did not know the identity, training or experience of the physician who would be treating Ms. Gonzalez.  <u>See</u> Testimony of Dr. Nsa Henshaw.

141.    Apart from sending the referral, Dr. Henshaw never communicated with anyone from the Belkin Breast Health Center about Ms. Gonzalez's care. <u>See</u> Testimony of Dr. Nsa Henshaw and Dr. Ambili Ramachandran.

142.    Without an urgent referral, Ms. Gonzalez was not examined at the Belkin Breast Health Center until almost two months later in September 2016. <u>See</u> Testimony of Dr. Nsa Henshaw and Dr. Ambili Ramachandran.

143.    On September 9, 2016, Ms. Gonzalez was seen by Ambili Ramachandran, M.D. at the Belkin Breast Health Center.  Dr. Ramachandran was an internist like Dr. Henshaw. Dr. Ramachandran had completed her fellowship only just over two years prior to treating Ms. Gonzalez. During those two years, she worked at the Belkin Breast Health Center approximately one day per week.  <u>See</u> Testimony of Dr. Ambili Ramachandran.

144.     Dr. Ramachandran was never contacted by Dr. Henshaw or anyone at DotHouse regarding Ms. Gonzalez. Referring physicians were able to and did contact Dr. Ramachandran regarding patients in 2016. See Testimony of Dr. Ambili Ramachandran.

145.     Dr Henshaw did not send any of Ms. Gonzalez's medical records to Dr. Ramachandran and Dr. Ramachandran did not otherwise have access to Ms. Gonzalez's medical records. See Testimony of Dr. Ambili Ramachandran.

146.     Dr. Ramachandran did not know that Ms. Gonzalez had seen Dr. Pahk in March 2016, that Dr. Pahk had identified a 1cm palpable breast lump in Ms. Gonzalez's right breast on physical examination or that Dr. Pahk had observed asymmetry of Ms. Gonzalez's breasts at that time. See Testimony of Dr. Ambili Ramachandran.

147.     Dr. Ramachandran did not know that Ms. Gonzalez had reported a growing, painful, burning breast lump that was causing misshape in her breast and had been present for one year at her March 2016 appointment with Dr. Pahk. See Testimony of Dr. Ambili Ramachandran.

148.     Dr. Ramachandran did not know that Ms. Gonzalez told Dr. Pahk in March 2016 that she had reported her breast lump to her PCP (Dr. Pahk) in 2015 and that Dr. Pahk had told her the lump would go away. See Testimony of Dr. Ambili Ramachandran.

149.     Dr. Ramachandran did not know that Ms. Gonzalez had seen Dr. Henshaw in July 2016 (four months after seeing Dr. Pahk) about her breast lump, that her breast lump had grown 3-4 times larger in a four-month period, that her breast lump was still causing her pain, or that she had an inverted right nipple. See Testimony of Dr. Ambili Ramachandran.

150.    Dr. Ramachandran did not know that Dr. Henshaw felt that Ms. Gonzalez's presentation in July 2016 was alarming and highly suspicious of cancer. See Testimony of Dr. Ambili Ramachandran.

151.    Dr. Ramachandran based her examination of Ms. Gonzalez on Ms. Gonzalez's reported history and not on Ms. Gonzalez's medical history which was unavailable to her. Dr. Ramachandran indicated in her note in the medical record and believed at the time that the reason for the referral was breast pain and not a growing and painful palpable breast lump which had been present for well over one year. See Testimony of Dr. Ramachandran.

152.    At Ms. Gonzalez's September 9, 2016 appointment with Dr. Ramachandran, Ms. Gonzalez told Dr. Ramachandran that she felt a "sharp pain and burning sensation" in her right breast every day and that she felt like her "nipple [was] being pulled inside," and that her pain and the mass coincided. Dr. Ramachandran performed a physical exam and noted "very dense areas of breast tissue at 12 oc and 5cm from nipple, and at 6 oc and 2 cm from nipple."  Dr. Ramachandran also reviewed Ms. Gonzalez's March 2016 ultrasound. See Testimony of Dr. Ambili Ramachandran; Exhibit 2 Boston Medical Center Medical Records at USA013100-013103.

153.    By the time Dr. Ramachandran reviewed Ms. Gonzalez's March 2016 ultrasound, over five months had elapsed, and Ms. Gonzalez was now complaining of pain over a larger area.  Despite Ms. Gonzalez's complaint of a larger area of concern, Dr. Ramachandran did not suggest any repeat or additional testing for Ms. Gonzalez. Instead, Dr. Ramachandran "reassured" Ms. Gonzalez and "educated [Ms. Gonzalez]" about breast health, suggesting that Ms. Gonzalez apply heat and ice to her breast, avoid caffeine, and wear a supportive bra, none of

which measures could diagnose or treat breast cancer. <u>See</u> Testimony of Dr. Ambili Ramachandran; Exhibit 2 Boston Medical Center Medical Records at USA013100-013103.

154.    Had Dr. Henshaw or anyone at DotHouse reached out to Dr. Ramachandran asking for a mammogram or biopsy for Ms. Gonzalez, Dr. Ramachandran would have been able to arrange those diagnostic tests at the Belkin Breast Health Center. <u>See</u> Testimony of Dr. Tracy Battaglia and Dr. Ambili Ramachandran.

### H. DR. HENSHAW REVIEWS BOSTON MEDICAL CENTER CONSULTATION REPORT AND, DESPITE VERY CONCERNING PRESENTATION HIGHLY SUSPICIOUS OF CANCER, FAILS TO FOLLOW UP WITH MARIELIS GONZALEZ REGARDING HER BREAST LUMP.

155.    Dr. Henshaw received and reviewed Dr. Ramachandran's consultation report. <u>See</u> Testimony of Dr. Nsa Henshaw.

156.    Dr. Henshaw knew that a tissue biopsy was required to determine whether Ms. Gonzalez's growing palpable breast lump was a fibroadenoma, a breast cyst, fibrocystic changes or breast cancer (the differential diagnosis for a palpable breast lump). <u>See</u> Testimony of Dr. Nsa Henshaw.

157.    After reviewing Dr. Ramachandran's consultation report, Dr. Henshaw was aware that Dr. Ramachandran did not order a biopsy – or any further imaging – for Ms. Gonzalez and did not rule out cancer in Ms. Gonzalez's palpable breast lump. <u>See</u> Testimony of Dr. Nsa Henshaw.

158.    Despite this knowledge, Dr. Henshaw did not follow up with Dr. Ramachandran or the Belkin Breast Health Center regarding the report. <u>See</u> Testimony of Dr. Nsa Henshaw and Dr. Ambili Ramachandran.

159.    Dr. Henshaw also did not follow up in any way with Ms. Gonzalez regarding Ms. Gonzalez's very concerning and alarming presentation which was highly suspicious of breast cancer. See Testimony of Dr. Nsa Henshaw.

160.    Dr. Henshaw should have been alarmed when she received Dr. Ramachandran's report and had no answer for what was going on with her patient. She could have and should have questioned why Dr. Ramachandran had no understanding or ability to answer her question of what the lump was and should have contacted Dr. Ramachandran directly to get a definitive answer of who could do a biopsy and when. Under these circumstances a biopsy had to be scheduled. See Testimony of Dr. John Russo.

161.    Dr. Henshaw failed to close the loop on her referral of Marielis Gonzalez. See Testimony of Dr. John Russo.

162.    Dr. Henshaw treated Ms. Gonzalez three separate times during the fall and winter of 2016 and early 2017. However, Dr. Henshaw did not follow up regarding Ms. Gonzalez's breast lump at any of these appointments. In particular, Dr. Henshaw did not ask Ms. Gonzalez about her breast lump, did not examine Ms. Gonzalez's breasts to see what was happening with the breast lump, and did not ask Ms. Gonzalez what had happened with the breast clinic evaluation of her breast lump at any of these appointments. See Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA008174-008177, USA008178-008185 and USA008192-008197.

163.    Ms. Gonzalez treated with Dr. Henshaw at DotHouse on November 28, 2016 in connection with her severe back pain.  She told Dr. Henshaw that she had been experiencing severe pain in her mid-back approximately three times per week and that the pain had moved into her lower back.  Dr. Henshaw referred Ms. Gonzalez to physical therapy for evaluation and

Ms. Gonzalez began physical therapy in November of 2016. Dr. Henshaw never considered or ruled out a more serious cause of her back pain. See Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA008178-008185.

164.    When she treated Ms. Gonzalez in November 2016, Dr. Henshaw should have performed a differential diagnosis for Ms. Gonzalez's back pain, which should have included metastatic cancer to the spine, It never occurred to Dr. Henshaw that the pain could be a symptom of metastatic breast cancer. See Testimony of Dr. Nsa Henshaw and Dr. John Russo.

165.    On December 28, 2016, Ms. Gonzalez went to the emergency department at Carney Hospital ("Carney") where she reported both her back pain and her breast complaints. On January 4, 2017, a progress note was added to the DotHouse medical record reflecting this emergency department visit. The information regarding Ms. Gonzalez's Carney visit, and in particular that she raised her breast complaint with the Carney physicians, was in the medical record and available to Dr. Henshaw the next time she treated Ms. Gonzalez on January 20, 2017. See Exhibit 1 DotHouse Medical Record at USA008188.

166.    When Ms. Gonzalez followed up with Dr. Henshaw on January 20, 2017, she  she reported to Dr. Henshaw that her pain was now in her mid and lower back as well as across her chest area.  Dr. Henshaw ordered a Lumbar Spine Radiograph of Ms. Gonzalez, which detected no acute osseous abnormalities and minimal degenerative change.  Dr. Henshaw did not further investigate the cause of Ms. Gonzalez's back pain. See Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record at USA008192-008197

167.    The January 4, 2017 progress note reflecting Ms. Gonzalez's visit to the Carney emergency department was available to Dr. Henshaw at this visit, but Dr. Henshaw did not review it with Ms. Gonzalez or follow up with Ms. Gonzalez regarding the breast complaints she

had made at Carney. <u>See</u> Testimony of Dr. Nsa Henshaw; Exhibit 1 DotHouse Medical Record

at USA008192-008197

168.    While treating Ms. Gonzalez in January 2017, Dr. Henshaw did not ask Ms.

Gonzalez about her breast lump, did not examine Ms. Gonzalez's breasts to see what was

happening with the breast lump, and did not ask Ms. Gonzalez what had happened with the

evaluation of her breast lump at the Belkin Breast Health Center. <u>See</u> Testimony of Dr. Nsa

Henshaw; Exhibit 1 DotHouse Medical Record at USA008192-008197.

169.    On January 23, 2017, Ms. Gonzalez saw Kathryn Harris, M.D. at DotHouse

regarding her back pain.  Ms. Gonzalez reported to Dr. Harris that she had been having back pain

– ranging from her neck to her lower back - and that physical therapy was not helping.  Ms.

Gonzalez also expressed concern about her breast lump, telling Dr. Harris that she felt

uncomfortable in the nipple area. <u>See</u> Exhibit 1 DotHouse Medical Record at USA008200-

008207.

170.    In her note, Dr. Harris indicated that she would refer Ms. Gonzalez back to the

Belkin Breast Health Center. Dr. Harris's note also reflects a note signed by Dr. Henshaw on

September 21, 2016, which states "Mammo 9/16—dense nodular breasts, no discrete mass—

Birads 1 breast clinic evaluation—benign." Although Dr. Henshaw indicated otherwise in this

note, it is undisputed that Ms. Gonzalez never received a mammogram. <u>See</u> Exhibit 1 DotHouse

Medical Record at USA08204.

171.    Four days later, Ms. Gonzalez was seen at BMC by a dermatologist who observed

"ill-defined erythema and scale" on Ms. Gonzalez's right breast. <u>See</u> Exhibit 2 Boston Medical

Center Medical Record at USA013122.

## I.  MARIELIS GONZALEZ'S BREAST LUMP CONTINUES TO GROW AND SHE IS DIAGNOSED WITH STAGE FOUR METASTATIC BREAST CANCER.

172.     In February 2017, Ms. Gonzalez was seen at Boston Medical Center twice more in connection with her severe back pain. See Exhibit 2 Boston Medical Center Medical Record at USA013131-013134 and USA013156-013158.

