UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____<br><br>RICHARD BLANK, ESQ., as<br>Personal Representative of the ESTATE<br>OF MARIELIS GONZALEZ, et al.,<br><br>       Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>       Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 19-11855-JCB<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

September 3, 2021

Boal, M.J.

Plaintiffs Richard Blank, as personal representative of the estate of Marielis Gonzalez, Andy Napoleonis, for himself and as next friend of A.N., and Melissa Coury, as guardian ad litem of J.B., bring this suit against the United States of America, pursuant to the Federal Tort Claims Act. The Plaintiffs allege that Drs. Caroline Pahk and Nsa Henshaw, employees of DotHouse Health ("DotHouse"), a federally funded health clinic, committed medical malpractice by failing to properly evaluate and timely diagnose Ms. Gonzalez's breast cancer, resulting in her death. A bench trial was held before this Court on March 8-17, 2021.[1] For the following reasons, I find in favor of the Plaintiffs.

---

[1] All parties consented to the exercise of jurisdiction by a United States Magistrate Judge for all purposes and the case was reassigned to the undersigned on January 28, 2020. Docket Nos. 22, 23.

I.      FINDINGS OF FACT[2]

      A.      Ms. Gonzalez And Her Family

Marielis Gonzalez was born in 1986 in Puerto Rico.[3]  She moved to Dorchester, Massachusetts from Puerto Rico in 2008 with her one-year-old daughter, J.B.  That same year, Ms. Gonzalez began dating Andy Napoleonis.  In 2012, Ms. Gonzalez and Mr. Napoleonis had a daughter, A.N.[4]  They were married on December 6, 2013 and remained married until her death on August 15, 2020.[5]

Ms. Gonzalez and Mr. Napoleonis had a rocky relationship, marked by several separations.  Nevertheless, they remained in contact and Mr. Napoleonis remained involved in the care and raising of their daughter and J.B. during those separations.  In February 2019, Ms. Gonzalez obtained a restraining order against Mr. Napoleonis, which was lifted in November 2019.[6]  Both before Ms. Gonzalez obtained the restraining order and after the restraining order was lifted, Mr. Napoleonis cared for his wife at her home, whenever she was not in the hospital. Among other things, he picked up prescriptions, assisted Ms. Gonzalez in taking her medications, taking her to doctor's appointments, carrying her up and down the stairs to their third-floor apartment, helping her shower, dress, go to the bathroom, and cleaning and bandaging her bed sores.

---

[2] Where possible, this Court cites to the exhibits admitted into evidence and the available partial transcripts of the trial testimony.

[3] Stipulated Facts ("SF"), Ex. 67, at ¶ 1.

[4] SF at ¶ 4.

[5] Ex. 20.

[6] Ex. 49.

Due to Ms. Gonzalez's illness and the restraining order, A.N. and J.B. were placed in the custody of a guardian in 2019. Subsequently, A.N. went to live with her paternal grandmother and J.B. was placed in the custody of the Massachusetts Department of Children and Families ("DCF"). A.N. now lives with Mr. Napoleonis while J.B. remains in the custody of DCF.

B.     Breast Cancer Diagnosis And Treatment[7]

Because the breasts are a common site of potentially fatal cancer in women, examination of the breasts is an essential part of a physical examination. It is the duty of every physician to identify breast abnormalities at the earliest possible stage and to institute a diagnostic workup. If a patient complains of a breast lump to her physician, the physician should take a history of the lump, perform a physical exam, and order diagnostic testing, including ultrasound, mammogram, MRI, and/or biopsy. Diagnostic imaging, however, cannot rule out cancer. Ultrasounds have very limited usefulness in the diagnosis of cancer although may be used for an initial work-up for a breast mass for women under 30. Only a biopsy can rule out breast cancer.

Once breast cancer is diagnosed, it is generally assigned a stage. Stage I cancer involves a tumor that measures less than 2 cm, has not spread outside of the breast, and no lymph nodes are involved. It generally has more than 90% survival rate 10 years after diagnosis. Stage II cancers involve a tumor that measures between 2 cm and 5 cm and no lymph node involvement. It generally has a more than 80% survival rate 10 years after diagnosis. Stage III cancers involve tumors that are over 5 cm or have invaded the chest wall or skin. Stage III cancers have a 50% survival rate 10 years after diagnosis. Finally, Stage IV cancers involve cancer that has spread

---

[7] These findings are derived from the uncontested testimony of the various expert witnesses or, where contested, from the Plaintiffs' expert witnesses' testimony, which this Court has credited. In addition, all parties relied on a "Diagnostic Algorithm for Palpable Breast Abnormalities in Women < 30 years of age," UpToDate, May 2019 (Ex. 58).

beyond the breast and nearby lymph nodes to other organs of the body.  Most patients diagnosed with Stage IV breast cancer will die within 10 years.

There are other characteristics of breast tumors that may also affect prognosis and treatment: hormone receptor status, HER2 status, and tumor grade.  A cancer is called estrogen-receptor positive ("ER+") if it has receptors for estrogen.  Similarly, a cancer is progesterone-receptor positive ("PR+") if it has receptors for progesterone.  Breast cancers that are ER+ and/or PR+ are likely to respond to hormonal therapy.  Therefore, the presence of estrogen or progesterone positivity is generally a favorable prognosticator.  HER2 positive cancers tend to grow faster but are also more susceptible to chemotherapy.  In addition, there are other treatments available for HER2 positive cancers.

Tumor grade refers to how the cancer cells grow.  Cancer grades are reported on a scale from 1 to 3, with grade 1 tumors generally growing at a slower rate and grade 3 tumors growing at the fastest rate.  In addition, the level of Ki-67 protein in a breast tumor indicates how quickly the cells are dividing and forming new cells.

C.      Ms. Gonzalez's Medical Treatment And Breast Cancer Diagnosis

In or around 2009, Ms. Gonzalez began receiving health care at DotHouse.  DotHouse is a federally funded neighborhood health clinic in Dorchester, Massachusetts.  On October 16, 2009, Ms. Gonzalez saw Dr. Shenbagam Dewar, complaining of left breast pain for one week and migraines.[8]  Ms. Gonzalez thought that the breast pain could be from trauma from her toddler daughter.[9]  Dr. Dewar performed a breast exam, noting normal axilla, normal skin and

---

[8] Ex. 1 (USA 007289-7290).

[9] Ex. 1 (USA 007289).

areola, no masses, no nipple discharge, no erythema, no warmth, and no tenderness.[10]  Dr. Dewar

reassured Ms. Gonzalez that the pain was unlikely to be cancer because cancers are usually

painless, advised her to avoid coffee, and advised her to continue monthly breast self-exams.[11]

On January 5, 2010, Ms. Gonzalez had a complete physical exam with Dr. Dewar, and

the breast pain was again addressed, described as it "comes and goes, no relationship to

periods."[12]  Her breast exam was described as "axilla normal, skin normal, no masses."[13]  No

breast complaints were mentioned again in the medical records until a visit with Dr. Caroline

Pahk on March 13, 2016.

However, I find that, on or around July 20, 2015, Ms. Gonzalez complained of a lump in

her right breast to her primary care physician ("PCP") at the time, Dr. Pahk, who did not note

that complaint on her note for that visit or address the concern at that time.  Although Ms.

Gonzalez's deposition testimony was somewhat inconsistent in this respect,[14] the medical

records contain many references to Ms. Gonzalez stating that she told Dr. Pahk about the lump in

2015.  For example, a note from a visit with Dr. Pahk on March 18, 2016 states that Ms.

Gonzalez "report[ed] had lump check last year PCP said it would go away."[15]  Dr. Pahk's note

for the visit does not dispute Ms. Gonzalez's statement that she had told Dr. Pahk about the lump

---

[10] Ex. 1 (USA 007290).