173.     Ms. Gonzalez returned to DotHouse on February 3, 2017 and saw Vasileia Varvarigoue, M.D.  Ms. Gonzalez told Dr. Varvarigoue that she had been experiencing approximately three months of pain over the entirety of her spine, which had been getting worse over time, and that she had significant back pain when she coughed, sneezed and tried to sleep. She reported that she had gone to physical therapy for her back pain, but that she had been discharged because she was not making any improvements. X-rays of Ms. Gonzalez's lumbar, cervical and thoracic spine showed mild straightening of the cervical lordosis, but no degenerative changes or fractures. See Exhibit 1 DotHouse Medical Record at USA008216-008220.

174.     On February 22, 2017, Ms. Gonzalez experienced excruciating back and hip pain such that she could not get out of bed even with her husband's help.  She called 911 and was transported to the Emergency Department at Carney where she had chest, abdomen, and pelvic CT scans. These scans revealed findings highly suggestive of breast cancer which had metastasized to her lungs, spine and bones. The doctors at Carney told Ms. Gonzalez that the cancer had weakened the bones in her back, which had caused them to break. They advised Ms. Gonzalez that if she did not receive proper treatment immediately, the broken bones in her back could press on her spinal cord which could cause her to lose function of her legs. See Testimony of Andy Napoleonis; Exhibit 3 Carney Hospital Medical Records (USA010264 – USA010429) at USA010309-010323.

33

175.    Ms. Gonzalez and her husband subsequently went to DotHouse and reported that they were frustrated with the delayed diagnosis at DotHouse and preferred to receive future treatment at another facility. Again, the note reflecting this conversation incorrectly indicates that Ms. Gonzalez had had a mammogram. She had not.  See Testimony of Andy Napoleonis; Exhibit 1 DotHouse Medical Records at USA-008237, USA008239-008241.

176.    Mammograms are more effective than ultrasounds in diagnosing breast cancer but still miss more than 10% of those cancers. A biopsy is the only way to rule out cancer in a breast lump. See Testimony of Dr. John Russo and Dr. Leigh Simmons.

177.    On March 1, 2017, Ms. Gonzalez had a mammogram and right breast biopsy at Boston Medical Center, which confirmed her diagnosis of stage four metastatic breast cancer. Ms. Gonzalez's breast mass was now 6.4 x 5.1 x 4.5 cm, more than six times larger than it had been when Dr. Pahk examined it in March 2016. See Exhibit 2 Boston Medical Center Medical Record at USA013274-013277,

### J.    MARIELIS GONZALEZ RECEIVES CANCER TREATMENT, BUT ULTIMATELY DIED IN AUGUST 2020.

178.    Just days after her diagnosis was confirmed, Ms. Gonzalez began radiation treatment at Brigham and Women's Hospital ("BWH"). By this time, Ms. Gonzalez was weak and in constant and unbearable pain. See Testimony of Andy Napoleonis; Exhibit 4 Brigham & Women's Hospital Medical Record at Gonzalez000018-000019; Gonzalez000104-000105.

179.    On March 22, 2017, Ms. Gonzalez was admitted to BWH with a spinal cord compression at T9, resulting from the metastasis of her breast cancer. Ms. Gonzalez's doctors told her that her spinal compression was inoperable due to her radiation treatment and multiple lytic lesions throughout her spine where her cancer had spread. In order to treat her back pain resulting from the spinal cord compression, Ms. Gonzalez's doctors prescribed steroids which

she began to take on a regular basis. <u>See</u> Testimony of Andy Napoleonis; Exhibit 4, Brigham &

Women's Hospital Medical Record at Gonzalez001066-001068.

180.    As a result of her spinal cord compression, Ms. Gonzalez could not walk on her

own and required a back brace. Ms. Gonzalez began to walk at home with a walker and to use a

wheelchair whenever she left the house. Attempting to go up and down the stairs caused Ms.

Gonzalez extreme pain. Unfortunately, Ms. Gonzalez's apartment in Dorchester was a third-floor

walkup and she could not get up and down the stairs without her husband carrying her,

sometimes with help from friends or her daughter, JB. <u>See</u> Testimony of Andy Napoleonis.

181.    On or about March 24, 2017, Ms. Gonzalez began chemotherapy treatment at

BWH. As a result of the chemotherapy treatment, Ms. Gonzalez lost all of her beautiful long

brown hair. The chemotherapy treatment also caused her to become very weak, to develop a

foggy memory, and to feel constantly fatigued and unwell. Additionally, throughout the spring of

2017, Ms. Gonzalez gained a substantial amount of weight as a result of the steroid medication

she was taking to treat her severe back pain. <u>See</u> Testimony of Andy Napoleonis; Exhibit 4

Brigham & Women's Hospital Medical Record at Gonzalez001066-001068; Exhibit 30

Photograph of Marielis Gonzalez (Gonzalez005781).

182.    Ms. Gonzalez's medical records from Dana Farber Cancer Institute ("DFCI")

indicate that Ms. Gonzalez "noted a right breast mass in 2015," that "US was negative and no

biopsy done" and that the "[m]ass has gradually increased in size" and had been "intermittently

painful since the fall of 2016." <u>See</u> Exhibit 5 Dana Farber Medical Record at USA010566.

183.    On April 1, 2017, Ms. Gonzalez was readmitted to BWH for severe abdominal

pain and remained inpatient for three days before she was discharged home. <u>See</u> Testimony of

Andy Napoleonis; Exhibit 4 Brigham & Women's Hospital Medical Record at Gonzalez016358-016360.

184.    Throughout 2017, Ms. Gonzalez continued to receive regular chemotherapy treatment at DFCI while also treating with DFCI oncologists approximately weekly for severe back pain, constipation, abdominal distension, numbness of her left leg, abdomen and legs, chest pain, anxiety attacks, depression, a left calf DVT, lower extremity edema, dizziness, and difficulty ambulating. Due to her severe back pain and inability to ambulate without a walker or wheelchair, Ms. Gonzalez was typically transported to and from these appointments by ambulance. See Testimony of Andy Napoleonis; see generally Exhibit 5 Dana Farber Medical Record.

185.    Ms. Gonzalez's DFCI and BWH physicians prescribed Ms. Gonzalez a host of medications to treat symptoms arising from her metastatic cancer and from her cancer treatment. These medications included high doses of opioids, including oxycodone and MS Contin, for pain management; senna and bisacodyl for constipation; omeprazole and Maalox for worsening heartburn and acid reflux; lidocaine for numbness of the hands and feet; Duloxetine for depression; enoxaparin to treat her DVT; vitamin D for her bones; Lorazepam for anxiety; Reglan to treat nausea and vomiting resulting from chemotherapy treatment; and simethicone for stomach pain. See Exhibit 61 Videotaped Deposition of Marielis Gonzalez at 21:6 – 23:24; Testimony of Andy Napoleonis; Exhibit 4 Brigham & Women's Hospital Medical Record at Gonzalez001718.

186.    In May 2017, Ms. Gonzalez's husband called DFCI to report that Ms. Gonzalez was getting frequent nose bleeds, that she had recently been violent and very angry and that she was overall feeling very fatigued and unwell. Ms. Gonzalez reported to her doctors that she got

easily angry and was short tempered. She told her doctors that she was very frustrated with her situation, felt much weaker and that it was very difficult for her to walk or to move around at all. Ms. Gonzalez's doctors concluded that Ms. Gonzalez's anger and violent episodes were likely due to necessary steroid treatment to treat her back pain. See Testimony of Andy Napoleonis; Exhibit 5 Dana Farber Medical Record at USA010565, USA010574.

187.   That same month, Ms. Gonzalez developed numbness in her hands and in her feet. She began to have trouble using her hands and started to drop objects inadvertently. Ms. Gonzalez's doctors told her that she would need to take a break from chemotherapy treatment and that they would need to try a different type of treatment. Ms. Gonzalez started a different type of chemotherapy treatment in June 2017. She became weaker and continued to gain weight. She reported to her doctors that her back brace no longer fit because of the weight gain and that the wheelchair she was renting was taken away from her at home, making it even more difficult for her to get around. See Testimony of Andy Napoleonis; Exhibit 4 Brigham & Women's Hospital Medical Record at USA010581, USA010593; Exhibit 28 Photograph of Marielis Gonzalez (Gonzalez005781).

188.   In August 2017, Ms. Gonzalez underwent a procedure to insert a port-a-cath, which would deliver her chemotherapy treatment. She also reported to her doctor that she still had numbness in her hands and feet. At this point, Ms. Gonzalez was taking 4 tabs of oxycodone (15-20mg) 5-6 times per day and 1-2 doses overnight for pain management. She had been prescribed 300 tabs just less than two weeks prior to reporting to her doctor that she was already running out. Ms. Gonzalez also continued to take opioids to manage her pain as well. She told her doctors that the chemotherapy treatment was also making her skin hurt and that she tried to use lotion, but it did not relieve her pain. Ms. Gonzalez told her doctors that she felt like a

"monster" because of her rapid weight gain and the changes to her appearance since starting treatment, that she was experiencing stressful marital difficulties, and that she had recently expressed her desire to die.  See Testimony of Andy Napoleonis; Exhibit 5 Dana Farber Medical Record at USA010653, USA010664.

189.     In September 2017, while at home, Ms. Gonzalez was using her walker to get to the bathroom when she suddenly felt very weak and fell, hitting her head on the ground. She transported to BWH where she was treated and subsequently released to CareOne Rehabilitation. Ms. Gonzalez was treating on an in-patient basis at CareOne Rehabilitation for approximately two weeks, where she received physical therapy services. Ms. Gonzalez continued to experience severe back pain and was unable to walk without a walker or wheelchair. See Testimony of Andy Napoleonis; Exhibit 4 Brigham & Women's Hospital Medical Record at Gonzalez013406.

190.     While treating at DFCI, Ms. Gonzalez was also hospitalized numerous times at BWH for pain management between 2017 and 2020. In 2018, Ms. Gonzalez underwent neurosurgery to decrease swelling in Ms. Gonzalez's brain. During this visit, Ms. Gonzalez also underwent a procedure to implant a pump in her abdomen through which her medication could be administered. Ms. Gonzalez also developed bed sores which required frequent cleaning and bandaging. See Testimony of Andy Napoleonis; see generally Exhibit 4 Brigham & Women's Hospital Medical Record and at Gonzalez006807-006809, Gonzalez009586-009587; Exhibit 61 Videotaped Deposition of Marielis Gonzalez at 21:2-5.

191.     While in-patient at Brigham & Women's Hospital in April and May 2018, Ms. Gonzalez's oncologists informed her that the risks of continuing chemotherapy treatment outweighed the benefits and that, if she continued the chemotherapy treatment, it would kill her. Ms. Gonzalez therefore made the extremely difficult decision to stop treatment. She was

discharged to hospice and for continuing palliative care and pain management. See Testimony of

Andy Napoleonis; Exhibit 4 Brigham & Women's Hospital Medical Record at Gonzalez007045;

Exhibit 57 Redacted Affidavit of Marielis Gonzalez at ¶18.

192.    Around this time, Ms. Gonzalez's doctors stopped Ms. Gonzalez's steroid regime

and adjusted her medication. Ms. Gonzalez subsequently lost all of the weight she had gained

during treatment very quickly and continued to lose weight. Once a beautiful and vibrant young

mother, Ms. Gonzalez became a weak and frail woman who looked decades older than her real

age. See Testimony of Andy Napoleonis; Exhibit 29 Photograph of Marielis Gonzalez

(Gonzalez022697).

193.    Ms. Gonzalez subsequently continued to receive pain management and palliative

care at DFCI and BWH as well as hospice care facilities, including New England Life Care and

Care Dimensions Hospice House. For the last two and a half years of her life, Ms. Gonzalez died

a slow and excruciating death. See Testimony of Andy Napoleonis; see generally Exhibit 4

Brigham & Women's Hospital Medical Record, Exhibit 5 Dana Farber Medical Record, Exhibit

7 IPC – The Hospitalist Company Medical Records (Gonzalez016632-016643), Exhibit 8 Care

Dimension Hospice House Medical Records (Gonzalez023084-023282; Gonzalez023299-

026213) and Exhibit 9 New England Life Care Medical Records (USA-011873-012546).

194.    During this time, Ms. Gonzalez dealt not only with the extreme pain resulting

from her inoperable spinal fracture and the unbearable symptoms arising from her cancer and

cancer treatment but was also forced to face her own death. Ms. Gonzalez relied heavily on her

faith in God while she was dying but fell into a deep depression as she became weaker and sicker

over time. See Testimony of Andy Napoleonis.