[11] Id.

[12] Ex. 1 (USA 007294-7298).

[13] Ex. 1 (USA 007296).

[14] See Videotaped Deposition of Marielis Gonzalez, Ex. 61, at 9:2-14; 26:21-27:5; Discovery Deposition of Marielis Gonzalez, Ex. 65, at 5:15-22, 14:16-22.

[15] Ex. 1 (USA 007963).

the prior year.  While the United States suggested that Ms. Gonzalez was confusing the July

2015 visit with the October 2009 visit where she complained of left breast pain, I find such an

inference not reasonable given all of the evidence and circumstances.  Among other things, the

complaints were different (breast pain vs. a lump), concerned a different breast, and Ms.

Gonzalez's visit with Dr. Dewar was more than five years prior, not "last year."  Similarly, Ms.

Gonzalez consistently informed her medical providers that she first noticed the lump in 2015 and

showed it to her PCP at that time, who did not seem to feel it was concerning.[16]

On March 18, 2016, when she was 29 years old, Ms. Gonzalez presented to urgent care at

DotHouse and saw Dr. Pahk.[17]  She complained of a lump in her right breast causing pain,

burning, and getting bigger.[18]  She also reported that the lump was affecting the shape of her

breast.[19]  On breast examination, Dr. Pahk documented a 1 cm hard rubbery mass at 11 o'clock

2-3 cm from nipple with surrounding thicker tissues which she described as feeling like

fibrocystic changes, with the left breast mildly more full-appearing.[20]  No discharge, no

overlying cellulitis or dimpling, and no axillary lymphadenopathy were noted.[21]

Dr. Pahk testified that Ms. Gonzalez's symptoms were worrying and that it was necessary

to rule out breast cancer.  Dr. Pahk's note from the visit stated that she would refer Ms. Gonzalez

---

[16] Ex. 5 (USA 010513); see also Ex. 1 (USA 008025), Ex. 4 (Gonzalez 000013, 000021, 001067), Ex. 7 (Gonzalez 016640).

[17] Ex. 1 (USA 007963-7967).

[18] Ex. 1 (USA 007963).

[19] Id.

[20] Ex. 1 (USA 007964).

[21] Id.

to the Belkin Breast Health Center ("Belkin") at Boston Medical Center ("BMC") for a further evaluation.[22]  For reasons that are not clear, however, no referral was ever made for Ms. Gonzalez to have a consultation at Belkin.  Rather, Dr. Pahk made a referral for a breast ultrasound at BMC.[23]

On March 30, 2016, Ms. Gonzalez underwent a targeted right breast ultrasound at BMC.[24]  Dr. Neely Hines found no suspicious mass or suspicious sonographic findings, no solid or cystic masses or other sonographic abnormalities in the targeted area.[25]  Under "impression," the ultrasound report noted "[n]o evidence of malignancy."[26]  The report also indicated "clinical follow up recommended."[27]  Dr. Hines testified that Dr. Pahk, not Belkin, was responsible for initiating clinical follow up as the ordering physician.  Dr. Pahk received Ms. Gonzalez's ultrasound results and reviewed them on April 5, 2016.[28]  Dr. Pahk never followed up with Ms. Gonzalez, Belkin, or BMC regarding Ms. Gonzalez's lump.

Shortly after Ms. Gonzalez's March 18, 2016 appointment with Dr. Pahk, DotHouse underwent a change in its electronic medical records system.  As a result of that change, Ms. Gonzalez's PCP was changed in the system from Dr. Pahk to Dr. Nsa Henshaw.  The March 18, 2016 visit was the last time that Dr. Pahk saw Ms. Gonzalez at DotHouse.  Dr. Pahk did not

---

[22] Ex. 1 (USA 007965).

[23] Ex. 1 (USA 008443-8445).

[24] Ex. 2 (USA 013081-13082).

[25] Ex. 2 (USA 013081).

[26] Ex. 2 (USA 013082).

[27] Id.

[28] Ex. 34 (USA 010034).

communicate with Dr. Henshaw regarding Ms. Gonzalez at any time after treating her on March 18, 2016.

On July 18, 2016, when she was thirty years old, Ms. Gonzalez saw Dr. Henshaw for a complete physical exam and to address a persistent right breast lump.[29]  Ms. Gonzalez described the lump as bigger and distorting her nipple with no rash or nipple discharge.[30]  Dr. Henshaw reviewed Dr. Pahk's March 2016 note in the medical record prior to examining Ms. Gonzalez.[31] On breast exam by Dr. Henshaw, she noted that the "[r]ight breast exhibits no nipple discharge, no skin change and no tenderness.  Inverted nipple: ill defined 3 x 4 cm R breast mass 9 – 11 o'clock ? breast tissue.  No induration, skin peau d'orange change."[32]  The note from the visit does not note an examination of Ms. Gonzalez's axillary lymph nodes.  Trial testimony by Dr. Henshaw indicates that she interpreted her note to mean that there was no induration and no peau d'orange skin change.[33]  Regardless, Dr. Henshaw thought that Ms. Gonzalez's symptoms were alarming and suspicious of breast cancer.[34]  On July 19, 2016, she referred Gonzalez to Belkin for evaluation.[35]  The referral form indicated a "routine" priority.[36]

---

[29] Ex. 1 (USA 008151-8156).

[30] Ex. 1 (USA 008151).

[31] Trial Transcript, Dr. Henshaw, at 16:3-12

[32] Ex 1 (USA 008152).

[33] Trial Transcript, Dr. Henshaw, at 28:23-29:18.

[34] Trial Transcript, Dr. Henshaw, at 29:22-30:6.

[35] Ex. 1 (USA 008153, 008427-8429).

[36] Ex. 1 (USA 008427).

On September 9, 2016, Ms. Gonzalez saw Dr. Ambili Ramachandran at Belkin.[37]  Dr. Ramachandran is an internist.  At the time, Dr. Ramachandran had been a licensed physician for two years.  Dr. Ramachandran's report indicates that Ms. Gonzalez was referred to Belkin for right breast pain.  At the time, Dr. Ramachandran was not aware of Ms. Gonzalez's complaints to Dr. Pahk, or Dr. Pahk's and Dr. Henshaw's findings on examination, including that the lump appeared to have grown from 1 cm to 3-4 cm or that Dr. Henshaw had observed an inverted nipple.  She testified that she did not have access to Ms. Gonzalez's medical records at DotHouse.

Dr. Ramachandran took a medical history from Ms. Gonzalez and examined her breasts.[38]  Dr. Ramachandran described the breast exam as having no supraclavicular, infraclavicular, or axillary adenopathy, no discrete masses, and very dense areas of breast tissue on the right breast at 12 o'clock and 5 cm from the nipple and at 6 o'clock and 2 cm from the nipple.[39]  She documented no skin changes, no nipple changes, and no nipple discharge.[40]  No specific diagnosis was listed.  Dr. Ramachandran documented that she educated Ms. Gonzalez about breast pain, reassured her, and discussed management of breast pain, including heat/ice, NSAID with food, avoiding caffeine, wearing supportive bras, and trial of vitamin E 400 units daily for two months.[41]

Dr. Henshaw received and reviewed Dr. Ramachandran's report on September 21,

---

[37] Ex. 2 (USA 013100-13108).

[38] Ex. 2 (USA 013100-13102).