195.     In January 2019, Ms. Gonzalez told her doctors at DFCI that everyone was expecting her to die and that she was not ready for that. She became very distressed about the idea of dying and spending her remaining days in hospice and in the hospital. She told her doctors that she was extremely upset at the possibility that her children could end up in the foster care system and that on the one hand she wanted it all to be over but then she thinks about her kids and wants to live for them as long as she can. See Testimony of Andy Napoleonis; Exhibit 5 Dana Farber Medical Record at USA010883.

196.     Ms. Gonzalez's daughters, JB and AN, visited her in the hospital and watched as her cancer ripped through her. For over two- and one-half years, Ms. Gonzalez was forced to deal with her own pain and grief as well as her inability to shield her daughters from her slow death. Even when Ms. Gonzalez was home, she could no longer care for her own daughters. See Testimony of Andy Napoleonis

197.     In 2019, Ms. Gonzalez asked her friend, Rosana Arias, if she would care for JB and AN. At this time, Ms. Gonzalez was unable to care for her children. The stress within Ms. Gonzalez's and Mr. Napoleonis' marriage had reached its peak and Ms. Gonzalez had taken a restraining order out against Mr. Napoleonis. JB and AN went to live with Ms. Arias and saw their mother less often. Ms. Gonzalez feared for her daughters and continued to struggle with depression and anxiety. See Testimony of Andy Napoleonis.

198.     In December 2019, Ms. Gonzalez rescinded the restraining order against Mr. Napoleonis, explaining that she did not understand that the restraining order would last so long and prevent her from seeing Mr. Napoleonis. Around this time, Ms. Arias also told Ms. Gonzalez that she could no longer care for JB and AN. As a result, AN went to live with her paternal grandmother and JB went into the foster care system. Ms. Gonzalez was heartbroken to lose her

eldest daughter, JB to the foster care system. Her worst nightmare had become a reality. <u>See</u> Testimony of Andy Napoleonis; Exhibit 4 Brigham & Women's Hospital Medical Record at Gonzalez020803.

199.    Throughout 2020, Ms. Gonzalez was hospitalized frequently for continued palliative care, pain management and hospice care. <u>See</u> Testimony of Andy Napoleonis; <u>see generally</u> Exhibit 4 Brigham & Women's Medical Record and Exhibit 5 Dana Farber Cancer Institute Medical Record.

200.    Ms. Gonzalez became extremely weak during the last year of her life and began to have difficult speaking. When she could no longer manage to speak, she used a crayon to write messages to her husband on a piece of paper while in the hospital. <u>See</u> Testimony of Andy Napoleonis; Exhibit 30 Photograph of Marielis Gonzalez (Gonzalez023034).

201.    On August 15, 2020, Ms. Gonzalez died as a result of her cancer diagnosis at the young age of thirty-four. <u>See</u> Testimony of Andy Napoleonis; Exhibit 31 Death Certificate of Marielis Gonzalez (Gonzalez023008-023009).

202.    Ms. Gonzalez incurred medical expenses far in excess of $436,895.07 as a result of the delayed diagnosis of her breast cancer. However, MassHealth has asserted a lien of $436,895.07 in this action.[2]

**K.  CONSCIOUS PAIN AND SUFFERING OF MARIELIS GONZALEZ**

203.    In light of the above, it is clear that Ms. Gonzalez experienced tremendous physical pain and suffering in connection with the delay in diagnosis of her breast cancer and her slow and excruciating death as a result of her cancer diagnosis. By the time Ms. Gonzalez was diagnosed with breast cancer, the cancer had spread into her spine causing fractures and

---

[2] Plaintiffs seek only the total MassHealth lien of $436,895.07 as medical expenses in this case.

compressions which in turn caused her to experience unbearable back pain. Ms. Gonzalez not only needed to undergo radiation and chemotherapy treatment, which caused her to lose her hair and to feel constantly weak and ill but was also put on various medication including steroids which caused her to gain a substantial amount of weight. For nearly three- and one-half years after her diagnosis, Ms. Gonzalez slowly lost the ability to function. She faded mentally as a result of the many pills she took daily and soon lost the ability to walk on her own. Her medication caused her to experience chronic constipation and she soon lost the ability to go to the bathroom on her own. Her pain became so severe that she required neurosurgery to reduce swelling in her brain and surgery to insert of port in her abdomen through which she could continue to receive medication. By the summer of 2020, Ms. Gonzalez could barely speak and had to communicate with her husband by writing messages down on paper. See Testimony of Andy Napoleonis; see generally Exhibit 4 Brigham & Women's Medical Record and Exhibit 5 Dana Farber Medical Record.

204.    Ms. Gonzalez also experienced extreme mental suffering in connection with the delayed diagnosis of her cancer and her fatal cancer diagnosis. Ms. Gonzalez had been traumatized by the death of her mother from cancer at a very young age. She was very worried about cancer because of her mother's death, which she specifically told her doctors. Her worst fear that she would die young from cancer became her reality. Ms. Gonzalez felt ignored and patronized because she knew something was wrong and she did everything possible that she could think of to get someone to take the lump in her breast seriously. Despite her pleas for help, no one helped her. During the almost three-and-one-half years after she was diagnosed with stage 4 metastatic breast cancer, Ms. Gonzalez was acutely aware that she was dying. She began to experience stress in her marriage as her husband began caring for her children and was unable

to keep his business afloat. Every night and morning she would think about her last day and ask God to heal her and to allow her to see her children grow. Ms. Gonzalez loved her children more than anything and it broke her heart to see them watch her slowly become a person that they could not recognize. She became physically and mentally unable to care for them during this time-period and expressed to doctors that her worst fear was that her children would go into the foster care system. Unfortunately, this also became a reality, when JB was placed in the custody of the Department of Children and Families. While falling apart physically, Ms. Gonzalez faced her own death and the disintegration of her family. See Exhibit 61 Videotaped Deposition of Marielis Gonzalez at 24:9-15 and 25:15-19, 20-24; Testimony of Andy Napoleonis; see generally Exhibit 4 Brigham & Women's Medical Record and Exhibit 5 Dana Farber Medical Record.

**L.  LOSS OF CONSORTIUM OF ANDY NAPOLEONIS**

      **i.  LOSS OF CONSORTIUM OF ANDY NAPOLEONIS DURING LIFETIME OF HIS WIFE, MARIELIS GONZALEZ**

205.    Andy Napoleonis first met Marielis Gonzalez in 2007 before Ms. Gonzalez moved to Massachusetts from Puerto Rico. He says he knew she was the one since the day he met her. When they met, Mr. Napoleonis was eighteen years old and Ms. Gonzalez was twenty-two. In 2008, when Ms. Gonzalez moved to Massachusetts, they began officially dating and moved in together. Ms. Gonzalez had a one-year-old child, JB, at the time. JB moved in with Ms. Gonzalez and Mr. Napoleonis and they lived together as a family. At just eighteen years old, and with few resources himself, Mr. Napoleonis began helping to raise Ms. Gonzalez's infant child. See Testimony of Andy Napoleonis.

206.    In 2012, Ms. Gonzalez and Mr. Napoleonis had a daughter, AN. Ms. Gonzalez, Mr. Napoleonis, JB and AN lived together in an apartment in Dorchester, Massachusetts. In

2013, Ms. Gonzalez and Mr. Napoleonis were married at their community church. See Testimony of Andy Napoleonis.

207.    Throughout the years of their relationship, Mr. Napoleonis and Ms. Gonzalez loved each other very much and also had a volatile relationship at times. Mr. Napoleonis was young and immature as he took on the responsibility of caring for a family when he was still a child himself. Both Ms. Gonzalez and Mr. Napoleonis grew up in families with few resources and violence in the home. At times, they would fight and separate, but they always returned to one another and Mr. Napoleonis took his duty of being a husband and father seriously. He was always there for his family, even while he and Ms. Gonzalez were separated. See Testimony of Andy Napoleonis; Exhibit 21 Photograph of Marielis Gonzalez and Andy Napoleonis (Gonzalez005780).

208.    In 2015, Mr. Napoleonis started his own electronic repair shop. Ms. Gonzalez worked at the shop in an administrative role. Ms. Gonzalez and Mr. Napoleonis enjoyed working together and were excited to start saving their earnings from the store for their children's future education. Ms. Gonzalez's and Mr. Napoleonis' relationship had its ups and its downs, but prior to Ms. Gonzalez's health worsening, Ms. Gonzalez and Mr. Napoleonis were in a good place and hopeful for the future. See Testimony of Andy Napoleonis.

209.    Mr. Napoleonis was very worried for Ms. Gonzalez when she discovered her breast lump in 2015, especially because Ms. Gonzalez's mother had died of cancer at a young age. In 2015 and early 2016, Mr. Napoleonis comforted Ms. Gonzalez after her appointments with Dr. Pahk at DotHouse while she was crying and very upset that no one would believe her and help her make sure that her breast lump was not cancer. Mr. Napoleonis drove Ms. Gonzalez to most of her appointments at DotHouse and Boston Medical center in 2015, 2016 and 2017.

44

Often times, Mr. Napoleonis, JB, AN and Ms. Gonzalez would drive to these appointments and the family would wait for Ms. Gonzalez in the car. See Testimony of Andy Napoleonis.

210.   As Ms. Gonzalez's condition worsened significantly in the latter part of 2016 and early 2017, she was in so much pain that she could barely move around the house. Mr. Napoleonis began taking on household duties that Ms. Gonzalez could no longer fulfil including cooking, cleaning and caring for the children. Ms. Gonzalez became unable to have sexual relations both due to her physical pain and her worsening depression. In early 2017, Ms. Gonzalez spent the majority of her days in bed and was barely able to get up at all. Mr. Napoleonis became extremely worried about her physical and mental state. He began to care for Ms. Gonzalez like she was a third child. See Testimony of Andy Napoleonis; Exhibit 61 Videotaped Deposition of Marielis Gonzalez at 24:19-22.

211.   Eventually, in 2017, when Ms. Gonzalez could not move from bed even with Mr. Napoleonis' help, he called an ambulance and went with Ms. Gonzalez to Carney Hospital where Ms. Gonzalez was first diagnosed with metastatic breast cancer. Mr. Napoleonis was heartbroken, very angry at Ms. Gonzalez's doctors who had allowed this to happen, especially considering the number of times she told them about the lump and her worry that it was cancerous, and extremely scared. He was also overwhelmed with his wife's grief and the prospect of telling his two young daughters that they were going to lose their mother. He knew they would not understand and that their lives would never be the same. See Testimony of Andy Napoleonis.

212.   From February 2017 to August 2020, Mr. Napoleonis watched Ms. Gonzalez change from the beautiful young woman in her prime who he had loved so much, to a shell of the person he once knew. Mr. Napoleonis cared for his wife, who was now unable to care for herself,

whenever she was not in the hospital. This included picking up her prescriptions and helping her take the many medications she required, bringing her to chemotherapy and radiation treatment and going to those appointments with her, carrying her up the stairs to their third-floor walkup apartment, helping her to change her clothes, helping her to shower, helping her to go to the bathroom and supporting her emotionally as she faced her own death. Mr. Napoleonis would also clean Ms. Gonzalez when she began to defecate in bed due to an inability to control her bowels. He also cleaned and bandaged Ms. Gonzalez bed sores. Ms. Gonzalez's medication made her violent at times and caused her personality to change. Mr. Napoleonis did his best to hold the family together during these very difficult years. He often struggled alone as he was unable to go to Ms. Gonzalez for support and companionship. <u>See</u> Testimony of Andy Napoleonis.

213.     When Ms. Gonzalez's doctors told Ms. Gonzalez that she should stop chemotherapy and radiation treatment, Mr. Napoleonis was forced to face the truth, that there was nothing he or anyone could do to save his wife now. Ms. Gonzalez's terminal diagnosis caused the family to experience unbearable stress. Ms. Gonzalez's condition caused Mr. Napoleonis and Ms. Gonzalez to fight often and, in 2019, Ms. Gonzalez and Mr. Napoleonis separated. With the involvement of family members who Ms. Gonzalez did not trust and with whom Ms. Gonzalez did not have a healthy relationship, Ms. Gonzalez also took out a restraining order against Mr. Napoleonis. In December 2019, Ms. Gonzalez rescinded the restraining order, explaining that she did not understand that it would mean that she would continue to be unable to see her husband. During this time, Mr. Napoleonis was also prohibited from seeing his children. <u>See</u> Testimony of Andy Napoleonis; Exhibit 4 Brigham & Women's Medical Record at Gonzalez020803.