[39] Ex. 2 (USA 013102).

[40] Id.

[41] Ex. 2 (USA 013103).

2016.[42]  After reviewing the report, which mentioned only breast pain, Dr. Henshaw was aware that Dr. Ramachandran did not order a mammogram, a biopsy, or any further testing to attempt to rule out breast cancer.  Dr. Henshaw did not follow up with Dr. Ramachandran, Belkin, or Ms. Gonzalez regarding her growing lump.  She testified that she "was not concerned" after she received the report.[43]

Dr. Henshaw saw Ms. Gonzalez again on October 28, 2016.[44]  Ms. Gonzalez complained, among other things, of back pain.[45]  However, it does not appear that Dr. Henshaw evaluated her for back pain.  She also did not ask any questions regarding Ms. Gonzalez's breast lump or examine her breasts.

On November 28, 2016, Ms. Gonzalez presented to urgent care at DotHouse and saw Dr. Henshaw.[46]  She complained of sinus pain and back pain.[47]  Dr. Henshaw recommended ROM exercises, warm moist heat and ibuprofen for the back pain, and made a referral for a physical therapy evaluation.[48]

Ms. Gonzalez went to the Carney Hospital Emergency Room on December 28, 2016 for neck, mid, and lower back pain for one year that had been worsening over the prior month

---

[42] Ex. 34 (USA 010053); Trial Transcript, Dr. Henshaw, at 40:5-9.

[43] Id. at 45:3-4.

[44] Ex. 1 (USA 008174-8177).

[45] Ex. 1 (USA 008174).

[46] Ex. 1 (USA 008178-8185).

[47] Ex. 1 (USA 008178).

[48] Ex. 1 (USA 008179).

despite physical therapy.[49]  She also complained of feeling lumps in her right breast, worsening

over the prior month or two.[50]  Ms. Gonzalez was advised to continue with physical therapy and

to contact her PCP for follow up.[51]  With regards to her breast complaints, the emergency room

physician thought that the lumps were consistent with cysts but advised her to follow up with her

PCP or OB/GYN if she may need an ultrasound or mammogram.[52]

On January 20, 2017, Ms. Gonzalez saw Dr. Henshaw at Urgent Care at DotHouse.[53]

She complained of worsening back pain, not improving with therapy.[54]  Dr. Henshaw advised

her to think about alternative therapies, such as acupuncture and integrative medicine, and to try

Naproxen in the interim.[55]  She also ordered a plain film x-ray of the lumbar spine, which

showed no fractures but some mild disc narrowing and degenerative changes at L5-S1.[56]

On January 23, 2017, Ms. Gonzalez was seen by Dr. Kathryn Harris for back pain, and

noted that physical therapy was not helping.[57]  She also complained of a lump in the right breast

with nipple discomfort.[58]  Dr. Harris performed a breast exam and noted that Ms. Gonzalez had a

---

[49] Ex. 3 (USA 010335-10338).

[50] Ex. 3 (USA 010335).

[51] Ex. 3 (USA 010337).

[52] Id.

[53] Ex. 1 (USA 008192-8197).

[54] Ex. 1 (USA 008194).

[55] Ex. 1 (USA 008193).

[56] Ex. 1 (USA 008376-8379).

[57] Ex. 1 (USA 008200-8207).

[58] Ex. 1 (USA 008200).

tender right upper outer quadrant of the breast but no discrete masses, skin changes, or axillary adenopathy.[59]  Dr. Harris referred her to Belkin for "[s]elf perceived breast mass" and to sports medicine for "chronic midline low back pain without sciatica."[60]

On February 1, 2017, Ms. Gonzalez was seen in the emergency room at BMC for back pain and discharged with a diagnosis of muscular pain.[61]  On February 3, 2017, Ms. Gonzalez was seen at DotHouse by Dr. Vasileia Varvarigou for a rash in her axillary area.[62]  Dr. Varvarigou noted that Ms. Gonzalez had chronic back pain, not responding to medication.[63]  He also noted that she reported a lump on her right breast and was complaining of increased pain.[64] He performed a breast exam and noted that she had an inverted nipple and erythema of the right breast, and no tenderness.[65]  There is no mention of the presence or absence of a breast lump or mass but Dr. Varvarigou noted that Ms. Gonzalez had an area right above the nipple that felt slightly harder than the rest of the breast tissue.[66]  Dr. Varvarigou also noted that Ms. Gonzalez had already been referred to orthopedics and Belkin.[67]

On February 16, 2017, Ms. Gonzalez was seen by Sports Medicine at BMC, who advised

---

[59] Ex. 1 (USA 008205).

[60] Ex 1 (USA 008205, 8207).

[61] Ex. 2 (USA 013131-13134).

[62] Ex. 1 (USA 008216-8220).

[63] Ex. 1 (USA 008216).

[64] Id.

[65] Ex 1 (USA 008217).

[66] Id.

[67] Ex. 1 (USA 008216).

referral to integrative medicine for low back pain.[68]  On February 22, 2017, Mr. Napoleonis

called 911 because Ms. Gonzalez was in such pain that she could not walk.  She was taken to

Carney Hospital, where imaging showed bony metastatic disease involving ribs, thoracic spine,

lumbar spine, sacrum and pelvis and a compression fracture.[69]  In addition, there was a 1 cm mid

lobe pulmonary nodule, likely metastatic in origin.[70]  She was diagnosed with metastatic breast

cancer with metastases to the spine.[71]

In March 2017, Ms. Gonzalez had a mammogram and right breast biopsy at BMC, which

confirmed that she had stage four metastatic breast cancer.[72]  The mammogram showed a mass

in the right breast that was 6.4 x 5.1 x 4.5 cm.[73]  Ms. Gonzalez's tumor was diagnosed as

strongly ER+ (99%), PR+ (69%), grade 2, HER2 positive, Ki-67 intermediate (20%).[74]

Ms. Gonzalez began radiation treatment at Brigham and Women's Hospital ("BWH")

after her diagnosis was confirmed.[75]  She later began chemotherapy treatment at Dana Farber

Cancer Institute ("DFCI").[76]  Ms. Gonzalez was weak and in constant and unbearable pain.[77]

---

[68] Ex. 1 (USA 008225).

[69] Ex. 3 (USA 010309-010322).

[70] Ex. 3 (USA 010317).

[71] Id.

[72] Ex. 1 (008359-8365), Ex. 2 (USA013284-13301).

[73] Ex. 1 (USA 008361).

[74] Ex. 2 (USA 013286, 013295).

[75] Ex. 57 (¶ 15); see also generally Ex. 4.

[76] Ex. 57 (¶ 15); see also generally Ex. 5.

[77] Ex. 57 (¶ 14).

She suffered multiple bilateral rib fractures and inoperable partial spinal cord compression as a result of the widespread metastases in her bones.[78]  At BWH and DFCI, Ms. Gonzalez's doctors performed multiple pain management procedures, including surgeries to decrease swelling in her brain and to implant a pump in her abdomen.[79]  Ms. Gonzalez was also prescribed heavy dosages of pain medications, which resulted in side effects such as constipation.[80]

Ms. Gonzalez also experienced substantial and rapid changes in her weight as a result of her cancer treatment, first gaining a significant amount of weight and then quickly becoming thin and frail.[81]  She was mostly confined to a bed or chair, had trouble ambulating, and often had to use a wheelchair.[82]  While receiving radiation and chemotherapy treatment, Ms. Gonzalez spent most of her time in hospitals and rehabilitation facilities.[83]  At one point when she was home for just a few days after leaving a nursing home, she was so weak that she cracked a rib while trying to turn a faucet in her home.[84]  In addition, the medical records contain numerous references to Ms. Gonzalez suffering from anxiety, depression, and panic attacks as a result of her diagnosis.[85] She became very distressed about the idea of dying and was extremely upset at the possibility of

---

[78] Ex. 5 (USA 010756).