214.    In 2020, Ms. Gonzalez and Mr. Napoleonis were reunited and lived together in a new apartment near the hospital in Boston. Mr. Napoleonis visited Ms. Gonzalez frequently in the hospital and continued to care for her as she died. During this time, Mr. Napoleonis spent most of his time with Ms. Gonzalez cherishing the time he got to spend with her before her death. See Testimony of Andy Napoleonis.

215.    During the last year of Ms. Gonzalez's life, her husband continued to care for her. Mr. Napoleonis helped Ms. Gonzalez get to the bathroom (she could not walk on her own by this point), disimpacted Ms. Gonzalez's bowels, cleaned the sheets when Ms. Gonzalez could no longer give adequate warning of her need to use the bathroom and cleaned the bed sores Ms. Gonzalez developed as a result of being on bed rest. Mr. Napoleonis was praised by home healthcare workers for providing excellent care to Ms. Gonzalez and changing the bandages on her bed sores two to three times daily. Mr. Napoleonis also did his best to keep a smile on her face despite the enormous challenges she faced. See Testimony of Andy Napoleonis; Exhibit 8 Care Dimension Hospice House Medical Records (Gonzalez023084-023282; Gonzalez023299-026213) at Gonzalez026194.

### ii.    LOSS OF CONSORTIUM OF ANDY NAPOLEONIS AS A RESULT OF THE DEATH OF HIS WIFE, MARIELIS GONZALEZ

216.    Mr. Napoleonis is completely devastated by the loss of his wife. Mr. Napoleonis is now thirty years old and has never loved another woman. He fell in love with Ms. Gonzalez as a teenager and, despite the tremendous obstacles that they faced, stayed with her until the end of her life. Mr. Napoleonis is heartbroken at the loss of the mother of his child and must face AN's grief and confusion at the loss of her mother each day. See Testimony of Andy Napoleonis.

217.    Prior to Ms. Gonzalez's diagnosis, Ms. Gonzalez and Mr. Napoleonis supported one another, raised JB and AN together, and had a fulfilling relationship. Mr. Napoleonis and

Ms. Gonzalez were working together to create a better future for themselves and for their children. They went to one another for support, companionship, and advice and despite experiencing difficult times in their relationship, always returned to one another in love. Mr. Napoleonis has no doubt that, but for Ms. Gonzalez's diagnosis, they would have continued to raise their children together, would have grown their business together and would have relied on their friendship to get them through hard times. They would have grown old together and experienced all of life's ups and downs as they had planned. See Testimony of Andy Napoleonis.

218.     As a result of Ms. Gonzalez's delayed diagnosis, Mr. Napoleonis and Ms. Gonzalez will never be able to fulfill their personal goals together, including raising JB and AN as a family, developing their family business, buying a home, and saving up to send their girls to college. Mr. Napoleonis is now raising AN on his own. While he copes with his own grief, he is also navigating his eight-year-old daughter's grief as she processes a life without her mother. Without the resources or support, he is unable to raise JB, who is currently living with a foster family through the Department of Children and Families. The delay in diagnosing Ms. Gonzalez's breast cancer has devastated Mr. Napoleonis, stripped him of his family and left him to navigate an already difficult life alone. See Testimony of Andy Napoleonis.

### M. LOSS OF CONSORTIUM OF JB AND AN

#### i.     LOSS OF CONSORTIUM OF JB AND AN DURING LIFETIME OF THEIR MOTHER, MARIELIS GONZALEZ

219.     JB has always been extremely close with her mother. JB was born in 2007 in Puerto Rico. She has had very little contact with her biological father since she was born. She has never lived with her biological father and has never received care or support from him. In Puerto Rico, Ms. Gonzalez and JB had a difficult life involving familial violence and very few resources. When JB was one year old, she came to Massachusetts with her mother. In

Massachusetts, JB and her mother moved in with Mr. Napoleonis. JB became very close and dependent on her mother as they continued to have few resources on which to rely. JB was always closest to her mother, as Mr. Napoleonis supported her but had no prior experience being a father and was very young at the time. See Testimony of Andy Napoleonis; Exhibit 22 Photograph of Marielis Gonzalez and two daughters (Gonzalez005783); Exhibit 23 Photograph of Marielis Gonzalez and JB (Gonzalez022939).

220.    AN was born in 2007, giving JB a sister. JB and AN became close immediately. As sisters, they were each other's closest friends and loved each other very much. JB also took her role as a big sister seriously and helped her mother raise AN. Ms. Gonzalez spent the majority of her time with JB and AN together. They lived as a family in their apartment in Dorchester and were happy. JB and AN loved to dress up like princesses and to play outside together. They learned to have faith in God from their mother and that if they worked hard, they could get through anything. They looked up to their mom and told her that they wanted to be her when they grew up. See Testimony of Andy Napoleonis; Exhibit 22 Photograph of Marielis Gonzalez and two daughters (Gonzalez005783); Exhibit 24 Photograph of Marielis Gonzalez and AN (Gonzalez005779).

221.    When Ms. Gonzalez's breast and back pain became unmanageable, Ms. Gonzalez was not able to care for JB and AN as she previously had while healthy. JB and AN began to struggle in school and became sad that their mother was struggling. Mr. Napoleonis began caring for them more often and JB began to help more around the house as well. At such a young age, AN became especially confused and angry that her mother was not able to be there for her in the same way that she had been while healthy. See Testimony of Andy Napoleonis.

222.    Soon after their mother's diagnosis was confirmed, JB and AN found out that their mother had breast cancer. They could not comprehend that their strong, vibrant mother could be so sick. They were upset and angry that something like this could happen to their mother, who had gone to the doctors so many times for help. As Ms. Gonzalez and Mr. Napoleonis continued to struggle with Ms. Gonzalez's terminal diagnosis, they attempted to shield JB and AN from the stress of the situation, but the tragedy inevitably caused turmoil at home. See Testimony of Andy Napoleonis.

223.    After Ms. Gonzalez's diagnosis, JB, then nine-years-old, started helping her mother in any way she could. She helped her mother get out of bed and move around the apartment as she became very weak during chemotherapy and radiation treatment. With Mr. Napoleonis, she helped her mother go up and down three flights of stairs which was very difficult due to Ms. Gonzalez's spine fracture. She also helped around the house including by cleaning, cooking and caring for her younger sister, AN. From the age of nine to twelve years old, JB became a caretaker to her mother and sister, instead of a little girl able to enjoy her young life. See Testimony of Andy Napoleonis.

224.    JB and AN visited their mother in the hospital often between 2017 and 2019. They watched as their mother's physical appearance changed drastically. They saw their mother go from a beautiful young woman to a large-bloated woman with no hair as a result of her cancer treatment, and back to a weak woman, too frail to move from her bed. They also watched as their mother changed from a happy and loving person to an angry, depressed and desolate person. See Testimony of Andy Napoleonis.

225.    As her mother's condition deteriorated, AN began to have behavioral issues both at home and at school. She was constantly upset. AN's teachers reported to Ms. Gonzalez and

Mr. Napoleonis that she was causing issues at school with other children. Ms. Gonzalez and Mr. Napoleonis became worried about AN's mental state. <u>See</u> Testimony of Andy Napoleonis; Exhibit 4 Brigham & Women's Medical Record at USA011611.

226.     During this time, AN would frequently tell her mother, "Mommy, I don't want you to die," and pray for her mother to get better. <u>See</u> Exhibit 61 Videotaped Deposition of Marielis Gonzalez at 24:23 – 25:2.

227.     In 2019, the stress of Ms. Gonzalez's diagnosis became unbearable for the family. Ms. Gonzalez and Mr. Napoleonis began to fight at home often. By this point, Ms. Gonzalez was frequently in and out of the hospital and required full time medical care. As a result of both Ms. Gonzalez's and Mr. Napoleonis' inability to care for JB and AN, and marital turmoil resulting in a restraining order against Mr. Napoleonis, JB and AN were sent to live outside of the home with their mother's friend, Rosana Arias. JB and AN struggled while living with Ms. Arias, separated from their parents and still very upset over their mother's condition. <u>See</u> Testimony of Andy Napoleonis.

228.     At the end of 2019, Ms. Arias told Ms. Gonzalez that she would no longer be able to care for JB and AN. As a result, AN was sent to live with her grandmother (Mr. Napoleonis' mother) and JB was released into the custody of the Department of Children and Families. At this point, on top of being separated from their dying mother and Mr. Napoleonis, JB and AN were separated from other another. JB and AN had not been apart since AN's birth in 2007 and have not been reunited since this date. As their mother died, JB and AN could not even rely on one another to get through this unbearable tragedy. <u>See</u> Testimony of Andy Napoleonis.

229.     When her mother died in August 2020, JB was alone. She was not with her mother, the one person who she could always rely on throughout her young life, and she was not

with her sister. Instead, she was informed that her mother had died while in state custody. JB's biological father has shown no interest in bringing JB to live with him in Puerto Rico. He continues to provide no support to JB. See Testimony of Andy Napoleonis.

230.    When her mother died in August 2020, AN was eight years old. Mr. Napoleonis told AN that her mother had died as a result of her cancer diagnosis. AN told her father that she will see her mother in heaven one day. She misses her mother every day. See Testimony of Andy Napoleonis.

       ii.      LOSS OF CONSORTIUM OF JB AND AN AS A RESULT OF THE DEATH OF THEIR MOTHER, MARIELIS GONZALEZ.

231.    The delay in diagnosing Ms. Gonzalez's breast cancer caused JB to lose her mother at the age of thirteen. The loss of her mother has had a tremendous impact on JB, especially considering the tragic circumstances of her young life. For nearly her entire life, JB relied almost solely on her mother for advice, support, and companionship. Her mother kept her safe in Puerto Rico where they were surrounded by violence and had very little. They then moved together – just JB and her mother – to Massachusetts where they continued to encounter difficulties with little money. Despite having few resources, JB and her mother always had each other. JB saw her mother as her closest friend and her protector. JB then watched as her mother physically and emotionally died a slow and excruciating death. Losing her mother would have been devastating under any circumstances, but while her mother died, JB was separated from her mother and sister and forced to cope with her loss in state custody. She was not able to say goodbye to her mother and has grieved her loss without any family support. JB must now navigate a life spent within the foster care system without her mother, without support from her biological father, and separated from her sister. At thirteen she has experienced profound loss

and faces what will likely be an extremely difficult life without her mother. <u>See</u> Testimony of Andy Napoleonis.

232.    The delay in diagnosing Ms. Gonzalez's breast cancer caused AN to lose her mother at the age of eight. AN was raised primarily by her mother. For most of her young life she was not yet in school and spent all day by her mother's side. AN was extremely close to her mother and loved her very much. After her mother's death, AN had great difficulty understanding why she could not see her mother anymore. She frequently becomes very upset that her mother is not here. AN has lost the advice, support and companionship of her mother and is left without a mother to guide her in life. She now lives with Mr. Napoleonis who cares for her as a single father. AN is also left without her sister, JB, who is in state custody. AN misses JB very much and does not understand why the two have to be apart. AN's young life is filled with grief, sadness and confusion. Ms. Napoleonis struggles to care for her on his own but is doing the best he can. AN continues to struggle in school and without maternal support and companionship at home. <u>See</u> Testimony of Andy Napoleonis.

233.    Andy Napoleonis will never be able to do for JB and AN what their mother would have done for them. Ms. Gonzalez was a complete mother who loved her children more than anything. The loss of their mother will have a profoundly negative effect on them for the rest of their lives. <u>See</u> Testimony of Andy Napoleonis.

234.    Richard Blank, Esq. at the request of Ms. Gonzalez drafted two trusts for Ms. Gonzalez's young daughters, JB and AN. The trusts are designed to protect any money that JB and AN may receive. Richard Blank and his colleague Roland Gray III are trustees of the trusts. As trustees, Richard and/or Roland will use any property of the trusts to meet a broad array of needs of JB and AN including education, tutoring, counseling, primary and secondary schooling

and college tuition. They will also help JB and ANmeet their basic needsif necessary, including

by providing funds for appropriate healthy food and safe housing. The level of support the

trustees can provide to JB and AN depends on the amount of money in the trusts. Richard Blank

and his firm have not been paid to date for the services provided in connection with these trusts

and are owed in excess of $80,000. Neither Andy Napoleonis nor any other family member can

take money out of the trusts without the approval of the trustees. JB and AN are given a period of

forty-five days under Massachusetts law to take out any amount of money from the trusts when

they turn 21. After this time period, the money is held in trust for their benefit at least until they

turn thirty-five at which time JB and AN can take any money out of the trusts at any time. There

is currently a nominal amount of money in the trusts. See Testimony of Richard Blank, Esq.;

Exhibit 62 Declaration of Trust JB; Exhibit 63 Declaration of Trust AN.