[79] Ex. 57 (¶ 14); Ex. 4 (Gonzalez 006807, 009586-9587); Ex. 5 (USA 010811).

[80] Id.; Ex. 61 at 22:6-10.

[81] Exs. 28, 29.

[82] See, e.g., Ex. 5 (USA 010570).

[83] Ex. 57 (¶ 14); Ex. 5 (USA 010803).

[84] Id.

[85] See, e.g., Ex. 4 (Gonzalez 001710); Ex. 5 (USA 010505, 010511, 010521).

her children ending up in foster care.[86]

In the spring of 2018, Ms. Gonzalez's doctors informed her that, if she continued treatment, the chemotherapy would kill her.[87]  She decided at that time to stop treatment and commence palliative care.[88]  She outlived her doctors' prognosis, ultimately dying over two years later on August 15, 2020.[89]

II.    CONCLUSIONS OF LAW

This action arises under the Federal Tort Claims Act ("FTCA") because DotHouse Health, Inc. is a federally funded community health center and Dr. Pahk and Dr. Henshaw are employees of DotHouse Health.  See 28 U.S.C. §§ 2671 et seq.  Pursuant to the FTCA, the United States "shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.

"The 'law of the place' provides the substantive rules to be used in deciding FTCA actions."  Bolduc v. United States, 402 F.3d 50, 56 (1st Cir. 2005) (citing 28 U.S.C. § 1346(b)(1)).  The phrase "law of the place" refers to the law of the state in which the allegedly tortious acts or omissions occurred, in this case, Massachusetts.  Id. (citations omitted).  Here, the parties agree that this Court must apply Massachusetts law.  See Docket No. 142 at 58; Docket No. 144 at 72.

A.    Liability - Medical Malpractice

Blank, as personal representative of the estate of Ms. Gonzalez, brings a wrongful death

---

[86] Ex. 5 (USA 010883).

[87] Ex. 57 (¶ 18).

[88] Id.

[89] Ex. 31.

claim.  "The wrongful death statute imposes liability on anyone who 'by his negligence causes the death of a person.'"  Matsuyama v. Birnbaum, 452 Mass. 1, 20 (2008) (quoting M.G.L. c. 229, § 2), abrogated on other grounds by Doull v. Foster, 487 Mass. 1 (2021).  Thus, to prevail in his wrongful death claim, Blank must prove that Drs. Pahk and/or Dr. Henshaw were negligent. See Correa v. Schoeck, 479 Mass. 686, 693 (2018).   In addition, the complaint also contains a claim for negligence.  In the context of medical malpractice, in order to show that the defendant was negligent, the plaintiff bears the burden of proving by a preponderance of the evidence (1) that a physician-patient relationship existed between the physician and the injured party, (2) that the physician breached his or her duty of care, and (3) that the breach was the proximate cause of the injury.  Mitchell v. United States, 141 F.3d 8, 13 (1st Cir. 1998) (citations omitted).  There is no dispute that there was a physician-patient relationship between Ms. Gonzalez and Drs. Pahk and Henshaw.  See Docket No. 142 at 7-8.

      1.    Dr. Pahk And Dr. Henshaw Breached The Applicable Standard Of Care

The plaintiff must establish the applicable standard of care and demonstrate both that the defendant breached that standard, and that this breach caused the patient's harm.  Palandjian v. Foster, 446 Mass. 100, 104 (2006) (citing Harlow v. Chin, 405 Mass. 697, 701 (1989)).  "The proper standard is whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances of the profession . . ."  Id. (quoting Brune v. Belinkoff, 354 Mass. 102, 109 (1968)).  "Because the standard of care is based on the care that the average qualified physician would provide in similar circumstances, the actions that a particular physician, no matter how skilled, would have taken are not determinative."  Id. at 104-105 (citations omitted).

This standard does not require physicians to provide the best care possible.  Id. at 105.  It

is permissible to consider the medical resources available to the physician as one circumstance in determining the skill and care required.  Primus v. Galgano, 329 F.3d 236, 241 (1st Cir. 2003) (quoting Brune, 354 Mass. at 109).  In addition, "because the standard of care is determined by the care customarily provided by other physicians, it need not be scientifically tested or proven effective: what the average qualified physician would do in a particular situation *is* the standard of care."  Palandjian, 446 Mass. at 105 (emphasis in original).

Generally, a plaintiff may carry his or her burden on the issues of negligence and causation only with the assistance of expert testimony.  Primus, 329 F.3d at 241 (citations omitted); see also Palandjian, 446 Mass. at 105-106 ("Establishing the applicable standard of care typically requires expert testimony.").  The parties offered competing testimony of two experts, Dr. John Russo and Dr. Leigh Simmons, regarding the appropriate standard of care.  Dr. Russo testified for the Plaintiffs.  He testified that the standard of care for practitioners practicing family or internal medicine in 2015 and 2016 required such physicians of patients presenting with a palpable breast lump to take a complete history, perform a physical examination, order appropriate diagnostic testing, including mammogram, MRI, and/or biopsy, refer the patient to a specialist, and follow up with the patient to ensure that the breast lump had been diagnosed or resolved.[90]  Dr. Simmons, who testified for the United States, did not disagree that the standard of care articulated by Dr. Russo was the appropriate standard of care.[91]  Rather, Drs. Russo and Simmons disagreed as to their conclusions about whether Drs. Pahk and Dr. Henshaw had breached the standard of care.  For the following reasons, I find that Dr. Russo's testimony was more persuasive and that Dr. Pahk and Dr. Henshaw in fact breached the standard of care.

---

[90] Dr. Russo referred to this follow up as "closing the loop" on a referral.

[91] See Trial Transcript, Day 7, at 15:5-20, 91:12-92:24.

First, Dr. Pahk breached the standard of care in not evaluating Ms. Gonzalez's complaints of a breast lump in 2015. As discussed above, I credit the evidence that Ms. Gonzalez complained to Dr. Pahk of a breast lump in July 2015 but Dr. Pahk did not perform a physical examination of her breasts at that time, order any diagnostic testing, or refer her to a specialist. She did not even document the complaint in the medical records.

Similarly, I find that Dr. Pahk's care and treatment of Ms. Gonzalez fell below the standard of care in March 2016. On March 18, 2016, Ms. Gonzalez again reported the lump in her right breast to Dr. Pahk.[92] She reported that the lump had been present for a year, was growing, painful, and causing "misshape" in her breast,[93] all of which are concerning symptoms requiring a physician (per the experts) to rule out breast cancer. On examination, Dr. Pahk noted that a 1cm lump was indeed present.[94] She did not, however, order any diagnostic testing at that time. Rather, she wrote that she would refer Ms. Gonzalez to Belkin for a consultation.[95] However, no referral for a consultation ever happened. Instead, a few days later, Dr. Pahk wrote a referral for an ultrasound at BMC.[96]

While an ultrasound may be used as an initial test in a woman under 30, Dr. Simmons agreed that an ultrasound cannot rule out breast cancer.[97] Moreover, where, as here, a palpable,

---

[92] Ex. 1 (USA 007963).

[93] Id.

[94] Ex. 1 (USA 007964).

[95] Ex. 1 (USA 007965).

[96] Ex 1 (USA 008443-8445).