## III.  EXPERT TESTIMONY

### A.  JOHN RUSSO, M.D.

#### i.    STANDARD OF CARE.

235.    It is the duty of every physician to identify breast abnormalities at the earliest

possible stage and to institute a diagnostic workup. See Testimony of Dr. John Russo; Exhibit 59

Harrison's Principles of Internal Medicine at 524.

236.    The standard of care for practitioners practicing family medicine and internal

medicine, including primary care physicians, in 2015 and 2016 required such physicians of

patients presenting with a palpable breast lump to perform a physical examination, order

appropriate diagnostic testing (including mammogram, MRI or biopsy), to refer the patient to a

specialist and to follow up with the patient to ensure that the breast lump had been diagnosed or

resolved. Virtually all breast cancer is diagnosed by biopsy of a nodule detected either on a

mammogram or by palpation.  See Testimony of Dr. John Russo; Exhibit 59 Harrison's Principles of Internal Medicine at 524. see also Testimony of Dr. Leigh Simmons.

237.    The standard of care required family medicine and internal medicine practitioners, including primary care physicians, to perform a physical examination on a patient presenting with a breast lump. See Testimony of Dr. John Russo; see also Testimony of Dr. Leigh Simmons.

238.    Because the breasts are a common site of potentially fatal malignancy in women, examination of the breasts is an essential part of the physical examination. During the physical examination, the physician must inspect the breasts, including the nipple and areolae, for retractions or skin changes, must examine all regional lymph node groups and measure any lesion or mass felt on palpation. Lesions or masses with certain features are more likely to be cancerous (hard, irregular, tethered or fixed, or painful lesions). Physical examination alone cannot exclude malignancy. See Testimony of Dr. John Russo; Exhibit 59 Harrison's Principles of Internal Medicine at 524; see also Testimony of Dr. Leigh Simmons.

239.    Upon identifying a growing palpable breast mass on physical examination, the standard of care required family medicine and internal medicine practitioners, including primary care physicians, to order diagnostic testing, including a mammogram, MRI and/or biopsy. See Testimony of Dr. John Russo; see also Testimony of Dr. Leigh Simmons.

240.    An ultrasound is not the proper tool to detect breast cancer when a palpable mass exists and cannot rule out cancer. Although ultrasound is sometimes used to distinguish cysts from solid lesions, not all solid masses are detected by ultrasound. Thus, a palpable mass not visualized on ultrasound must be presumed to be solid and a mammogram, MRI and/or biopsy must be ordered. A negative mammogram or MRI in the presence of a persistent lump in the

breast, however, does not exclude malignancy. Solid lesions that are persistent, recurrent, complex or bloody cysts require mammography (or MRI) and biopsy. <u>See</u> Testimony of Dr. John Russo; Exhibit 59 Harrison's Principles of Internal Medicine at 525; <u>see</u> <u>also</u> Testimony of Dr. Leigh Simmons.

241.    In certain patients with palpable breast lumps, the "triple test" can be used to rule out breast cancer. The "triple test" for palpable breast lumps consists of physical examination, mammography, and fine-needle aspiration or biopsy. Biopsy is the gold standard to rule out malignancy in the setting of a palpable breast lump. <u>See</u> Testimony of Dr. John Russo; Exhibit 59 Harrison's Principles of Internal Medicine at 525.

242.    The standard of care required family medicine and internal medicine practitioners, including primary care physicians, to refer a patient presenting with a palpable breast lump to a specialist and to follow up with the patient to ensure the breast mass has resolved. <u>See</u> Testimony of Dr. John Russo; <u>see</u> <u>also</u> Testimony of Dr. Leigh Simmons.

243.    A primary care physician specializing in family medicine or internal medicine has a duty to oversee a patient's care and collaborate with specialists involved to be certain that patients are properly evaluated and treated. Such a primary care physician does not satisfy the standard of care by referring a patient to a specialist and taking no further action to ensure that the patient is properly diagnosed. <u>See</u> Testimony of Dr. John Russo; <u>see</u> <u>also</u> Testimony of Dr. Leigh Simmons.

244.    A primary care physician is responsible for providing her patients with "comprehensive" and "longitudinal" care. This means that primary care physicians must follow up and close the loop on patient referrals – especially in scenarios where patients present with symptoms concerning for cancer. The very purpose of a primary care physician is coordination

of care – to make sure that patients presenting with particular medical issues are properly evaluated. This is because primary care physicians are in a unique position to provide such comprehensive care. They have intimate knowledge concerning the patient's history, access to all of the patient's medical records, first-hand knowledge concerning examination of the patient and close familiarity with the timeline of care that the patient has received for a particular issue. See Testimony of Dr. John Russo; see also Testimony of Dr. Leigh Simmons.

245.    A primary care physician cannot simply press a referral button and then throw up her hands and claim that she can do nothing further for her patient. See Testimony of Dr. John Russo; see also Testimony of Dr. Leigh Simmons.

246.    Setting the imaging or referral process in motion does not meet the standard of care of a primary care physician. This is akin to claiming that a primary care physician can just press a referral button and absolve herself of all remaining duties to her patients. See Testimony of Dr. John Russo; see also Testimony of Dr. Leigh Simmons.

247.    Changes in a breast lump must be monitored by the primary care physician over time regardless of whether the patient has been referred to a specialist. A persistent breast lump that has grown and is causing the patient pain in the setting of other changes to the breast, such as nipple retraction or skin changes, is highly suspicious of cancer. In such a situation, the primary care physician must ensure that breast cancer is ruled out in a palpable breast lump through biopsy. See Testimony of Dr. John Russo; Exhibit 58 "Diagnostic algorithm for palpable breast abnormalities in women <30 years of age" UpToDate, May 2019 (Exhibit 1, Dr. Simmons Expert Report); Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 15; see also Testimony of Dr. Leigh Simmons.

ii.   DR. PAHK'S BREACHES OF THE STANDARD OF CARE.

248.   Dr. Pahk breached the standard of care by failing to perform a proper diagnostic workup of Ms. Gonzalez's breast lump, by failing to effectuate a proper referral of Ms. Gonzalez to an appropriate specialist and by failing to follow up with Ms. Gonzalez to ensure that her breast lump had been diagnosed or resolved. See Testimony of Dr. John Russo.

249.   Dr. Pahk deviated from the standard of care in July 2015, when Ms. Gonzalez first reported her breast lump to Dr. Pahk, by failing to perform a physical examination on Ms. Gonzalez's breast, by failing to order any diagnostic testing for Ms. Gonzalez and by failing to refer Ms. Gonzalez to a specialist. See Testimony of Dr. John Russo.

250.   Dr. Pahk deviated from the standard of care in February 2016, when Ms. Gonzalez again reported her breast lump to Dr. Pahk, by failing to perform a physical examination on Ms. Gonzalez's breast, by failing to order any diagnostic testing for Ms. Gonzalez and by failing to refer Ms. Gonzalez to a specialist. See Testimony of Dr. John Russo.

251.   Dr. Pahk's treatment of Ms. Gonzalez in March 2016 fell below the standard of care. Dr. Pahk referred Ms. Gonzalez for an ultrasound. A family medicine practitioner practicing according to the standard of care in 2016 who identified a 1CM palpable breast lump that had been present for one year, was growing, burning, causing misshape in a patient's breast and causing a patient pain would have ordered appropriate diagnostic imaging in order to rule out cancer in that patient. A biopsy is the only way to definitively rule out breast cancer in a palpable breast lump. Dr. Pahk's decision to order an ultrasound, and no further diagnostic imaging or tissue sampling, for Ms. Gonzalez after identifying a 1CM palpable breast lump that had been present for one year, was burning, growing, causing misshape in Ms. Gonzalez's breast and causing Ms. Gonzalez pain fell far below the standard of care. See Testimony of Dr. John

Russo; Exhibit 58 "Diagnostic algorithm for palpable breast abnormalities in women <30 years of age" UpToDate, May 2019 (Exhibit 1, Dr. Simmons Expert Report); Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 2, 15; see also Testimony of Dr. Leigh Simmons, Dr. Caroline Pahk and Dr. Nsa Henshaw (biopsy is only way to definitively rule out breast cancer in a palpable breast lump).

252.     Cancerous breast masses are typically solitary, discrete, firm or hard and may be fixed to adjacent tissue. There is no doubt that Ms. Gonzalez presented to Dr. Pahk in 2016 with a clinically suspicious breast lump. The standard of care requires a primary care physician upon identifying a clinically suspicious breast mass to biopsy that breast mass regardless of imaging findings. An ultrasound can be used as initial imaging in order to locate the breast mass for the purpose of identifying the piece of tissue which will excised on biopsy (or to distinguish between cysts and solid masses), but by no means does an ultrasound diagnose or establish the innocence or malignance of a clinically suspicious breast mass. See Testimony of Dr. John Russo; Exhibit 59 Harrison's Principles of Internal Medicine at 524-525; see also Testimony of Dr. Leigh Simmons.

253.     Dr. Pahk did not formulate a diagnostic plan for Ms. Gonzalez in connection with her breast lump. On the contrary, Dr. Pahk's notes in the medical record do not reference any such diagnostic plan. They do not include a differential diagnosis for Ms. Gonzalez's breast lump, and they do not indicate which diagnostic testing Ms. Gonzalez will receive. A primary care physician, like Dr. Pahk, is responsible for following up on patient imaging and ensuring that a clinical referral is made and effectuated especially in the setting of a clinically suspicious breast lump. Dr. Pahk failed to take any action with regard to Ms. Gonzalez's care after ordering the ultrasound, never carried out a diagnostic plan and never followed up with Ms. Gonzalez

regarding her growing and palpable breast mass. <u>See</u> Testimony of Dr. John Russo; Exhibit 58 "Diagnostic algorithm for palpable breast abnormalities in women <30 years of age" UpToDate, May 2019 (Exhibit 1, Dr. Simmons Expert Report); Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 2, 15; <u>see</u> <u>also</u> Testimony of Dr. Leigh Simmons.

254.     Dr. Pahk deviated from the standard of care in her care and treatment of Ms. Gonzalez by failing to effectuate a proper referral of Ms. Gonzalez to an appropriate specialist after seeing her on March 18, 2016. Dr. Pahk did not ensure that Ms. Gonzalez was referred to a specialist by failing to refer Ms. Gonzalez to a breast specialist (the only existing referral from Dr. Pahk is the referral for an ultrasound). Even if Dr. Pahk had referred Ms. Gonzalez to a breast clinic, she had no knowledge of the experience or qualifications of the physician or physicians to whom she alleges to have referred Ms. Gonzalez. Dr. Pahk's complete lack of knowledge of the experience or qualifications of the physician or physicians to which she referred Ms. Gonzalez was a deviation from the standard of care. <u>See</u> Testimony of Dr. John Russo; <u>see</u> <u>also</u> Testimony of Dr. Caroline Pahk (admitting no knowledge of experience or qualifications of physicians at Belkin Breast Health Center) and Dr. Tracy Battaglia (confirming nonexistence of referral from Dr. Pahk to Belkin Breast Health Center).

255.     Dr. Pahk deviated from the standard of care by failing to ensure that Ms. Gonzalez was seen in consultation by a specialist and by failing to close the loop on her referral of Ms. Gonzalez. After reviewing Ms. Gonzalez's ultrasound results, Dr. Pahk took no further action to follow up on Ms. Gonzalez's referral. She never received a consultation report from a specialist but assumed Ms. Gonzalez had been seen by a specialist. It is the duty of a primary care physician to follow up on patient referrals in order to manage continuity and coordination of

patient care. The standard of care required Dr. Pahk, after identifying Ms. Gonzalez's growing, painful and persistent palpable breast lump, to follow up with Ms. Gonzalez to ensure that she had been seen by a specialist and that her breast mass had resolved, and she failed to do so. See Testimony of Dr. John Russo; see also Testimony of Dr. Leigh Simmons (acknowledging that Dr. Pahk did not close the loop on the clinical referral of Ms. Gonzalez to the Belkin Breast Health Center she claims to have made).