[97] Trial Transcript, Day 7, at 102:13-15.

growing mass is not visualized on ultrasound, a mammogram and/or biopsy must be ordered.[98]
Dr. Pahk, however, did not order a mammogram or biopsy.[99]  She did not even follow up,
despite the radiologist's recommendation for clinical follow up.[100]  In addition, Dr. Pahk never
received a consultation report from Belkin, which should have alerted her to the fact that Ms.
Gonzalez was not evaluated by a specialist at Belkin, even if Dr. Pahk had intended for such an
evaluation to occur.  However, Dr. Pahk never followed up with Belkin or Ms. Gonzalez to make
sure that such an evaluation happened.  While Dr. Simmons opined that Dr. Pahk did not breach
the standard of care because she referred Ms. Gonzalez to Belkin, she acknowledged that the
standard of care requires a PCP to follow up on specialist consults.[101]  She further testified that
intending to make a referral does not meet the standard of care if the referral does not actually
occur.[102]  She also acknowledged that Dr. Pahk did not in fact "close the loop" with respect to
the referral for a clinical consultation at Belkin.[103]  Therefore, I find that Dr. Pahk breached the
standard of care in March 2016.

Dr. Henshaw also breached the standard of care in July 2016.  Dr. Henshaw admitted that
Ms. Gonzalez's presentation on July 18, 2016 (i.e., a growing, persistent lump, and inverted

---

[98] Ex. 58.

[99] Dr. Pahk testified that DotHouse was not able to perform a diagnostic mammogram or biopsy. However, the evidence shows that she could have made a referral for a mammogram or biopsy. The evidence also shows that if she had called Belkin and recommended a mammogram and/or biopsy be performed, Belkin would have honored that request.

[100] Ex. 2 (USA 013082).

[101] Trial Transcript, Day 7, at 92:10-24

[102] Trial Transcript, Day 7, at 99:5-10; 101:5-102:12.

[103] Trial Transcript, Day 7, at 101:5-102:12.

nipple) was alarming and suspicious of breast cancer.  Yet there is no evidence in the medical record that she examined Ms. Gonzalez's axillary lymph nodes.  In addition, Dr. Henshaw failed to order a mammogram and/or biopsy or to refer Ms. Gonzalez to a breast surgeon for such testing.  Rather, she again referred her to Belkin without specification.  Moreover, she referred Ms. Gonzalez to Belkin on a "routine" basis and, as a result, Ms. Gonzalez was not seen by Belkin until almost two months later.[104]  Dr. Henshaw also failed to contact Belkin to make clear the severity of the situation, to ask that Ms. Gonzalez see a breast surgeon, or to ask that a mammogram and/or biopsy be performed, all of which are requests that Belkin would have honored according to the testimony of BMC and Belkin witnesses.  As a result, Ms. Gonzalez saw an internist at Belkin, who was no more qualified than Dr. Henshaw herself to evaluate Ms. Gonzalez's concerning symptoms.[105]

Moreover, Dr. Henshaw failed to follow up after she received the report of Dr. Ramachandran.  Dr. Ramachandran's report should have been very concerning to Dr. Henshaw in multiple respects.  First, Dr. Ramachandran's report incorrectly identified the reason for the referral as breast pain, not a clinically suspicious breast lump.[106]  Second, Dr. Ramachandran apparently did not identify Ms. Gonzalez's lump on physical examination, which was the very reason Ms. Gonzalez was seeing Dr. Ramachandran in the first place.[107]  Third, Dr. Ramachandran did not recommend any diagnostic testing, which Dr. Henshaw acknowledged

---

[104] Ex. 1 (USA 008427).

[105] The government insists that Belkin committed no error in its handling of Ms. Gonzalez's complaints.

[106] Ex. 2 (USA 013103).

[107] Id.

was indicated in a patient with Ms. Gonzalez's symptoms.[108]   Accordingly, the standard of care required that Dr. Henshaw at least follow up with Belkin and/or Ms. Gonzalez to reconcile all of these discrepancies.  Dr. Henshaw failed to do so.

Although Dr. Henshaw treated Ms. Gonzalez on three occasions after her July 2016 appointment, she failed to follow up with Ms. Gonzalez regarding her breast lump at any of those appointments.  At no time during these appointments, did Dr. Henshaw ask any questions regarding Ms. Gonzalez's breast lump, examine Ms. Gonzalez's breasts, or order any diagnostic testing.  I find that her failure to follow up with Ms. Gonzalez to ensure that her breast lump had either resolved or been diagnosed is also a breach of the standard of care.  I, however, do not find that Dr. Henshaw breached the standard of care by failing to evaluate her back pain for the possibility that it indicated metastatic cancer, as back pain is a common and non-specific symptom, and Ms. Gonzalez had no other symptoms that her cancer had spread.  In addition, no expert testimony was presented in this regard.

   2.   Causation

"It is a bedrock principle of negligence law that a defendant cannot and should not be held liable for a harm unless the defendant caused the harm."  Doull v. Foster, 487 Mass. 1, 3 (2021) (citations omitted).  "Causation has traditionally involved two separate components: the defendant had to be both a factual cause (or 'cause in fact') and a legal cause of the harm."  Id. (citations omitted).

   a.   The Negligence Of Dr. Pahk And Dr. Henshaw
         Is The Factual Cause Of Ms. Gonzalez's Death

A defendant is the factual cause of the plaintiff's harm if the harm would not have

---

[108] Id.

occurred "but for" the defendant's negligent conduct.  Id. at 4, 9.  There is no requirement that a defendant be the sole factual cause of a harm.  Id. at 6.  There may be more than one "but for" cause of a harm.  Id.  "In fact, there is no limit on how many factual causes there can be of a harm."  Id.  "The focus instead remains only on whether, in the absence of a defendant's conduct, the harm would have still occurred."  Id.

The parties offered conflicting testimony regarding the issue of factual causation. Plaintiffs offered the testimony of Dr. Paul Tartter, a breast surgeon.  Dr. Tartter opined that the delay in diagnosis of Ms. Gonzalez's breast cancer caused her death.  According to Dr. Tartter, it is more likely than not that appropriate diagnostic testing, such as a mammogram and/or biopsy, done in 2015 or 2016, would have yielded the correct diagnosis of breast cancer.  He also opined that, had Ms. Gonzalez's breast cancer been diagnosed in 2015 or 2016, it is more likely than not that appropriate treatment would have been initiated, which would have prevented her death.

The United States offered the testimony of Dr. Stephanie Bernstein, a doctor board certified in internal medicine, medical oncology, and medical hematology.[109]  She opined that it is more likely than not that Ms. Gonzalez harbored metastatic breast cancer by 2015.[110]  She further opined that it is very unlikely that a diagnosis in 2015 or 2016 would have prevented the development of metastatic cancer and her ultimate death.[111]  The United States also offered the testimony of Dr. James L. Connolly, a senior pathologist at Beth Israel Deaconess Medical Center.  Dr. Connolly testified that it was his opinion that the metastases in Ms. Gonzalez's spine were present greater than four years before diagnosis and, therefore, the delay in diagnosis did

---

[109] Ex. 55.

[110] Partial Transcript, Day 5, at 61:4-6.

[111] Partial Transcript, Day 5, at 61:18-62:11.

not affect her ultimate prognosis.