256. Dr. Pahk deviated from the standard of care by failing to follow up with Ms. Gonzalez at any point after seeing her on March 18, 2016 to ensure that her breast lump had been diagnosed or resolved. After seeing Ms. Gonzalez on March 18, 2016 and reviewing her ultrasound results, Dr. Pahk took no further steps to follow up with Ms. Gonzalez. She did not take any action to ensure that Ms. Gonzalez had been seen by a specialist, as discussed above, and did not see Ms. Gonzalez again. Dr. Pahk did not discharge her obligation as a primary care physician to rule out cancer in Ms. Gonzalez after Ms. Gonzalez presented to her with a palpable breast lump which had been present for one year, was growing, burning, causing misshape in her breast and causing her pain. Dr. Pahk's obligation was to follow up with Ms. Gonzalez to ensure that cancer was ruled out and she did not. See Testimony of Dr. John Russo; see also Testimony of Dr. Leigh Simmons and Dr. Caroline Pahk (both acknowledging that Dr. Pahk did not take any action to follow up on Ms. Gonzalez's condition after reviewing her ultrasound results).

**iii. DR. HENSHAW'S BREACHES OF THE STANDARD OF CARE.**

257. Dr. Henshaw deviated from the standard of care in her care and treatment of Ms. Gonzalez on July 18, 2016 by failing to perform a proper diagnostic workup of Ms. Gonzalez's very concerning breast lump, which was highly suspicious of cancer, by failing to effectuate a proper referral to a breast specialist for Ms. Gonzalez, by failing to close the loop on her referral

of Ms. Gonzalez, and by failing to follow up with Ms. Gonzalez to ensure that her breast lump had resolved or had been diagnosed. See Testimony of Dr. John Russo.

258.   Dr. Henshaw deviated from the standard of care by failing to order any diagnostic testing for Ms. Gonzalez at any point after seeing her on July 18, 2016. Dr. Henshaw identified a rapidly growing persistent palpable breast lump in Ms. Gonzalez's right breast in the presence of an inverted nipple, ongoing pain and skin peau d'orange change. It is the duty of an internist primary care physician to rule out cancer in a patient with a palpable breast lump. A biopsy is the only way to definitively rule out breast cancer in a palpable breast lump. Based on Ms. Gonzalez's presentation, which was highly suspicious of cancer, Dr. Henshaw breached the standard of care by failing to order any diagnostic testing for Ms. Gonzalez. See Testimony of Dr. John Russo; Exhibit 59 Harrison's Principles of Internal Medicine at 525; Exhibit 58 "Diagnostic algorithm for palpable breast abnormalities in women <30 years of age" UpToDate, May 2019 (Exhibit 1, Dr. Simmons Expert Report); Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 2, 15.

259.   There is no question that Ms. Gonzalez presented to Dr. Henshaw in July 2016 with a clinically suspicious breast mass that was highly suspicious of breast cancer. Ms. Gonzalez's presentation at this appointment was 300% alarming. Dr. Henshaw herself characterizes Ms. Gonzalez's presentation as "very alarming," "concerning" and "highly suspicious of cancer." The standard of care for treatment of a patient presenting with a clinically suspicious breast lump is biopsy regardless of imaging findings. Dr. Henshaw did not refer Ms. Gonzalez for any diagnostic imaging, but instead reviewed a four-month-old ultrasound. This was a serious breach of the standard of care. See Testimony of Dr. John Russo; see also Testimony of Dr. Nsa Henshaw and Dr. Leigh Simmons (acknowledging Ms. Gonzalez

presented to Dr. Henshaw in July 2016 with a clinically suspicious breast mass highly suspicious of breast cancer which should have been biopsied); Exhibit 58 "Diagnostic algorithm for palpable breast abnormalities in women <30 years of age" UpToDate, May 2019 (Exhibit 1, Dr. Simmons Expert Report); Exhibit 72 Diagnostic evaluation of women with suspected breast cancer – UpToDate at page 2, 15.

260.    Dr. Henshaw deviated from the standard of care by failing to refer Ms. Gonzalez to an appropriate breast specialist on an urgent basis after treating her on July 18, 2016. Based on Ms. Gonzalez's highly concerning presentation, Dr. Henshaw should have referred Ms. Gonzalez on an urgent basis to a breast specialist, and in particular to a surgeon for a breast biopsy. Rather than refer Ms. Gonzalez on an urgent basis to a surgeon, she referred Ms. Gonzalez on a routine basis to a breast clinic. The standard of care required Dr. Henshaw to refer Ms. Gonzalez to a physician whom she knew to be a specialist with a particular expertise in breast health.  In particular, the standard of care required Dr. Henshaw to refer Ms. Gonzalez to a surgeon to evaluate her clinically suspicious mass and perform the necessary biopsy. Dr. Henshaw's complete lack of knowledge of the experience or qualifications of the physician or physicians to which she referred Ms. Gonzalez was a deviation from the standard of care. See Testimony of Dr. John Russo.

261.    A primary care physician does not satisfy the standard of care by simply expecting a patient to receive the appropriate diagnostic testing and clinical treatment. Dr. Henshaw's failure to effectively refer Ms. Gonzalez for diagnostic imaging and to a breast surgeon (due to Ms. Gonzalez's truly alarming presentation by July 2016), breached the standard of care. See Testimony of Dr. John Russo; see also Testimony of Dr. Leigh Simmons (intending for a patient to be seen by an appropriate specialist does not satisfy the standard of care).

262.     Dr. Henshaw deviated from the standard of care in her care and treatment of Ms.
Gonzalez by failing to follow up with Ms. Gonzalez to ensure her breast lump had been
diagnosed or had resolved and by failing to close the loop on her referral of Ms. Gonzalez. Dr.
Henshaw's obligation as Ms. Gonzalez's primary care physician was to follow up with Ms.
Gonzalez to ensure that Ms. Gonzalez underwent a comprehensive evaluation, which would have
included a biopsy of her breast lump, to be certain that cancer was ruled out. Dr. Henshaw
received and reviewed the consultation report from Ms. Gonzalez's appointment with the breast
clinic which showed that Ms. Gonzalez had not received a biopsy (or any imaging) and that
cancer had not been ruled out in Ms. Gonzalez.  Dr. Henshaw failed to follow up with the breast
clinic, Dr. Ramachandran or Ms. Gonzalez regarding the report or Ms. Gonzalez's follow up
care. See Testimony of Dr. John Russo; see also Testimony of Dr. Nsa Henshaw (admitting that
she did not follow up with Ms. Gonzalez about her breast lump after July 2016 and never spoke
with anyone at the Belkin Breast Health Center about Ms. Gonzalez).

263.     Dr. Henshaw also failed to follow up with Ms. Gonzalez regarding her breast
lump on three separate occasions in 2016 and 2017, when she treated Ms. Gonzalez for back
pain, in breach of the standard of care. At these appointments, Dr. Henshaw failed to ask Ms.
Gonzalez about her breast lump or her consultation at the breast clinic, failed to perform a
physical examination of Ms. Gonzalez's breasts, and failed to refer Ms. Gonzalez for further
imaging or treatment. Dr. Henshaw's failure to consider that Ms. Gonzalez's back pain resulted
from the spreading of her cancer was a deviation of the standard of care. See Testimony of Dr.
John Russo; see also Testimony of Dr. Nsa Henshaw (admitting that she did not ask Ms.
Gonzalez any questions about her breast lump, examine Ms. Gonzalez's breasts or refer her for
any testing or clinical care in connection with her breast lump at these appointments).

264.    Dr. Henshaw cannot rely on an ultrasound taken seven months prior to seeing Ms. Gonzalez for back pain and a referral which did not result in any additional diagnostic testing or treatment to claim that she had no idea Ms. Gonzalez could have breast cancer when she treated her in late 2016 and early 2017. As her primary care physician, Dr. Henshaw was responsible for the longitudinal and comprehensive care of Ms. Gonzalez. The standard of care required Dr. Henshaw to follow up with Ms. Gonzalez concerning her clinically suspicious breast mass and she failed to do so. See Testimony of Dr. John Russo.

**B.  PAUL TARTTER, M.D.**

265.    The delay in diagnosing Ms. Gonzalez's breast cancer caused Ms. Gonzalez to develop stage 4 breast cancer and caused her early death. See Testimony of Dr. Paul Tartter.

266.    As a general rule, earlier diagnosis of breast cancer leads to better prognosis for the patient. Cancer diagnosed at a later stage becomes more difficult to treat and more difficult to cure. See Testimony of Dr. Paul Tartter; see also Testimony of Dr. Stephanie Bernstein and Dr. Caroline Pahk.

267.    To a reasonable degree of medical certainty, had Ms. Gonzalez's breast cancer been diagnosed in 2015 or 2016, it is more likely than not that appropriate treatment would have been initiated, which would have led to earlier intervention and less injury to Ms. Gonzalez and would have prevented her death. Had Ms. Gonzalez been diagnosed in 2015 or 2016 when Dr. Pahk and Dr. Henshaw treated her, it is more likely than not that her cancer would not have developed to stage four and would not have spread to her lungs, spine and bones. See Testimony of Dr. Paul Tartter.

268.    By the time Ms. Gonzalez was officially diagnosed with stage 4 metastatic breast cancer in March 2017, her disease was advanced and refractory to treatment. Biopsy at this time

revealed that Ms. Gonzalez's breast lump was 6.4 x 5.1 x 4.5CM, six times larger than when Dr.

Pahk first documented Ms. Gonzalez's breast lump in the medical records. Patients, like Ms.

Gonzalez, with a diagnosis of stage 4 metastatic breast cancer have an approximately 0% long

term survival rate. Though there is the occasional long-term survivor, most patients with stage 4

metastatic breast cancer die within three years. See Testimony of Dr. Paul Tartter.

      **i.**      D<small>R</small>. P<small>AHK</small> C<small>AUSED</small> M<small>S</small>. G<small>ONZALEZ</small>'<small>S</small> I<small>NJURIES AND</small> D<small>EATH</small>.

269.    Dr. Pahk's failure to ensure that Ms. Gonzalez underwent appropriate diagnostic

testing and evaluation, including biopsy, in July 2015, February 2016, and March 2016 caused

the delay in diagnosing Ms. Gonzalez's breast cancer, allowing her disease to progress and

depriving her of treatment that would more likely than not have resulted in a better outcome and

chance for survival. See Testimony of Dr. Paul Tartter.

270.    It is more likely than not that appropriate diagnostic testing, such as a

mammogram, MRI and/or biopsy, done on or near any of these dates on Ms. Gonzalez would

have yielded the correct diagnosis of breast cancer. See Testimony of Dr. Paul Tartter.

271.    A breast mass that is found to be less than 2CM in diameter on clinical exam

would more likely than not correspond with stage 1 breast cancer, which is highly treatable. It is

more likely than not that Ms. Gonzalez had stage 1 breast cancer on these dates. The survival

rate for women with stage 1 breast cancer who receive treatment, such as a lumpectomy and

radiation, or a mastectomy, is over 90% long-term survival (at least 10 years). See Testimony of

Dr. Paul Tartter.

272.    Had Dr. Pahk properly diagnosed Ms. Gonzalez in July 2015 or February 2016, it

is more likely than not that such treatment would have been initiated, that Ms. Gonzalez would

not have developed stage four breast cancer, that Ms. Gonzalez's cancer would not have spread

to her lungs, bone and spine, and that Ms. Gonzalez would have had an over 90% chance of long-term (at least 10 years) survival, therefore resulting in less injury to Ms. Gonzalez and preventing her death. <u>See</u> Testimony of Dr. Paul Tartter.

ii.   **DR. HENSHAW CAUSED MS. GONZALEZ'S INJURIES AND DEATH.**

273.   Dr. Henshaw's failure to ensure that Ms. Gonzalez underwent appropriate diagnostic testing and evaluation, including biopsy, in July 2016 caused the delay in diagnosing Ms. Gonzalez's breast cancer, allowing her disease to progress and depriving her of treatment that would more likely than not have resulted in a better outcome and chance for survival. <u>See</u> Testimony of Dr. Paul Tartter.

274.   It is more likely than not that appropriate diagnostic testing, such as a mammogram, MRI and/or biopsy, done on or near July 2016 on Ms. Gonzalez would have yielded the correct diagnosis of breast cancer. <u>See</u> Testimony of Dr. Paul Tartter.

275.   A breast mass that is found to be between 2CM and 5CM in diameter on clinical exam would more likely than not correspond with stage 2 breast cancer. The survival rate for women with stage 2 breast cancer who receive treatment, such as lumpectomy and radiation, or mastectomy, is approximately 80% long term survival (at least 10 years). <u>See</u> Testimony of Dr. Paul Tartter.