I find that the Plaintiffs' evidence was more persuasive on the issue of causation and that the Plaintiffs have proved by a preponderance of the evidence that Dr. Pahk's and Dr. Henshaw's breach of the standard of care was a factual cause of Ms. Gonzalez's death. First, Dr. Tartter was more persuasive because he was best qualified to opine on this issue.[112] Dr. Tartter spent his entire 40-plus year career treating breast cancer. He operated on over 3,000 breast cancer patients over the course of his career and treated many others who did not undergo surgery. He also kept a database of the breast cancer patients he treated over 40 years. Dr. Bernstein, on the other hand, did not specialize in the treatment of breast cancer, and had significantly less patient interaction because she worked as a part-time physician for significant periods of her career, and did not treat patients for others.[113]

More significantly, however, Dr. Bernstein's opinion that Ms. Gonzalez's breast cancer probably metastasized to her lymph nodes and spine before a lump had even been detected appears to be based on a theory of "microscopic" metastases[114] with no scientific basis in the medical literature.[115] In addition, Dr. Bernstein acknowledged that Ms. Gonzalez's tumor had positive prognosticators that would have made it more susceptible to hormonal treatment.[116] She

---

[112] Ex. 47.

[113] Partial Transcript, Day 5, at 63:2-66:23.

[114] Specifically, Dr. Bernstein opined that Ms. Gonzalez "had a breast cancer that had not been detected, metastasize to the lymph nodes that had not been detected, and, in fact, metastasize to the spine that had not been detected before she first found a lump." Partial Transcript, Day 5, at 87:14-19.

[115] See Partial Transcript, Day 5, at 87:1-18; 105:10-109:13.

[116] Partial Transcript, Day 5, at 94:14-95:25.

also acknowledged that earlier diagnosis in this case would have likely resulted in a different clinical course, including fewer complications, fractures, and compressions.[117]

Similarly, Dr. Connolly never explained the basis for his opinion that Ms. Gonzalez's metastases had been present for more than four years prior to her diagnosis. He did not testify about what calculations, if any, he performed in reaching his opinion. There is no evidence in the record that Ms. Gonzalez had symptoms of metastatic bone disease prior to late October 2016, when she started experiencing back pain that became increasingly worse over time. Indeed, an x-ray in January 2017 did not show the fractures that were found in February 2017 when Ms. Gonzalez was finally diagnosed with cancer.[118]

Therefore, I credit Dr. Tartter's testimony that it is more likely than not that, had Ms. Gonzalez been properly diagnosed in July 2015 or March 2016, she would not have been diagnosed with Stage IV metastatic breast cancer. It is more likely than not that, at that point, appropriate diagnostic testing, such as a mammogram and/or biopsy, would have yielded the correct diagnosis of breast cancer. It is also more likely than not that, given the size of the lump at that time, she would have been diagnosed with Stage I breast cancer, which is highly treatable. With appropriate treatment, Ms. Gonzalez would have had more than a 90% chance of long-term survival if diagnosed at that time.

I also credit Dr. Tartter's testimony that it is more likely than not that, had Ms. Gonzalez been properly diagnosed in July 2016, she would not have been diagnosed with Stage IV metastatic breast cancer. It is more likely than not that, at that time, appropriate diagnostic testing, such as a mammogram and/or biopsy would have yielded the correct diagnosis of breast

---

[117] Partial Transcript, Day 5, at 77:8-79:2; 93:7-18.

[118] Ex. 1 (USA 008376-8379).

cancer.  At that time, Dr. Henshaw identified a palpable breast lump that was approximately 3 to 4 cm.[119]  Per Dr. Tartter, a breast mass that is found to be between 2 and 5 cm in diameter on clinical exam would more likely than not correspond with Stage II breast cancer.  The long-term survival rate for women with Stage II breast cancer is approximately 80%.  Therefore, had Dr. Henshaw properly diagnosed Ms. Gonzalez in July 2016, it is more likely than not that appropriate treatment would have been initiated and Ms. Gonzalez would have had an 80% chance of survival.  By the time Ms. Gonzalez was officially diagnosed with Stage IV metastatic breast cancer in March 2017, per Dr. Tartter, her chances of survival were essentially zero.  Accordingly, I find that Drs. Pahk and Henshaw's negligence more likely than not caused Ms. Gonzalez's death.

> b. The Negligence Of Dr. Pahk And Dr. Henshaw
>    Is The Proximate Cause Of Ms. Gonzalez's Death

In addition to being the factual cause of an injury, the plaintiff must also show that the negligent conduct was a legal or proximate cause of the injury.  Kent v. Commonwealth, 437 Mass. 312, 320 (2002) (citing Wallace v. Ludwig, 292 Mass. 251, 254 (1935)).  "This means that the harm must have been 'within the scope of the foreseeable risk arising from the negligent conduct.'"  Doull, 487 Mass. at 4 (quoting Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 45 (2009)).  This aspect of causation is "based on considerations of policy and pragmatic judgment."  Id. (quoting Kent, 437 Mass. at 320-321).  "If a series of events occur between the negligent conduct and the ultimate harm, the court must determine whether those intervening events have broken the chain of factual causation or, if not, have otherwise extinguished the element of proximate cause and become a superseding cause of the harm."  Kent, 437 Mass. at

---

[119] Ex. 1 (USA 008152).

321.

The United States argues that Belkin's involvement with the care of Ms. Gonzalez's breast complaints broke the causal chain between Dr. Pahk and Dr. Henshaw's negligence and Ms. Gonzalez's death.  See Docket No. 142 at 68.  According to the United States, Belkin's failure to diagnose Ms. Gonzalez was not reasonably foreseeable because Belkin was a comprehensive breast health center with the means and expertise to adequately evaluate Ms. Gonzalez and order appropriate testing for her.  Id.  However, no evidence was presented at trial that the conduct of Belkin, Dr. Ramachandran, or any other medical professional at Belkin was a cause of Ms. Gonzalez's injuries or death.  Indeed, before trial, the United States consistently took the position that no medical professional, including Dr. Ramachandran or any other provider at Belkin, "in any way caused or contributed to the Plaintiff's injuries."[120]  See Docket No. 145-1 at 3.  The government persisted with this theory to the end.

In addition, the conduct of Belkin and its physicians was reasonably foreseeable and therefore not an intervening superseding cause.  "When a negligent act, such as one yielding a failure to diagnose cancer, is followed by a reasonably foreseeable intervening event . . ., 'the causal chain of events remains intact and the original negligence remains a proximate cause of a plaintiff's injury.'"  Goudreault v. Nine, 87 Mass. App. Ct. 304, 311 (2015) (quoting Delaney v. Reynolds, 63 Mass. App. Ct. 239, 242 (2005)).  "It is only when 'the intervening event [is] of a type so extraordinary that it could not reasonably been foreseen, that [the] new event is deemed to be the proximate cause of the injury and relieves a defendant of liability.'"  Id. at 311 n.13.

---

[120] Indeed, the theory that Belkin's conduct was an intervening superseding cause appears to be contradictory to the government's argument that diagnosis in 2015 or 2016 would not have made a difference because her cancer had already metastasized more than four years prior to her diagnosis.  See Docket No. 143 at 6-7.

First, it was reasonably foreseeable that Ms. Gonzalez would not be seen at Belkin for a consultation without a proper referral.  While Dr. Pahk claims to have referred Ms. Gonzalez for a clinical evaluation at Belkin, no such referral exists in the records.  Moreover, Dr. Pahk should have been aware that Ms. Gonzalez was never evaluated by a physician at Belkin and that appropriate diagnostic testing was never ordered when she failed to receive a consultation report.  However, she did not follow up with either Belkin or Ms. Gonzalez or order the correct diagnostic testing.