276.   Had Dr. Henshaw properly diagnosed Ms. Gonzalez in July 2016, it is more likely than not that such treatment would have been initiated, that Ms. Gonzalez would not have developed stage 4 breast cancer, that Ms. Gonzalez's cancer would not have spread to her lungs, bone and spine, and that she would have had an approximately 80% chance of long-term (at least 10 years) survival, therefore resulting in less injury to Ms. Gonzalez and preventing her death. <u>See</u> Testimony of Dr. Paul Tartter.

### iii. MS. GONZALEZ'S BREAST CANCER WAS NOT METASTATIC PRIOR TO LATE 2016 AND THE ONSET OF BACK PAIN

277.     Ms. Gonzalez did not have metastatic breast cancer when she treated with Dr. Pahk and Dr. Henshaw in 2015 and 2016 prior to the onset of her back pain. Ms. Gonzalez did not have any symptoms of metastatic breast cancer prior to the onset of back pain in late 2016. If breast cancer spreads, it typically goes first to the axillary lymph nodes. Based on Ms. Gonzalez's ultimate presentation at diagnosis, it is more likely than not that she would have exhibited axillary lymph nodes on physical examination if her breast cancer had metastasized. There is no evidence in the records that Ms. Gonzalez exhibited axillary lymph nodes in 2015 or 2016. Further, Ms. Gonzalez did not exhibit any other symptoms which would suggest that her breast cancer had metastasized when she treated with Dr. Pahk and Dr. Henshaw in 2015 and 2016 prior to experiencing back pain. Moreover, any difficulty examining Ms. Gonzalez's breasts has nothing to do with the metastasis of her cancer. See Testimony of Dr. Paul Tartter.

278.     The back pain Ms. Gonzalez was experiencing prior to late 2016 was not in any way caused by metastases of breast cancer. It is not uncommon that someone like Ms. Gonzalez would experience back pain from time to time. The back pain that Ms. Gonzalez experienced in 2015 and 2016 improved over time and with treatment, including acupuncture. Back pain associated with metastatic cancer would not improve over time or with treatment. Further, in February 2017, Ms. Gonzalez reports to emergency department physicians at Carney Hospital that the back pain she experienced in late 2016 and early 2017 was "different" than the back pain she had experienced during the prior years. See Testimony of Dr. Paul Tartter; Exhibit 1 DotHouse Medical Record at USA007912, USA007918, USA007926; Exhibit 3 Carney Hospital Medical Record at USA010309.

279.     Nothing about the biology or growth rate of Ms. Gonzalez's tumor suggests that her breast cancer was metastatic in 2015 or 2016 (prior to the onset of her back pain). Ms. Gonzalez's tumor was HER-2 positive, estrogen positive and progesterone positive – "triple positive." Triple positive breast cancers are associated with very high survival rates in breast cancer patients. Additionally, there was nothing remarkable about the growth rate of Ms. Gonzalez's tumor. Ms. Gonzalez's tumor was intermediate grade. It would be quite common for a tumor of such intermediate grade to grow from 1 cm to 3-4cm in four months as Ms. Gonzalez's tumor did. Tumor burden had a significant impact on Ms. Gonzalez's ultimate response to treatment. Earlier treatment, when Ms. Gonzalez's breast lump was 1cm in March 2016 or 3-4 cm in July 2016, would have resulted in significant tumor response and a much higher rate of survival. See Testimony of Dr. Paul Tartter.

280.     For women with triple positive breast cancer like Ms. Gonzalez, there is no increased risk of breast cancer mortality for younger patients. Moreover, age alone is not an independent prognostic factor for breast cancer patients. Ms. Gonzalez's age cannot be relied upon to suggest a worse prognosis and certainly cannot be relied upon to suggest metastatic disease in 2015 and 2016 prior to the onset of Ms. Gonzalez's back pain. See Testimony of Dr. Paul Tartter.

281.     Earlier diagnosis of Ms. Gonzalez's tumor would certainly have led to fewer complications, including fewer fractures and no spinal cord compression, and a significantly improved quality of life for Ms. Gonzalez – who was in her early thirties with two young children before dying of cancer in August 2020. Had Ms. Gonzalez's tumor been diagnosed in 2015 or 2016 by Dr. Pahk or Dr. Henshaw, Ms. Gonzalez would have avoided years of extreme pain and suffering, would have more likely than not had a substantially increased chance of

survival, and would be alive today. See Testimony of Dr. Paul Tartter; see also Testimony of Dr. Stephanie Bernstein.

### C.  NEVILLE LEE, PH.D.

282.    Ms. Gonzalez suffered a loss of earning capacity of $93,954 and a loss of reasonably expected net income of $231,438, both in present value terms. The replacement cost of her household services was $831,199 through her normal healthy life expectancy in present value terms. There is a probable loss to the survivors of $1,156,591 in present value terms. See Testimony of Dr. Neville Lee.

283.    If Ms. Gonzalez's migraine headaches resulted in permanent disability prior to March 2017, her date of diagnosis, and caused her not to have any labor market activity for the remainder of her worklife, her total loss is reduced to $824,428 in present value terms. See Testimony of Dr. Neville Lee.

284.    Dr. Lee's estimate of loss makes no allowance for the pain and suffering that Ms. Gonzalez endured as a result of her injuries, nor does it account for her loss of enjoyment from the pleasures of life. There has been no accounting for any medical costs required because of Ms. Gonzalez's health problems. See Testimony of Dr. Neville Lee.

### i.    MS. GONZALEZ'S LOSS OF EARNING CAPACITY DAMAGES

285.    Earning capacity is the earnings of a person who chooses to maximize the expectation of actual earnings, both before and after injury. Earning capacity does not necessarily mean the actual pre-injury earnings of one who was injured, but that which an individual, by virtue of training, experience and education, had the *capability* of earning.  It includes not only loss of wages, but loss of employer-paid benefits at 25% of Ms. Gonzalez's wages. See Testimony of Dr. Neville Lee.

286.     With her level of education, Ms. Gonzalez would have had annual wages of $20,585 had she worked full-time. At the date of her death, Ms. Gonzalez, as an active female, aged 34, had an expected worklife of 14.92 years. Ms. Gonzalez was expected to have future pre-injury compensation increasing at an average annual real (adjusted for inflation) rate of 1% a year. Ms. Gonzalez had a loss of earning capacity from the date of her diagnosis to her date of death of $93,954, in present value terms. See Testimony of Dr. Neville Lee.

### ii.     MS. GONZALEZ'S LOSS OF REASONABLY EXPECTED NET INCOME DAMAGES

287.     Ms. Gonzalez had reasonably expected income of $306,686 in present value terms from the date of her death through her worklife expectancy. From this, a total of 32% of her income is subtracted for taxes and her own personal consumption. Her loss of reasonably expected net income is $231,438 in present value terms. See Testimony of Dr. Neville Lee.

### iii.     MS. GONZALEZ'S REPLACEMENT COST OF HOUSEHOLD SERVICES DAMAGES

288.     The replacement cost method determines the amount of time per week that would have been spent on each type of household activity, and values that work using the prevailing wage rate for that activity. The total replacement cost of household services provided by Ms. Gonzalez was determined to be $831,199 through her through her healthy life, in present value terms, as of the date of filing. See Testimony of Dr. Neville Lee; Exhibit 64 Life Expectancy Tables.

289.     Ms. Gonzalez had reported to the Massachusetts Department of Transitional Assistance that she suffered from migraine headaches, but there was nothing to indicate any permanent disability.  Had she been permanently disabled prior to her March 2017 diagnosis, using the same methodology, the replacement cost of household services for a disabled woman

not in the labor force, would reduce to $824,428 in present value terms. <u>See</u> Testimony of Dr. Neville Lee; Exhibit 64 Life Expectancy Tables.

## PROPOSED CONCLUSIONS OF LAW

### I.      MASSACHUSETTS MEDICAL MALPRACTICE LAW APPLIES IN THIS FTCA ACTION.

290.    This action arises under the Federal Tort Claims Act ("FTCA") because DotHouse Health, Inc. ("DotHouse") is a federally funded community health center and Dr. Pahk and Dr. Henshaw are employees of DotHouse Health. <u>See</u> 28 U.S.C. §2671 <u>et seq.</u>

291.    Under the FTCA, the United States is liable "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

292.    Because the term "place" under § 1346(b) refers to the state in which the allegedly tortious acts or omissions occurred, the substantive tort law to be applied in this case is that of Massachusetts. <u>See</u> 28 U.S.C. § 1346(b).

293.    The United States in this FTCA action is held liable "in the same manner and to the same extent as a private individual under like circumstances." <u>See</u> 28 U.S.C. §2674. Thus, the United States is held liable in this action to the same matter and to the same extent as Dr. Pahk and Dr. Henshaw would be held liable under like circumstances under Massachusetts law. <u>See</u> <u>id.</u>

294.    The FTCA is a waiver of the government's sovereign immunity in private tort actions. The FTCA was intended to afford an injured party the "opportunity for recovery 'as a matter of right'" and to "provid[e] for more fair and equitable treatment of private individuals when they deal with the Government or are involved in litigation with their Government." <u>Lopez v. United States</u>, 758 F.2d 806, 809 (1985).

## II.   THE UNITED STATES IS LIABLE UNDER THE FTCA FOR THE NEGLIGENCE OF DR. PAHK AND DR. HENSHAW.

### A.   DR. PAHK AND DR. HENSHAW WERE NEGLIGENT IN THEIR CARE AND TREATMENT OF MARIELIS GONZALEZ UNDER MASSACHUSETTS LAW.

295.    The proper standard is whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession. Brune v. Belinkoff, 354 Mass. 102, 109 (1968).

296.    Plaintiffs must prove by a preponderance of the evidence that the conduct of Dr. Pahk and/or Dr. Henshaw failed to conform to good practice because Dr. Pahk and/or Dr. Henshaw failed to provide Ms. Gonzalez with the degree of skill and care expected of the average primary care physician under the circumstances. See id.; see also Delicata v. Bourlesses, 9 Mass. App. Ct. 713, 717-18 (1980).

297.    Dr. Pahk was negligent and breached the standard of care in her care and treatment of Marielis Gonzalez. See Brune v. Belinkoff, 354 Mass. 102, 109 (1968).

298.    Dr. Henshaw was negligent and breached the standard of care in her care and treatment of Marielis Gonzalez. See Brune v. Belinkoff, 354 Mass. 102, 109 (1968).

### B.   THE NEGLIGENCE OF DR. PAHK AND DR. HENSHAW CAUSED MARIELIS GONZALEZ'S INJURIES AND DEATH.

299.    A defendant is a factual cause of a harm if the harm would not have occurred "but for" the defendant's negligent conduct. Doull v. Foster, 487 Mass. 1, 163 N.E.3d 976, 983-89. The purpose of this but-for standard is to separate the conduct that had no impact on the harm form the conduct that caused the harm. Id. at 986.

300.    There is no requirement that a defendant must be the sole factual cause of a harm. Id. at 986-87, citing Reporters' Note to Restatement (Third) § 26 comment c ("That a party's tortious conduct need only be a cause of the plaintiff's harm and not the sole cause is well

recognized and accepted in every jurisdiction").  The focus instead remains only on whether, in the absence of a defendant's conduct, the harm would have still occurred. Id. at 987, citing Restatement (Third) § 26 comment i ("Quite often, each of the alleged acts or omissions is a cause of the harm, i.e., in the absence of any one, the harm would not have occurred"). This is not a high bar. Id.

301.    Dr. Pahk's negligence caused Ms. Gonzalez's injuries and death. See Doull v. Foster, 487 Mass. 1, 163 N.E.3d 976, 983-89.

302.    Dr. Henshaw's negligence caused Ms. Gonzalez's injuries and death. See Doull v. Foster, 487 Mass. 1, 163 N.E.3d 976, 983-89.

303.    The testimony of an expert witness that a causal relationship exists or probably exists is sufficient to establish proximate cause. See Primus v. Galgano, 329 F.3d 236, 241 (1st Cir. 2003); Berardi v. Menicks, 340 Mass. 396, 402 (1960); Glicklich v. Spievak, 16 Mass. App. Ct. 488, 492 (1983).

### III.    PLAINTIFFS ARE ENTITLED TO RECOVER THEIR FULL DAMAGES FROM THE UNITED STATES UNDER MASSACHUSETTS SYSTEM OF JOINT AND SEVERAL LIABILITY.

304.    Massachusetts law applies joint and several liability where the combined negligence of two or more individuals causes indivisible harm. See O'Connor v. Raymark Industries, Inc., 401 Mass. 586, 591 (1988); Renzi v. Paredes, 452 Mass. 38, 54 (2008) (affirming judge's instruction on joint and several liability of defendants in medical negligence case).