Second, the conduct of Dr. Hines, the BMC radiologist who interpreted Ms. Gonzalez's 2016 ultrasound, was reasonably foreseeable.  It is undisputed that Dr. Pahk referred Ms. Gonzalez for an ultrasound at BMC, which she underwent on March 30, 2016.  Dr. Hines testified that she interpreted Ms. Gonzalez's ultrasound, completed a report in which she recommended clinical follow-up and sent the report back to Dr. Pahk, who was the referring physician.  Dr. Pahk testified that she received and reviewed the report and took no further action to follow up on Ms. Gonzalez's care.  Nothing about Dr. Hines' conduct was unforeseeable.  As was her practice as a radiologist, Dr. Hines interpreted Ms. Gonzalez's ultrasound and recommended follow-up by the referring physician.  Dr. Pahk failed to ever follow up.

Finally, Dr. Ramachandran's conduct was also foreseeable.  Despite being alarmed by Ms. Gonzalez's symptoms, Dr. Henshaw ordered a routine referral instead of an urgent one.  Dr. Ramachandran also testified that she had no access to Ms. Gonzalez's medical records at DotHouse and was not aware that she had presented to Dr. Henshaw with a growing, painful, breast lump.  As discussed above, Dr. Ramachandran's report should have alerted Dr. Henshaw that Ms. Gonzalez was evaluated for the wrong complaint and that no appropriate diagnostic testing was ordered.  She also failed to follow up with Belkin or Ms. Gonzalez and failed to order

the appropriate testing, i.e., a mammogram and/or biopsy.[121]

Accordingly, I find that the Plaintiffs have shown by a preponderance of the evidence that Dr. Pahk's and Dr. Henshaw's negligence was also the proximate cause of Ms. Gonzalez's death.

B.    Damages

1.    Loss Of Consortium During The Life Of Ms. Gonzalez[122]

"When a spouse suffers personal injury as a result of the negligence of a third party, the other spouse may recover damages from the third party for loss of consortium." Charron v. Amaral, 451 Mass. 767, 769 (2008) (quoting Olsen v. Bell Tel. Lab., Inc., 388 Mass. 171, 176 (1983)).  A spouse may only pursue a claim for loss of consortium where the couple was married when the personal injury cause of action accrued.  See id. at 770.  The plaintiff must show that

---

[121] This Court also notes that the United States' arguments with respect to the conduct of Belkin's medical professionals appears to be a restatement of their argument that once Dr. Pahk and Dr. Henshaw referred Ms. Gonzalez to Belkin they discharged their duties as primary care providers.  For the reasons stated above, the referrals were insufficient to meet the proper standard of care.

[122] The United States has argued that Mr. Napoleonis and Ms. Gonzalez's children may not recover for loss of consortium separate and apart from the estate's wrongful death claim.  See Docket No. 123 at 7-9.  The Massachusetts wrongful death statute, M.G.L. c. 229, § 2, provides the exclusive remedy for the recovery of damages for loss of consortium or loss of companionship and society resulting from death, and such action must be brought by the decedent's executor or administrator presenting "all claims by the designated beneficiaries for damages flowing from the wrongful death." Stockdale v. Bird & Son, Inc., 399 Mass. 249, 253 (1987) (citing Hallett v. Town of Wrentham, 398 Mass. 550, 555-556 (1986)).  However, a spouse and children may have a separate claim for loss of consortium during the decedent's life.  See Deasy v. Somerville Hosp., No. 931292, 1995 WL 1146115, at *3 (Mass. Super. Dec. 4, 1995) ("[L]ost consortium occurring before death cannot be considered as part of 'damages resulting from wrongful death' (as opposed to wrongful injury), and so cannot be duplicative of them."); see also Minkley v. MacFarland, 371 Mass. 891, 891 (1976) (Noting that a wife may have a claim for loss of consortium "during the life of her husband," and that "it may not be fatal to such claim that the husband lives only a few hours after a tortious injury.").  Accordingly, I find that Mr. Napoleonis and Ms. Gonzalez's children are entitled to recover loss of consortium damages during the life of Ms. Gonzalez.

his or her spouse's injury resulted in the loss of his or her society, companionship, or sexual availability.  See Zhang v. Massachusetts Inst. of Tech., 46 Mass. App. Ct. 597, 607 (1999).

Similarly, children may recover damages for loss of parental consortium.  "[I]n order to recover for loss of parental consortium, [a child] must establish *a reasonable expectancy* of a dependent relationship with the injured parent."  Gottlin v. Graves, 40 Mass. App. Ct. 155, 161 (1996) (quoting Angelini v. OMD Corp., 410 Mass. 653, 662 (1991)) (emphasis in original). The dependent relationship has to do with the child's "dependence on the injured parent for management of the child's needs and for emotional guidance and support rather than economic dependence on the injured parent."  Id. (citations omitted).  There is no requirement that a child live with the injured parent in order to recover for loss of consortium.  Id.

Loss of consortium damages are "notoriously difficult to quantify."  Litif v. United States, 682 F. Supp. 2d 60, 82 (D. Mass. 2010) (quoting Havinga v. Crowley Towing & Transp. Co., 24 F.3d 1480, 1484 (1st Cir. 1994)).  "[T]here is no scientific formula or measuring device that can be applied to place an exact dollar value on noneconomic damages. . ."  Id. (quoting Muñiz v. Rovira, 373 F.3d 1, 8 (1st Cir. 2004)).  The court must use "a process of rational appraisal" based "upon the evidence adduced at trial."  Id. (citing Ruiz v. Gonzalez Caraballo, 929 F.2d 31, 35 (1st Cir. 1991)).

The evidence established that Ms. Gonzalez and Mr. Napoleonis had a rocky and complicated relationship marked by periods of separation.  Nevertheless, based on the evidence of record, they also loved and supported each other.  Based on that evidence, it also appears that Ms. Gonzalez's illness contributed to some of the problems in their relationship.  As Mr. Napoleonis testified, he stayed with Ms. Gonzalez until the end of her life, taking care of her under very difficult circumstances during most of her illness.  Accordingly, I award him $50,000.

29

Ms. Gonzalez was a very loving, involved mother.  She took care of her children, cooking, cleaning, helping them with school, and playing with them.  For example, Ms. Gonzalez would often take the girls on outings to the park and for ice cream.  By all accounts, the girls were close with their mother and happy.

J.B. was nine when Ms. Gonzalez was diagnosed with breast cancer.  Despite her young age, she started helping her mother around the house and with her sister.  With Mr. Napoleonis, she helped her mother go up and down three flights of stairs.  J.B. and A.N. visited their mother in the hospital between 2017 and 2019.  They watched as their mother's physical appearance changed drastically as a result of her illness and treatment.  Ms. Gonzalez was no longer able to take care of her children or spend time with them outside as they had done prior to her diagnosis.

As a result of Ms. Gonzalez's inability to take care of her children, and marital turmoil resulting in a restraining order against Mr. Napoleonis, J.B. and A.N. were sent to live with a friend of Ms. Gonzalez's.  Subsequently, J.B. was placed in the custody of DCF while A.N. was sent to live with her paternal grandmother.  J.B. and A.N.'s loss of their mother's companionship, love, and care after her diagnosis was significant and traumatic.  Accordingly, I award $200,000 to J.B. and $100,000 to A.N. for loss of consortium during Ms. Gonzalez's life.