305.    Pursuant to joint and several liability, a plaintiff is entitled to recover her full damages from any liable party. See Com. v. Boston Edison Co., 444 Mass. 324, 327 n.4 (2005); Shantigar Foundation v. Bear Mountain Builders, 441 Mass. 131, 141 (2004); ("Under system of

joint and several liability, a plaintiff injured by more than one tortfeasor may sue any or all of them for her full damages.").

306.    Plaintiffs are entitled to recover the full amount of their damages from Defendant United States in this FTCA action. See Librera v. U.S., 718 F.Supp. 111, 113-15 (D. Mass. 1989). The court in Librera, held that Massachusetts law on joint and several liability applied under the FTCA. In particular, the court held that the United States could be held jointly and severally liable under Massachusetts law, as incorporated by the FTCA, as a joint tort-feasor in an action arising out of a slip and fall on post office property. The United States argued that it could not be held jointly and severally liable with an independent contractor of the US Postal Service. The court disagreed and aptly stated,

> Nonetheless, as both parties agree, under Massachusetts law an individual can be jointly and severally liable *with* an independent contractor, so long as the individual was himself negligent. Since Congress has made it explicit that "[t]he United States shall be held liable… *in the same manner and to the same extent* as a private individual under like circumstances…," 28 U.S.C. 2674 (emphasis added), both Massachusetts *and* federal law compel the compulsion that where the proper factual findings has been made, the Untied States may be held jointly and severally liable with an independent contractor.

Librera, 718 F.Supp. at 115. The court also indicated that nothing in the FTCA relieved the United States of properly applied joint and several liability.

307.    Plaintiffs' prior settlement with Boston Medical Center and its physicians is not relevant to liability or damages in this case. See Fed.R.Evid. 408; McInnis v. A.M.F., Inc., 765 F.2d 240, 246 (1st Cir.1985). Plaintiffs' settlement with Boston Medical Center and its physicians may only be considered as a set off to any judgment Plaintiffs may recover against the United States. See Morea v. Cosco, Inc., 422 Mass. 601, 604 (1996).

## IV. PLAINTIFFS ARE ENTITLED TO DAMAGES RESULTING FROM THE NEGLIGENCE OF DR. PAHK AND DR. HENSHAW.

### A. ANDY NAPOLEONIS, JB AND AN ARE ENTITLED TO RECOVER DAMAGES FOR THEIR LOSS OF CONSORTIUM DURING THE LIFE OF MARIELIS GONZALEZ

308. Andy Napoleonis, Ms. Gonzalez's husband, is entitled to recover damages for his loss of his wife's consortium as a result of Ms. Gonzalez's injuries during Ms. Gonzalez's life. See Gross v. Bohn, 782 F.Supp.173, 184 (D. Mass. 1992) ("It is clear that a claim of loss of consortium may be maintained where the loss arose from personal injury to the spouse caused by the negligence of a third party."); Deasy v. Somerville Hosp., 1995 WL 1146115, at *2-3 (in wrongful death case, allowing separate loss of consortium claim for three-week period before decedent's death from her injuries).

309. Ms. Gonzalez's daughter, JB, is entitled to recover damages for her loss of her mother's consortium as a result of Ms. Gonzalez's injuries during Ms. Gonzalez's life. See Ferriter v. Daniel O'Connell's Sons, Inc., 381 Mass. 507, 692 (1980) (recognizing minor child's right to loss of parental consortium); Deasy v. Somerville Hosp., 1995 WL 1146115, at *2-3 (in wrongful death case, allowing separate loss of consortium claim for three-week period before decedent's death from her injuries).

310. Ms. Gonzalez's daughter, AN, is entitled to recover damages for her loss of her mother's consortium as a result of Ms. Gonzalez's injuries during Ms. Gonzalez's life. See Ferriter v. Daniel O'Connell's Sons, Inc., 381 Mass. 507, 692 (1980) (recognizing minor child's right to loss of parental consortium); Deasy v. Somerville Hosp., 1995 WL 1146115, at *2-3 (in wrongful death case, allowing separate loss of consortium claim for three-week period before decedent's death from her injuries).

**B. RICHARD BLANK AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MS. GONZALEZ IS ENTITLED TO RECOVER FOR MS. GONZALEZ'S CONSCIOUS PAIN AND SUFFERING.**

311.    The Court may take into consideration as an element of damages, apprehensions, fears and consequential suffering caused to Ms. Gonzalez as a result of contemplating the fact of her impending death. See Glicklich v. Spievack, 16 Mass. App. Ct. 488, 495 n.3 (1983).

312.    The Court may "infer that the mental processes of the deceased were such as reasonable [wo]men would have under similar conditions." See Choicener v. Walters Amusement Agency, Inc., 269 Mass. 341, 344 (1929).

313.    As a result of the negligence of Dr. Pahk, Ms. Gonzalez experienced conscious physical or mental pain and suffering during her lifetime. See Carr v. Arthur D. Little, Inc., 348 Mass. 469, 475 (1965) (to prove "conscious suffering," plaintiff must show that there was either "pain or at least consciousness of injury").

314.    As a result of the negligence of Dr. Henshaw, Ms. Gonzalez experienced conscious physical or mental pain and suffering during her lifetime. See Carr v. Arthur D. Little, Inc., 348 Mass. 469, 475 (1965) (to prove "conscious suffering," plaintiff must show that there was either "pain or at least consciousness of injury").

**C. RICHARD BLANK AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARIELIS GONZALEZ IS ENTITLED TO RECOVER MARIELIS GONZALEZ'S MEDICAL EXPENSES.**

315.    Richard Blank as Personal Representative of the Estate of Marielis Gonzalez is entitled to recover medical and hospital expenses paid as a result of the negligence of Dr. Pahk and Dr. Henshaw. See O'Leary v. U.S. Lines Co., 111 F. Supp. 745, 746 (D. Mass. 1953) (holding that a claim for medical and hospital expenses survives the death of the injured person, and these items are recoverable in a wrongful death action).

**D.  RICHARD BLANK AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARIELIS GONZALEZ IS ENTITLED TO RECOVER FOR MS. GONZALEZ'S LOSS OF EARNING CAPACITY DURING HER LIFE**

316.    Richard Blank as Personal Representative of the Estate of Marielis Gonzalez is entitled to recover for the loss of earning capacity of Ms. Gonzalez during her life. Griffin v. Gen. Motors Corp., 380 Mass. 362, 366 (1980); Mitchell v. Walton Lunch Co., 305 Mass. 76, 78 (1939).

317.    A person not working at the time of an accident or injury can recover for lost earning capacity. Doherty v. Ruiz, 320 Mass. 145, 146 (1939); Koch v. Lynch, 247 Mass. 459, 462 (1924) (holding that married woman plaintiff could recover for impairment of her capacity to labor without proof that she actually was working or in the receipt of wages or compensation at the time of and before the injury).

**E.  RICHARD BLANK AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARIELIS GONZALEZ IS ENTITLED TO RECOVER WRONGFUL DEATH DAMAGES PURSUANT TO M.G.L. C. 229, §2.**

318.    Pursuant to the Massachusetts Wrongful Death Statute, M.G.L. c. 229, §2, Richard Blank as Personal Representative of the Estate of Marielis Gonzalez can recover:

> the fair monetary value of the decedent to the persons entitled to receive the damages recovered…including but not limited to compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent to the persons entitled to the damages recovered…

319.    Richard Blank as Personal Representative of the Estate of Marielis Gonzalez is entitled to recover for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of Ms. Gonzalez to her husband, Andy Napoleonis, as a result of her death. See M.G.L. c. 229, §1, §2.

320.    Richard Blank as Personal Representative of the Estate of Marielis Gonzalez is entitled to recover for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of Ms. Gonzalez to her daughter, Jonielys Bracero, as a result of her death. <u>See</u> M.G.L. c. 229, §1, §2.

321.    Richard Blank as Personal Representative of the Estate of Marielis Gonzalez is entitled to recover for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of Ms. Gonzalez to her daughter, Andielys Napoleonis, as a result of her death. <u>See</u> M.G.L. c. 229, §1, §2.

322.    Damages which are based on the Wrongful Death Statute (damages to the next of kin for loss of consortium/society/companionship, loss of services, and net loss of expected income for the period of time after death), go directly to the specified next of kin without ever going into the estate. <u>Maltzman v. Hertz</u>, 336 Mass 704, 707-08 (1958).

## V.    THE COURT SHOULD LOOK TO COMPARABLE MASSACHUSETTS JURY VERDICTS AND SETTLEMENTS IN ORDER TO DETERMINE PLAINTIFFS' GENERAL DAMAGES.

323.    Due to the inherent difficulty in assessing general damages in medical negligence cases, the Court should look to jury verdicts and settlements in similar cases when assessing Plaintiffs' damages in this case. <u>See</u> <u>Limone v. U.S.</u>, 579 F.3d 79, 104 (1st Cir. 2009) (upholding damages award where district court looked to comparable damages awards and noting, "[t]he key is comparability: whether the counterpart cases involve analogous facts, similar measures of damages, and are otherwise fairly congruent."); <u>Gutiérrez–Rodríguez v. Cartagena</u>, 882 F.2d 553, 579 (1st Cir.1989) (stating that helpful guidance may be found in damage awards from "similar cases arising out of the same context that are tried in the same locale."); <u>Keene v. Brigham and Women's Hosp., Inc.</u>, 11 Mass.L.Rptr. 545, *21 (2000) (at assessment of damages,

reviewing comparable Massachusetts jury verdicts and settlements in medical malpractice case involving severe neurologic injuries to a child).

324.   A review of Massachusetts jury verdicts and settlements analogous to this case supports the conclusion that the reasonable value of Plaintiffs' claims in this case is between $3,000,000 and $6,000,000. See Manupelli, Estate of v. Berman, M.D., 20 N.Eng. J.V.R.A. 1:C1, 2004 WL 6222268 (2001); Mustapha v. Prakash, M.D. et al, 20 N.Eng. J.V.R.A. 1:C1, 2004 WL 6222268 (2004), Lamonica, Estate of v. Blaine, M.D., JVR No. 434431, 1998 WL 35078009 (1998); see also Renzi, Estate of v. Veatch, M.D. et al, JVR No. 450140, 2005 WL 5153649 (2005) and Decedent's Family v. Doctor, JVR No. 8649, 1985 WL 348572 (1985).

## VI.   MASSHEALTH MAY ONLY ASSERT ITS LIEN ON THE PORTION OF PLAINTIFFS' RECOVERY ATTRIBUTABLE TO MARIELIS GONZALEZ'S MEDICAL EXPENSES.

325.   The Commonwealth of Massachusetts Executive Office of Health and Human Services ("MassHealth") is entitled to assert a lien over only the portion of Plaintiffs' potential recovery attributable to the medical expenses of Marielis Gonzalez. See 42 U.S.C. §1396; Arkansas Dept. of Health and Human Services v. Ahlborn, 547 U.S. 268, 269-70 (2006); (holding that Arkansas statute permitting Arkansas Department of Health and Human Services to assert its lien on proceeds other than those recovered for medical expenses violated explicit statutory language of federal Medicaid law); G.L. c. 118E, §1, et seq.

326.   MassHealth has asserted a $436,895.07 lien in this action. However, MassHealth may not assert a lien over damages awarded to compensate the Estate of Marielis Gonzalez for pain and suffering, loss of consortium, lost earning capacity or replacement of household services. See Ahlborn, 547 U.S. at 269-70. MassHealth is not entitled to recover the entirety of its $436,895.07 in this action if damages explicitly awarded for Ms. Gonzalez's medical expenses are less than the amount of the full lien. See id.

Respectfully submitted,
PLAINTIFFS RICHARD BLANK, ESQ. AS
PERSONAL REPRESENTATIVE OF THE
ESTATE OF MARIELIS GONZALEZ; ANDY
NAPOLEONIS, INDIVIDUALLY AND AS NEXT
FRIEND OF AN; AND MELISSA COURY AS
NEXT FRIEND OF JB,

By their attorneys,


/s/ Cathleen N. Augusto
Lisa G. Arrowood (BBO #022330)
larrowood@arrowoodllp.com
Cathleen N. Augusto (BBO #696479)
caugusto@arrowoodllp.com
ARROWOOD LLP
10 Post Office Square
7th Floor South
Boston, MA  02109
(617) 849-6200 telephone
(617) 849-6201 facsimile

Dated:  March 31, 2021