2.    Damages – Estate Of Marielis Gonzalez

Generally, a successful medical malpractice plaintiff may recover damages for medical expenses, lost wages or loss of earning capacity, pain and suffering, loss of companionship, embarrassment, and other general damages.  See M.G.L. c. 231, § 60F.  In addition,

> [a] person who [] by his negligence causes the death of a person . . . shall be liable in damages in the amount of (1) the fair monetary value of the decedent to the persons entitled to receive the damages recovered, as provided in section one, including but not limited to compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice

30

of the decedent to the persons entitled to the damages recovered; (2) the
reasonable funeral and burial expenses of the decedent…

M.G.L. c. 229, § 2.

    a.    <u>Medical Expenses</u>

Ms. Gonzalez's estate is entitled to recover medical and hospital expenses paid as a result of the negligence of Dr. Pahk and Dr. Henshaw.  See <u>O'Leary v. U.S. Lines Co.</u>, 111 F. Supp. 745, 746 (D. Mass. 1953) (holding that claim for medical and hospital expenses survives the death of the injured person, and these items are recoverable in a wrongful death action.).  Here, the parties have stipulated that the amount of Ms. Gonzalez's medical expenses is $436,895.07.

    b.    <u>Loss Of Earning Capacity And Reasonably Expected Net Income</u>

A plaintiff in a negligence action is entitled to recover damages for the impairment or diminution of her capacity to work and earn money, both in the past and in the future, which the defendant's negligence caused.  See <u>Doherty v. Ruiz</u>, 302 Mass. 145, 146 (1939); <u>Casillo v. Worcester Area Transp. Co., Inc.</u>, 2001 Mass. App. Div. 113, at *3 (Jun. 5, 2001) (citing <u>Griffin v. General Motors Corp.</u>, 380 Mass. 362, 366 (1980)).  It is not necessary for the plaintiff to show that she was gainfully employed at the time of the injury because she is entitled to damages for the deprivation of her capacity to work and earn.  See <u>Matloff v. City of Chelsea</u>, 308 Mass. 134, 136 (1941) (citations omitted).  Homemakers are entitled to have considered, in assessment of their damages, their inability, due to an injury, to perform household duties.  <u>Casillo</u>, 2001 Mass. App. Div. 113 at *3 (citing <u>Rodgers v. Boynton</u>, 315 Mass. 279, 280-281 (1943)).

In addition, under the Massachusetts wrongful death statute, the survivors are entitled to recover the loss of the reasonably expected net income and services of the decedent.  M.G.L. c. 229, § 2.

Here, the Plaintiffs presented the expert testimony of Dr. Neville S. Lee, an economist,

who opined that Ms. Gonzalez suffered a loss of earning capacity of $93,954 and a loss of

reasonably expected net income of $231,438.  In addition, he testified that the replacement cost

of her household services was $831,199 through her normal life expectancy in present value

terms for a total loss of $1,156,591.  I credit Dr. Lee's testimony and award the estate a total of

$1,156,591 for loss of earning capacity, loss of reasonably expected net income, and loss of

services.[123]

       c.    <u>Conscious Pain And Suffering</u>

In a wrongful death action, "damages may be recovered for conscious suffering resulting

from the same injury . . ."  M.G.L. c. 229, § 6.  "Converting feelings such as pain, suffering, and

mental anguish into dollars is not an exact science."  <u>Litif</u>, 682 F. Supp. 2d at 85 (citing <u>Correa v.

Hosp. San Francisco</u>, 69 F.3d 1184, 1198 (1st Cir. 1995)).  "The fact-finder 'is free . . . to

harmonize the verdict at the highest or lowest points for which there is a sound evidentiary

predicate,' provided that the result does not 'strike such a dissonant chord that justice would be

denied were the judgment permitted to stand.'"  <u>Id.</u> (quoting <u>Milone v. Moceri Family, Inc.</u>, 847

F.2d 35, 37 (1st Cir. 1988)).

I find that Ms. Gonzalez experienced considerable pain and suffering, including the pain

associated with bone metastases that caused multiple fractures and an inoperable spinal cord

compression.  The medical records show that such pain was not well managed despite heavy

dosages of pain medication, resulting in the need for a brain operation to relieve pressure in her

brain and to implant a pump in her abdomen.  She was unable to ambulate and was largely

confined to a bed or a chair, which resulted in large bed sores.  She also suffered the mental

---

[123] Though the United States argues that Dr. Lee's testimony is not credible, they presented
nothing to contradict it.  I also find that there is no evidence to support the government's
argument that Ms. Gonzalez was permanently disabled due to migraines.

anguish and distress of being a young mother facing a deadly disease and the fear of leaving her young daughters without a mother and possibly in foster care.  Indeed, her fears became true with respect to J.B. while Ms. Gonzalez was still alive.  Accordingly, I award the estate $500,000 for Ms. Gonzalez's pain and suffering.

                d.      Loss Of Protection, Care, Assistance, Society,
                       Companionship, Comfort, Guidance, Counsel, And Advice

        Though they had a complicated and rocky relationship, I credit Mr. Napoleonis's testimony that he is heartbroken by the loss of his wife.  While he copes with his own grief, he is also navigating his eight-year-old daughter's grief as she processes a life without her mother.

        The loss suffered by J.B. and A.N. is immeasurable.  They were both deprived of their mother's love and support at an early age.  At the time of Ms. Gonzalez's death, J.B. was thirteen.  For most of her life, J.B. relied solely on her mother for support and companionship.  She has no relationship with her biological father.  She is now in foster care, having not only lost her mother, but also having been separated from her sister.  She was unable to say goodbye to her mother and only learned of her death on the phone.

        A.N. was eight years old when her mother died.  She was also close to her mother.  She has had a difficult time understanding why her mother is no longer with her and often becomes very upset.  She has also been separated from her sister.  Mr. Napoleonis struggles to care for her on his own but is doing the best he can.  He is unable to provide the support only a mother can.  Based on the foregoing, I award the following amounts for loss of protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice ("loss of companionship"): $250,000 for Mr. Napoleonis' loss of companionship, $1,000,000 for J.B.'s loss of companionship, and $750,000 for A.N.'s loss of companionship.

3.      Joint And Several Liability

Under Massachusetts law, a plaintiff injured by more than one tortfeasor may sue any or all of them for her full damages.  Shantigar Found. v. Bear Mountain Builders, 441 Mass. 131, 141 (2004) (citations omitted).  Tortfeasors who pay more than their "pro rata" share of damages may seek partial reimbursement, or contribution, from other joint tortfeasors.  Id. (citations omitted).  Tortfeasors who settle with the plaintiff prior to the entry of judgment, however, are insulated from claims for contribution from the remaining defendants (who are then entitled to a setoff in the judgment equal to the settlement amount).  Id.

Here, Ms. Gonzalez settled her claims with BMC.  Accordingly, the United States is entitled to a setoff in the judgment equal to the amount paid by BMC in settlement of Ms. Gonzalez's claims.

III.      CONCLUSION

For all of the foregoing reasons, the United States is liable to the Plaintiffs in the following amounts:

1.  Loss of consortium to Andy Napoleonis during the life of Marielis Gonzalez: $50,000;

2.  Loss of consortium to J.B. during the life of Marielis Gonzalez: $200,000;

3.  Loss of consortium to A.N. during the life of Marielis Gonzalez: $100,000;

4.  Conscious pain and suffering of Marielis Gonzalez: $500,000;

5.  Medical expenses of Marielis Gonzalez: $436,895.07;

6.  Loss of earning capacity and reasonably expected income: $1,156,591;

7.  Loss of protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice:

    a.  Andy Napoleonis: $250,000

     b.   J.B.: $1,000,000

     c.   A.N.: $750,000

Within one week, the parties shall file, jointly if possible, or separately if necessary, a proposed form of judgment.

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge